<u>**NON-CONFIDENTIAL VERSION**</u>

**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE: THE HONORABLE STEPHEN ALEXANDER VADEN, JUDGE**

| | |
|---|---|
| CVB, INC.,<br><br>     Plaintiff<br><br> v.<br><br>UNITED STATES,<br><br>     Defendant,<br><br> and<br><br>BROOKLYN BEDDING, LLC, *et. al.*,<br><br>     Defendant-Intervenors. | No. 21-cv-00288<br><br>**NON-CONFIDENTIAL VERSION**<br><br>Proprietary Information Removed from Pages: 13-16, 18-27, 29-35, 40-43 |

**BRIEF OF PLAINTIFF CVB, INC. IN SUPPORT OF ITS RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD**

Geoffrey M. Goodale
Andrew R. Sperl
Nathan J. Heeter
DUANE MORRIS LLP
505 9th Street, N.W. – Suite 1000
Washington, DC 20004
(202) 776-5211
gmgoodale@duanemorris.com

Stephen G. Larson
Robert C. O'Brien
Paul A. Rigali
LARSON LLP
555 South Flower Street, Suite 4400
Los Angeles, CA 90071
(213) 436-4864
slarson@larsonllp.com

*Counsel to Plaintiff CVB, Inc.*

March 28, 2022

# TABLE OF CONTENTS

Page

RULE 56.2 STATEMENT ................................................................................................1

I.  Administrative Determination to Be Reviewed .................................................1

II. Issues Presented and Summary of Argument ...................................................2

    A.  Were the Commission's determinations that the U.S. market is not sharply segmented and that the competition between the MiB and FPM segments is not highly attenuated unsupported by substantial evidence and contrary to law? .................................................................................................. 2

    B.  Was the Commission's determination that the volume of subject imports had a significant volume effect on the domestic industry during the POI unsupported by substantial evidence and contrary to law? ................................... 2

    C.  Was the Commission's determination that subject imports depressed or suppressed the prices of domestic like product unsupported by substantial evidence and contrary to law? .................................................................. 3

    D.  Was the Commission's determination that subject imports had a significant impact on the domestic industry unsupported by substantial evidence and contrary to law? ................................................................ 3

STATEMENT OF FACTS ................................................................................................4

STANDARD OF REVIEW ...............................................................................................6

SUBSTANTIVE LEGAL STANDARDS .........................................................................7

ARGUMENT ....................................................................................................................8

I.  The Commission's Findings Regarding Attenuated Competition and Market Segmentation Were Not Supported by Substantial Evidence and Were Not In Accordance with Law. ......................................................................................8

    A.  Record Evidence Showed that FPMs and MiBs Comprise Distinct Market Segments. ................................................................................ 9

    B.  Competition Between Subject Imports and the Domestic Product as a Whole Is Highly Attenuated. ...................................................... 13

II. The Commission's Determination of Significant Volume Effects From the Subject Imports Was Not Supported by Substantial Evidence and Was Not In Accordance with Law. .....................................................................................17

A.  Record Evidence Showed that the U.S. Mattress Market is Segmented, And the Commission Failed to Properly Consider This Segmentation in Conducting Its Volume Analysis. ........................................................................ 17

B.  Record Evidence Showed There Are No Significant Volume Effects With Respect to the Segment of the Market (MiBs) with which the Subject Imports Actually Compete. ................................................................................. 18

1.  U.S. Consumption Increased Due to Increased Demand for MiBs .......... 18

2.  U.S. Producers Have Gained Share in the MiB Segment, Despite Declines in the FPM segment. ................................................................................. 22

3.  Volume and Increases in Subject Product Import Volume Are Not Significant. ............................................................................................... 26

III.  The Commission's Findings That Subject Imports Had an Adverse Price Effect on the Domestic Like Product Were Not Supported by Substantial Evidence. ...................... 29

A.  Record Evidence Showed No Price Depression. .................................................. 29

B.  Record Evidence Showed The Commission Vastly Overstated the Importance of Price in Purchasing Decisions in its Determination that Underselling Was Significant During the Period of Investigation. ...................... 33

IV.  The Commission's Finding That Subject Imports Had a Significant Impact on the Domestic Industry was Unsupported by Substantial Evidence and Otherwise Contrary to Law. .................................................................................................... 37

A.  Record Evidence Showed Discrete MiB and FPM Market Segments Existed ................................................................................................................. 38

B.  Record Evidence Showed Performance of the Domestic MiB Segment Improved Throughout the POI, the Domestic Industry Replaced its FPM Capacity and Production with MiB Production on Almost a One-To-One Basis over the POI, and Domestic Industry Increased its MiB Capacity Further in the Interim Period .................................................................................. 39

C.  Record Evidence Showed Alternative Factors Affected the Domestic Industry's Financial Performance, such as the Decreasing Demand for FPMs and the Increasing Competition in the U.S. in the MiB Segment During the POI ...................................................................................................... 45

CONCLUSION ................................................................................................................ 47

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Altx, Inc. v. U.S.*
370 F.3d 1108 (Fed. Cir. 2004) ................................................................6, 8, 11

*Altx, Inc. v. United States*
25 CIT 1100, 167 F. Supp. 2d 1353 (2001) ............................................8

*Anshan Iron & Steel Co., Ltd. v. United States*
358 F. Supp. 2d 1236 (Ct. Int'l Trade 2004) ............................................7

*Blast Furnace Coke from China and Japan*, Inv. Nos. 731-TA-951-952, USITC
Pub. 3619 at 3, 2003 WL 22415864 (Prelim.) (Remand) (Aug. 2003) ........................... 14-15

*Bottom Mount Combination Refrigerator-Freezers from Korea and Mexico*, 77
Fed. Reg. 28,623 (USITC May 15, 2012) (final determination) ....................................... 32-35

*Certain Iron Mechanical Transfer Drive Components From Canada and China*,
81 Fed. Reg. 91,198 (USITC Dec. 16, 2016) ............................................ 29-30, 32

*Consol. Edison Co. v. NLRB*
305 U.S. 197 (1938) ................................................................6

*Hangzhou Spring Washer Co., Ltd v. United States*
387 F. Supp. 2d 1236 (Ct. Int'l Trade 2005) ............................................6

*Luoyang Bearing Factory v. United States*
288 F. Supp. 2d 1369 (Ct. Int'l Trade 2003) ............................................6

*Makita Corp. v. United States*
974 F. Supp. 770 (Ct. Int'l Trade 1997) ............................................38

*Mattresses From Cambodia, Indonesia, Malaysia, Serbia, Thailand, the Republic
of Turkey, and the Socialist Republic of Vietnam: Antidumping Duty Orders
and Amended Final Affirmative Antidumping Determination for Cambodia*, 86
Fed. Reg. 26,460 (Dep't Commerce May 14, 2021) ............................................5

*Micron Tech., Inc. v. United States*
117 F.3d 1386 (Fed. Cir. 1997) ................................................................6

*Mittal Steel Point Lisas Ltd. v. United States*
542 F.3d 867 (Fed. Cir. 2008) ............................................ 7-8

*Nevinnomysskiy Azot v. United States*
   31 CIT 1373, 29 ITRD 2352 (2007) ....................................................................44

*Nucor Corp. v. United States*
   28 CIT 188, 318 F. Supp. 2d 1207 (2004) ...................................................... 44-45

*Outboard Engines from Japan*
   Inv. No. 731-TA-1069, USITC Pub. No. 3752, 2005 WL 630159 (Feb. 2005).....27-28, 46-47

*Pohang Iron & Steel Co., Ltd. v. United States*
   23 C.I.T. 778 (1999) ..........................................................................................8

*Rhone-Poulenc, Inc. v. United States*
   927 F. Supp. 451 (Ct. Int'l Trade 1996) ..............................................................7

*Suramerica de Aleaciones Laminadas, C.A. v. United States,*
   818 F. Supp. 348 (Ct. Int'l Trade 1993) ..............................................................6

*Taiwan Semiconductor Indus. Ass'n v. USITC*
   2 F.3d 1339 (Fed. Cir. 2001).............................................................................8

*Timken Co. v. United States*
   699 F. Supp. 300 (Ct. Int'l Trade 1988) ..............................................................6

*Tropicana Products, Inc. v. U.S.*
   31 CIT 548, 484 F. Supp. 2d 1330 (2007)..........................................................37

*Uncoated Groundwood Paper from Canada*
   Inv. No. 701-TA-584, USITC Pub. No. 4822 (Sept. 2018)...................................47

*U.S. Steel Group v. United States*
   25 CIT 1046, 162 F. Supp. 2d 676 (2001) ...........................................................8

*Xanthan Gum From Austria and China,*
   78 Fed. Reg. 13,379 (USITC Feb. 27, 2013) ......................................................32

**STATUTES**

19 U.S.C. § 1516a ...............................................................................................6

19 U.S.C. § 1671d...............................................................................................7

19 U.S.C. § 1673d...............................................................................................7

19 U.S.C. § 1677.................................................................. 7-8, 17, 19-21, 23-25, 37, 39-41

<u>**NON-CONFIDENTIAL VERSION**</u>

**OTHER AUTHORITIES**

H.R. Rep. 96-317 (1979)..............................................................................................................7-8

Rule 56.2 ..........................................................................................................................................1

S. Rep. 96-249 (1979).................................................................................................................7-8

Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc.
    No. 103-316, Vol. 1, at 851-52 (1994), reprinted in 1994 U.S.C.C.A.N. 4040,
    4184-85 ...............................................................................................................................7

**NON-CONFIDENTIAL VERSION**

**UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: THE HONORABLE STEPHEN ALEXANDER VADEN, JUDGE**

| | |
|---|---|
| CVB, INC., <br><br> Plaintiff <br><br> v. <br><br> UNITED STATES, <br><br> Defendant, <br><br> and <br><br> BROOKLYN BEDDING, LLC, *et. al.*, <br><br> Defendant-Intervenors. | No. 21-cv-00288 <br><br> **NON-CONFIDENTIAL VERSION** <br><br> Proprietary Information Removed from Pages: 13-16, 18-27, 29-35, 40-43 |

**BRIEF OF PLAINTIFF CVB, INC. IN SUPPORT OF ITS RULE 56.2 MOTION
FOR JUDGMENT ON THE AGENCY RECORD**

Plaintiff, CVB, Inc., ("Plaintiff" or "CVB"), submits this brief in support of its motion for judgment on the agency record.

**RULE 56.2 STATEMENT**

I.   **Administrative Determination to Be Reviewed**

This action seeks judicial review of the final affirmative injury determinations rendered by the U.S. International Trade Commission ("ITC" or the "Commission") in its antidumping and countervailing duty investigations concerning mattresses from Cambodia, China, Indonesia, Malaysia, Serbia, Thailand, Turkey, and Vietnam. *See Mattresses from Cambodia, China, Indonesia, Malaysia, Serbia, Thailand, Turkey, and Vietnam*, 86 Fed. Reg. 26,545 (ITC May 14,

2021). Appx14715.[1] The public version of the Commission's determinations and views were published as *Mattresses from Cambodia, China, Indonesia, Malaysia, Serbia, Thailand, Turkey, and Vietnam*, Inv. Nos. 701-TA-645 and 731-TA-1495-1501 (Final), USITC Pub. No. 5191 (May 2021). Appx14727-15237. Plaintiff urges the Court to find that the determinations were unsupported by substantial evidence and otherwise not in accordance with law.

## II.    Issues Presented and Summary of Argument

### A.    *Were the Commission's determinations that the U.S. market is not sharply segmented and that the competition between the MiB and FPM segments is not highly attenuated unsupported by substantial evidence and contrary to law?*

Yes. The Commission erred as a matter of law in failing to consider alternative methods of analyzing subject imports, in particular, by distinguishing between the MiB and FPM market segments. The Commission improperly ignored record evidence that clearly demonstrated that MiBs and FPMs are segmented in relevant aspects of the mattress industry, including that MiBs and FPMs are designed and engineered differently and that FPM producers cannot quickly and easily shift to MiB production. Consequently, producers significantly focus on either one type of product or the other. The Commission also erred in failing to consider the significant record evidence showing that individual consumers prefer one format to the other, which makes it clear that the difference between MiBs and FPMs goes beyond packaging.

### B.    *Was the Commission's determination that the volume of subject imports had a significant volume effect on the domestic industry during the POI unsupported by substantial evidence and contrary to law?*

Yes. The Commission improperly ignored record evidence demonstrating significant non-price reasons for any increases in subject imports. In particular, subject imports consist almost

---

[1] Per *Joint Appendix Preparation in § 1581(c) Cases Assigned to Judge Vaden*, all record citations are to bates-numbered appendix pages.

**NON-CONFIDENTIAL VERSION**

entirely of MiBs, which are gaining market share at the expense of FPMs. By contrast, the majority of U.S. production consists of FPMs, which represent a declining share of the market. Despite that, U.S. producers have actually increased their share of the MiB market. In addition, evidence established that U.S. production would have been even greater but for raw material constraints. As such, neither the volume nor increase in subject imports has had any significant volume effect on the domestic industry.

> ### C.   Was the Commission's determination that subject imports depressed or suppressed the prices of domestic like product unsupported by substantial evidence and contrary to law?

Yes. The Commission erred in determining that subject imports caused significant price effects when there is no price convergence, or indication of domestic like product prices falling to meet subject imports. As a matter of law, underselling alone is not sufficient to establish price suppression, and the record evidence established that there was no price depression caused by imports from the subject companies. Further, as described below, the Commission's calculations are flawed and not reflective of actual price effects on the domestic market. Substantial evidence also does not support the Commission's findings that price is highly important in purchasing decisions.

> ### D.   Was the Commission's determination that subject imports had a significant impact on the domestic industry unsupported by substantial evidence and contrary to law?

Yes. The Commission failed to consider the discrete MiB and FPM market segments in performing its impact analysis. For instance, the Commission failed to consider that the domestic industry gained market share in the MiB segment, the segment in which subject imports were almost exclusively concentrated. The Commission also failed to consider that the performance of the domestic MiB segment improved throughout the POI, that the domestic industry replaced its

NON-CONFIDENTIAL VERSION

FPM capacity and production with MiB production over the full years of the POI, and increased its MiB capacity further in the interim period. The Commission further failed to consider and properly explain the impact of factors other than subject imports on the domestic industry – for instance, the decreasing demand for FPMs and the increasing competition in the U.S. in the MiB segment and the impact of raw material shortages.

## STATEMENT OF FACTS

Petitioners Brooklyn Bedding, Corsicana Mattress Co., Elite Comfort Solutions, FXI, Inc., Innocor, Inc., Kolcraft Enterprises, Inc., Leggett & Platt, Inc., the International Brotherhood of Teamsters, and United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO (collectively, "Petitioners"), filed petitions with the U.S. Department of Commerce and the Commission seeking the imposition of antidumping and countervailing duties on imports of mattresses from Cambodia, China, Indonesia, Malaysia, Serbia, Thailand, Turkey, and Vietnam (the "Subject Countries") on March 31, 2020. Appx1000-3951.

The Commission made an affirmative preliminary determination on May 15, 2020. *See* Appx9046; *see also* Appx9048-9059. Commerce then published its preliminary affirmative countervailing duty determination on mattresses from China on September 11, 2020, and its preliminary affirmative determinations on sales at less than fair value for mattresses from Cambodia, Indonesia, Malaysia, Serbia, Thailand, Turkey, and Vietnam on November 3, 2020. *See Mattresses From the People's Republic of China: Preliminary Affirmative Countervailing Duty Determination, and Alignment of Final Determination With Final Antidumping Duty Determination*, 85 Fed. Reg. 56,216 (Dep't Commerce Sept. 11, 2020); *see also* 85 Fed. Reg.

69,594 (Cambodia), 69,597 (Indonesia), 69,574 (Malaysia), 69,589 (Serbia), 69,568 (Thailand), 69,571 (Turkey), 69,591 (Vietnam) (Dep't Commerce Nov. 3, 2020).

Following the Commission's final phase investigations, five Commissioners made an affirmative determination that an industry in the United States is materially injured by reasons of imports of mattresses from the Subject Countries. The Commission reached its determination despite substantial evidence that:

- The markets for mattress-in-a-box ("MiB") and flat-pack mattress ("FPM") products have materially distinguishing factors such that the mattress market is segmented;

- The volume of subject imports did not have a significant volume effect on the domestic industry during the period of investigation;

- Prices of domestic mattresses *increased* for several mattress products following the introduction of imports from the Subject Countries other than China; and

- Significant non-price reasons existed for increases in subject imports, including instability and uncertainty with respect to domestic production and domestic supply, as well as reliability, availability, quality of supply, and the growth of the MiB market segment

The Commission published its final determinations on May 14, 2021. *See* Appx14727-14738. On that same date, the Department of Commerce published its antidumping duty order on mattresses from the Subject Countries, as well as its countervailing duty order on mattresses from China. *See Mattresses From Cambodia, Indonesia, Malaysia, Serbia, Thailand, the Republic of Turkey, and the Socialist Republic of Vietnam: Antidumping Duty Orders and Amended Final Affirmative Antidumping Determination for Cambodia*, 86 Fed. Reg. 26,460 (Dep't Commerce May 14, 2021); *Mattresses From the People's Republic of China: Countervailing Duty Order*, 86 Fed. Reg. 26,463 (Dep't Commerce May 14, 2021).

## STANDARD OF REVIEW

This Court reviews the Commission's determinations in antidumping duty proceedings to determine whether they are "unsupported by substantial evidence on the record or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). "Should the court determine that the Commission's determination is unsupported by substantial evidence or otherwise incorrect, the case will be remanded to the Commission with specific instructions, pursuant to 19 U.S.C. § 1516a." *Altx, Inc. v. U.S.*, 370 F.3d 1108, 1111 (Fed. Cir. 2004).

The "substantial evidence" standard requires more than "a mere scintilla" of evidence but is satisfied by "something less than the weight of the evidence." *See, e.g., Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *Luoyang Bearing Factory v. United States*, 288 F. Supp. 2d 1369, 1370 (Ct. Int'l Trade 2003). It is such evidence as a reasonable mind might accept as adequate to support a conclusion. *See Micron Tech., Inc. v. United States*, 117 F.3d 1386, 1393 (Fed. Cir. 1997); *Hangzhou Spring Washer Co., Ltd v. United States*, 387 F. Supp. 2d 1236, 1240 (Ct. Int'l Trade 2005).

It is insufficient for this Court "to merely examine the evidence that sustains the agency's conclusion," *Timken Co. v. United States*, 699 F. Supp. 300, 306 (Ct. Int'l Trade 1988), *aff'd* 894 F. 2d 385 (Fed. Cir. 1990), or to find "that the evidence supporting {the agency's} decision is substantial when considered by itself." *Suramerica de Aleaciones Laminadas*, C.A. *v. United States*, 818 F. Supp. 348, 353 (Ct. Int'l Trade 1993), *aff'd*, 44 F.3d 978 (Fed. Cir. 1994) (citation omitted). "The substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Id.*

Additionally, the Court will find a determination unlawful where the Commission failed to carry out its duties properly or neglected to provide an adequate basis for its conclusions. *See*

NON-CONFIDENTIAL VERSION

*Rhone-Poulenc, Inc. v. United States*, 927 F. Supp. 451, 454 (Ct. Int'l Trade 1996); *see also Anshan Iron & Steel Co., Ltd. v. United States*, 358 F. Supp. 2d 1236, 1243 (Ct. Int'l Trade 2004).

## SUBSTANTIVE LEGAL STANDARDS

In the final phase of antidumping and countervailing duty investigations, the Commission must determine whether an industry in the United States is materially injured or threatened with material injury "by reason of" the subject imports. *See* 19 U.S.C. §§ 1671d(b)(1), 1673d(b). The statute defines "material injury" as "harm which is not inconsequential, immaterial, or unimportant." *See* 19 U.S.C. § 1677(7)(A). In making this determination, the Commission must consider the volume of subject imports, their effect on prices for the domestic like product, and their impact on domestic producers of the domestic like product. *See* 19 U.S.C. § 1677(7)(B). Additionally, the Commission must evaluate "all relevant economic factors within the context of the business cycle and conditions of competition that are distinctive to the affected industry." 19 U.S.C. § 1677(7)(C)(iii). Such economic factors might include changes in demand, consumer tastes, non-subject imports, or management decisions by domestic producers. The Commission must "explain its analysis for each factor," as well as "such other economic factors as are relevant to the determination." *See* 19 U.S.C. § 1677(7)(B).

Material injury to the domestic industry must be "by reason of the subject imports." *See* 19 U.S.C. §§ 1671d(b)(1), 1673d(b). That is, there must be a causal link between the subject imports and the material injury. The Commission "must examine other factors to ensure that it is not attributing injury from other sources to the subject imports." Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103-316, Vol. 1, at 851-52 (1994), reprinted in 1994 U.S.C.C.A.N. 4040, 4184-85 ("SAA")); *accord* S. Rep. 96-249 at 75 (1979); H.R. Rep. 96-317 at 47; *Mittal Steel Point Lisas Ltd. v. United States,* 542 F.3d 867, 877 (Fed. Cir. 2008);

**NON-CONFIDENTIAL VERSION**

*Taiwan Semiconductor Indus. Ass'n v. USITC*, 2 F.3d 1339, 1345 (Fed. Cir. 2001). The legislative history explains that the Commission must examine factors other than subject imports to ensure that it is not attributing injury from other factors to the subject imports. *See* SAA at 851-52; S. Rep. 96-249 at 75 (1979); H.R. Rep. 96-317 at 47 (1979); *accord Mittal Steel*, 542 F.3d at 877.

The Commission's decision must include "an examination of the relevant data and a reasoned explanation supported by a *stated* connection between the facts found and the choice made." *U.S. Steel Group v. United States*, 25 CIT 1046, 162 F. Supp. 2d 676, 678 (2001) (emphasis added). The agency "is not free to prescribe what inference from the evidence it will accept or reject, but must draw all those inferences that the evidence fairly demands." *Pohang Iron & Steel Co., Ltd. v. United States*, 23 C.I.T. 778, 789 (1999). The statute also directs the Commission to include in a final determination of injury an explanation of the basis for its determination that addresses relevant arguments that are made by interested parties. 19 U.S.C. § 1677f(i)(3)(B). The Commission must address significant arguments and evidence which seriously undermine its reasoning and conclusions. *Altx, Inc. v. United States*, 25 CIT 1100, 167 F. Supp. 2d 1353, 1374 (2001). "If these statutory criteria are not met in a clearly discernable manner, the Court of International Trade properly may remand." *Altx,*, 370 F.3d at 1119-20.

## ARGUMENT

**I.    The Commission's Findings Regarding Attenuated Competition and Market Segmentation Were Not Supported by Substantial Evidence and Were Not In Accordance with Law.**

The U.S. mattress industry and the U.S. mattress market are split into two segments – one segment focusing on mattress-in-a-box ("MiB") and one focused on flat-packed mattresses ("FPM"). Competition between these two segments is highly attenuated, and the MiB segment has experienced impressive market growth during the period of interest ("POI") while the FPM

segment is in decline. MiBs are mattresses of any size or type (*e.g.*, foam, innerspring or hybrid) that are compressed, rolled, and placed into a box after production, and FPMs constitute the remainder. The segment of the U.S. industry producing MiBs is the segment of the industry in greatest competition with subject imports yet is also the segment of the industry with the strongest financial performance. It is indisputable that the MiB segment of the market is growing and the domestic industry is increasing its share of that segment. By contrast, the FPM segment is experiencing contraction in terms of production capacity, production and shipments. But this downturn was not caused by subject imports, since they are nearly absent from the FPM segment; rather, this downturn has occurred because FPMs are falling out of favor with U.S. consumers. Because this segment is relatively larger, its contraction has a disproportionate negative impact on the entire U.S. industry. When the industry and the market are analyzed on this segmented basis, the conclusion is clear: subject imports had no impact on the domestic industry.

Nonetheless, the Commission largely failed to address Respondent's arguments on attenuated competition, a violation of law which subjects the Commission's determination to remand by this Court. To the extent the Commission considered these arguments at all, its conclusions were not supported by substantial evidence, lacked a rational connection to the facts in the record, and were divorced from the inferences fairly demanded by the facts, also subjecting the Commission's determination to remand.

      *A.    Record Evidence Showed that FPMs and MiBs Comprise Distinct Market Segments.*

MiBs and FPMs differ in much more than packaging. Although their consumer uses may be similar, the products differ significantly in their overall business model, including design, production, transportation, and sale.

First, mattresses that are rolled and compressed are designed differently. Attempted compression and rolling of mattresses originally designed as FPMs has been unsuccessful. *See* Appx7821. To achieve successful recovery from compression and avoid breakage issues, an entirely new product must be engineered. MiB production requires investments in "capital intensive machines that enclose the foam mattress in plastic, compress the mattress, then roll the mattress to be put into a box." *See* Appx14808.

In the Commission's investigation of mattresses from China, Brian Adams of Ashley attempted to explain the difference, stating that:

> {T}ransitioning to production of MiBs is not as simple as purchasing a rolling machine and flipping the switch. We invested millions of dollars, not just in the machinery to compress, roll-pack, bale, wrap, and box the product, but also to reengineer the product all together. . . It also requires the perfect engineering of pocketed coil manufacturing, fabric and foam layer application and sewing in quilting in a way that is able to feed efficiently into the compression machine. In order to make this production work, we had to completely redesign the products we sold to be compatible with this process.

*See* Appx7574-7575.

The Joint Respondents likewise noted in the preliminary phase that:

> {O}n mattresses made to be roll compressed, foam must be a certain quality and cured for a longer duration before it can be reliably compressed. After curing, the smart producers also pre-compress the foam in bulk through large compression machines to remove air and make certain the rebound is sufficient. If the foam is not made to specific certifications, the mattress will not decompress. This means that a mattress stays in a flattened state, would not provide any cushioning, and doesn't return to the original pre-compressed height.

*See* Appx7862.

**NON-CONFIDENTIAL VERSION**

Testimony from the hearing further highlighted the physical differences between MiBs and FPMs. *See* Appx12437-12438; *see also* Appx115233-115235 (providing full specifications of foam and coil design for MiB). The Commission ignored this evidence in concluding simply that "MiBs and FPMs can be produced to the same specifications using the same springs and foam, with the exception that innerspring MiBs must omit the border wire that innerspring FPMs may possess." *See* Appx14768.

If the product differences were merely the packaging, then FPM producers would quickly and easily shift to selling the more preferable MiBs. Indeed, from the perspective of the MiB producer, the efficiencies generated by the MiB model make the transition to MiB, if possible, a "no-brainer." Appx7570. The fact that producers have not made that transition suggests that the differences between FPMs and MiBs extends beyond their packaging material.

Additionally, public statements from companies within the petitioning group showed that such companies view the MiB segment as distinct and requiring significant investment. After investing roughly $9 million to open a 165,000-square-foot manufacturing facility in La Porte, Indiana, the CEO of Corsicana Mattress Co., Michael Thompson, stated that Corsicana has had "significant growth in our boxed bed business and require{s} a facility that is appropriately equipped with well-trained employees to provide the manufacturing efficiency to support that growth." Appx11712. The company also explained that the new facility would allow it to access "key markets and provide same day shipping for customers." *Id.* In its 2019 annual report, Leggett & Platt, Inc. described MiBs as products that have "revolutionized the U.S. bedding industry and created tremendous opportunities." Appx11718. The report describes the growth in online compressed mattress brands as transforming the industry by providing "{p}roducts that are easily shippable, efficiently stored by retailers, and easily carried home by consumers." Appx11725. The

Petitioners themselves specifically advertise MiBs as a feature for their consumers, an unnecessary advertising expense for a mere packaging distinction. Appx11872-11874 (images from Corsicana, Early Birds, https://www.corsicanamattress.com/earlybird and FXI, Bedding Solutions, https://www.fxi.com/bedding).

In concluding simply that "MiBs and FPMs are also functionally interchangeable once unpackaged", Appx14769, the Commission likewise ignored substantial evidence of benefits to consumers, which are myriad. Consumers are allowed to avoid in-store sales pitches in favor of valuable peer-to-peer reviews. *See* Appx7637. A plurality of purchasers indicated that the ability to ship via common carrier was a "very important" purchase factor. Appx14848. Given these benefits, it is "{n}o surprise that 71 {percent} of consumers between 18 and 35 years old prefer to buy online." Appx11710. Indeed, Petitioners themselves admit the fact that individual customers prefer one format to the other, effectively gutting their argument that MiBs and FPMs are entirely and completely fungible with each other. *See* Appx12251-12252 (Fallen) ("Different end user consumers have different expectations for their mattresses. Some prefer to buy a mattress that is packaged and delivered to their doorstep as an MiB. Others will always prefer full white-glove delivery of a flat mattress into their bedroom and removal of their old mattress."); *see also* Appx12309 (Baisburd) ("Some people want it to be in a box, either the consumer themselves or the retailer. Some don't."). This admission should come as no surprise, given that Petitioners also recognize that companies like Casper, Leesa, and Tuft & Needle have spent millions *specifically to promote MiBs* in order to generate more customer demand in that segment of the market. Appx12225-12226 (Alves); *see also* Appx12356 (Adams).

The shift from FPM to MiB is not new. "In recent years, including since 2017, the mattress market has seen an increase in the popularity of mattresses sold via e-commerce, particularly

mattresses-in-a-box ('MiBs')." Appx14815. Multiple firms have confirmed "a continuing trend away from innerspring mattresses and toward { non-innerspring, hybrid, and MiB mattresses }, especially those sold online." Appx14841. "A majority of purchasers reported a decrease in demand for innerspring mattresses and an increase in most other types of mattresses (except FPMs)." Appx14839, Appx14842. Compared to FPMs, producers cited that the growth in MiBs "stem{s} from the ease with which suppliers can store, package and ship such mattresses." Appx14841. Other factors such as continued increase of direct-to-consumer sales, advertising of MiBs, consumer acceptance of e-commerce, digital sales and marketing and variety of brands also contribute to the shift from FPMs to MiBs. Appx14817.

Responses from U.S. producers to the Commission's questionnaire further confirmed that the demand for MiBs is here to stay. U.S. producer [          ] stated that MiBs sold over the internet are already accounting for an increasing share of all mattresses sold and when consumers have made internet purchases, they have become more comfortable in doing so. Appx124173. Likewise, as CEO of Culp Home Fashions, Sandy Brown, stated, "We continue to see favorable growth trends in our sewn mattress cover business, with current and expected demand exceeding pre-Covid-19 levels. *This demand is primarily driven by the ongoing growth in the boxed bedding space*." Appx11920 (emphasis added).

> **B.    Competition Between Subject Imports and the Domestic Product as a Whole Is Highly Attenuated.**

The Commission fundamentally erred in finding that "subject imports of MiBs competed with domestically produced FPMs" without recognizing that any competition is highly attenuated. Appx14768. Competition is now split, with domestic and imported MiBs competing against each other in the MiB segment, and domestic FPM manufacturers having the (diminishing) U.S. FPM

segment more or less to themselves. Competition between subject imports and the domestic like product is therefore highly attenuated. *See Blast Furnace Coke from China and Japan*, Inv. Nos. 731-TA-951-952, USITC Pub. 3619 at 3, 2003 WL 22415864, at *2 (Prelim.) (Remand) (Aug. 2003), aff'd by *Comm. for Fair Coke Trade v. United States*, 28 C.I.T. 1140 (2004) (holding that attenuated competition "does not refer to a lack of direct competition between subject imports and the domestic product. Rather, attenuated competition indicates competition that has reduced force or effect.")

Domestic producers tend to focus on either FPM or MiB production. As described above, the production of MiBs requires capital-intensive investments in specific assets and operations. These include rolling and compression machinery (Appx14808 ("{f}or compressed mattresses, U.S. producers use capital intensive machines that enclose the foam mattress in plastic, compress the mattress, then roll the mattress to be put into a box.")), as well as development of components which are compatible with the MiB production process. Appx7862-7863. Companies cannot merely flip a switch and begin producing MiBs. *See* Appx7574.

The Commission noted that "the three largest producers of FPMs also produced MiBs" and that "{n}early a quarter (12) of responding domestic producers produced both FPMs and MiBs in 2019" (Appx14765-14766), but that statistic ignores the overall polarization in the industry. In fact, almost all firms specialize in production of either MiB or FPM mattresses. Of the 53 U.S. producers submitting usable U.S. Producers' Questionnaire response, [

].[2] *See* Appx114520.

---

[2] The compilation chart appearing at Appx114520 omits producers [
]. *See* Appx124195-124198.

**NON-CONFIDENTIAL VERSION**

Further, out of 53 responding U.S. producers, only [    ] produced both MiBs and FPMs. *Id.*; Appx124195-124198. While the Commission considers there to be one industry producing the domestic like product as a whole, the data tell the tale of two distinct industries.

The table below shows how the top producers of each product have little if any production of the other product:

[




















]

Source: Appx124195-124198.

In closing arguments at the hearing, counsel for Petitioners asserted that at least 50 percent of U.S. producers produced MiBs at some point during the period of interest. Appx12471. However, it is hardly meaningful that a U.S. producer like [




]. Appx114520.

Consumer preferences for one style of mattress or the other are also articulated at the wholesaler level, when retailers – be they online, brick and mortar, or omni-channel – place their orders for products. Even if their customers have the ability to choose between an MiB and an FPM, retailers have already committed to one of the two types. Amazon is perhaps the best example, as [

]. *See* Appx115148. Amazon has a very specific set of requirements – a "physical profile" – for which its distribution is optimized. Appx12400. MiBs fit that profile, and FPMs do not. Unsurprisingly, nearly [

]. *See* Appx115148. To a purchaser like Amazon, MiBs and FPMs are not remotely competitive, even though its customer may be comparing an MiB on Amazon with an FPM at Mattress Firm. But since, as Petitioners have recognized, competition in this industry occurs at the wholesale level (*see* Appx93626), the Commission must examine the sale *to* Amazon. The Commission ignored this evidence in concluding that "{c}onsumer indifference toward mattress packaging is reflected in purchasing behavior at the wholesale level." Appx14770.

The Commission's failure to address Respondent's arguments on attenuated competition is a violation of the law that subjects the Commission's determination to remand. *See above* at 8-9. Further, to the extent the Commission considered these arguments at all, its conclusions were not supported by substantial evidence, lacked a rational connection to the facts in the record, and were divorced from the inferences fairly demanded by the facts, and thus the Commission's determination is subject to remand. As explained above, the record in this case draws but one logical conclusion: that the U.S. mattress industry and the U.S. mattress market are split into the MiB and FPM segments, and that competition between these segments is highly attenuated. The

**NON-CONFIDENTIAL VERSION**

Commission's disregard of the evidence on this point renders its assessment of the conditions of competition incorrect and renders the determination subject to remand by this Court.

II.     **The Commission's Determination of Significant Volume Effects From the Subject Imports Was Not Supported by Substantial Evidence and Was Not In Accordance with Law.**

Section 771(7)(C)(i) of the Tariff Act provides that the "Commission shall consider whether the volume of imports of the {subject} merchandise, or any increase in that volume, either in absolute terms or relative to production or consumption in the United States, is significant." 19 U.S.C. § 1677(7)(C)(i). Here, increases in subject imports' volume over the POI, concentrated in shipments in MiBs, were outpaced by U.S. producers' growth in the same segment during the POI. To the extent U.S. producers' volume and market share appear to have declined over the POI, those losses were limited to FPMs, where market demand has been in decline for several years, because of shifts in consumer preferences, not because of subject imports. U.S. producers have increased production and shipments of MiBs during the period of interest, gaining share over subject imports as a share of U.S. MiB consumption. The record does not support a finding of adverse volume effects by reason of subject imports.

A.     *Record Evidence Showed that the U.S. Mattress Market is Segmented, And the Commission Failed to Properly Consider This Segmentation in Conducting Its Volume Analysis.*

The Commission's determination that the volume and increase in volume of subject imports is significant (*see* Appx14773) ignores the segmented nature of the market for mattresses, discussed, *supra,* Section I.A-B. That error is fatal to the Commission's ultimate conclusion and not in accordance with law. It is essential to recognize that competition between subject imports and the domestic like product as a whole is highly attenuated, with subject imports instead competing with a segment of the domestic market. And U.S. producers have actually gained share

in the segment of the market with which the subject imports compete. Data provided to the Commission in the final phase demonstrated that the single most important determinant of success or failure for a mattress company both now and in the future is its willingness to embrace MiB production. The Commission's conflation of distinct market segments obscures this basic reality.

> **B.      Record Evidence Showed There Are No Significant Volume Effects With Respect to the Segment of the Market (MiBs) with which the Subject Imports Actually Compete.**

Competition between subject imports and the domestic product *as a whole* is highly attenuated. Subject imports compete for sales only in the segment of the market that is made up of buyers who are shopping for an MiB. Practically speaking, this means that a relatively small (but growing and healthy) share of the domestic industry that produced MiBs competes with imports, including the subject imports which are almost entirely sold as MiBs. Most of the domestic industry clinging to FPM production is wedded to a product with declining demand for reasons unrelated to competitive behavior by importers of the subject merchandise. To put it in simple terms, MiBs are growing as a segment of the overall mattress market (Appx124265), and U.S. producers are growing as a share of the MiB segment for the full year periods from 2017-2019. Appx124263. In that context, the volume and increase of subject imports is insignificant.

### 1.      U.S. Consumption Increased Due to Increased Demand for MiBs.

The record evidence established that total U.S. demand for mattresses increased over the full years of the POI by [      ] percent, yet overall shipments from U.S. producers declined while subject import shipments increased, and that relative market shares of the U.S. producers declined while the market share for foreign producers increased. Appx124461-124463. However, this overly simplified characterization of the facts fails to acknowledge the most important component of this investigation – MiBs, specifically domestic MiB production.

**NON-CONFIDENTIAL VERSION**

Overall apparent U.S. consumption of mattresses increased over the period of interest, from [    ] million units in 2017 to [        ] million units by 2019, or by [    ] percent and from [    ] million units to [      ] million units, or by a further [       ] percent, across the interim periods. *Id*. The Commission observed that "a majority of responding domestic producers, importers, and purchasers reported that demand for FPMs was stable or increasing, and FPMs accounted for a larger share of apparent U.S. consumption than MiBs." Appx14764. However, the increase in overall consumption was entirely driven by strong growth in consumption of MiBs, which increased from [    ] million units in 2017 to [      ] million units in 2019, or by [       ] percent, and from [    ] million units in part-year 2019 to [      ] million units in part-year 2020, or by a further [        ] percent. Appx124263. The growth in MiBs was obscured by a decline in consumption of FPMs, which fell from [       ] million units in 2017 to [        ] million units in 2019, or by [      ] percent, and falling from [       ] million units to [        ] million units, or by [    ] percent across the interim periods. Appx124267. Indeed, by interim 2020 the change in market preference is evident, with MiBs reaching [        ] percent of total mattress consumption (up from [     ] percent in 2017) and FPMs falling to [      ] percent (down from [        ] percent in 2017.) Appx124265, Appx124269.

The cumulative performance of the U.S. mattress industry camouflages the robust performance of the growing domestic MiB segment, reflecting instead the poor performance of the larger domestic share of FPM producers losing out to the paradigm shift towards MiBs. In 2017, U.S. producers' U.S. shipments were 8.8 percent MiB and 91.2 percent FPM, and by interim 2020 were 23.6 percent MiB and 76.4 percent FPM. Appx14931, Appx14935. As such, the apparent [    ] percentage point decline in U.S. producers' share of the total U.S. mattress market between 2017 and interim 2020 (Appx124461-124463) is in fact a tale of two trends: an [       ]

percentage point *increase* in market share by U.S.-produced MiBs and a [    ] percentage point *decrease* by U.S.-produced FPMs, as that segment declined as a share of total consumption. Appx124265, Appx124269. Indeed, the Commission reported that U.S. production of MiBs increased by 133.2 percent from 2017 to 2019, while U.S. production of FPMs declined by 16.1 percent over the same period." Appx14878.

Since U.S. producers supply essentially all of the FPM market (their share of the segment ranged from [    ] percent to [    ] percent) (Appx124267), it is U.S. producers who bore the brunt of the decline in demand for that product. Domestic FPM production declined by almost 3 million units during the full years of the POI. Appx14879. FPMs' share in the domestic industry's product mix declined from a dominant 91.6 percent in 2017 to 79.7 percent in 2019. *Id*. U.S. producers' U.S. shipments went from accounting for [    ] percent of total U.S. mattress consumption to [    ] percent total consumption in 2019, and [    ] percent of total consumption during the part-year 2020 period. Appx124267, Appx124269. However, this decline was not caused by subject imports, which held a small and steady share of the FPM segment, below [    ] percent throughout the period of interest. Appx124267.

The apparent consumption data gathered by the Commission reveals the extent of this growth in MiB demand: [

]

Source: Appx124259, Appx124263, Appx124267.

The shift in market composition from FPMs to MiBs is attributable to changing preferences by consumers and purchasers alike. While subject imports were composed almost entirely of MiBs (Appx124529), it is clear from U.S. producers' own decision to increase production of MiBs over FPMs that there is growing demand specific to MiBs that cannot be satisfied with traditional FPMs.

Qualitative questionnaire responses confirmed that industry participants are aware of the shift underway from FPMs to MiBs. The Commission stated that "multiple firms (including U.S. producers, importers, and purchasers) described a continuing trend away from innerspring mattresses and toward these other types, especially those sold online." Appx14841. Indeed, 26 of 37 responding U.S. producers, 70.2 percent, reported increasing demand for MiB mattresses compared to only 9 U.S. producers reporting growth in demand for FPMs. Appx14840. Even greater proportions of importers and purchasers, 79.4 percent (27 of 34) and 83.3 percent (15 of 18), respectively, reported growth in demand for MiBs. *Id.*

The global coronavirus pandemic of 2020-21 accelerated the demand trends for MiBs in the U.S. market. Government mandated stay-at-home orders and physical distancing have pushed

consumers to shop differently and contributed to the spike in e-commerce sales in the United

States. U.S. producers reported a [

]. *See, e.g.,* Appx107702. Some firms "described

the COVID-19 outbreak as having increased the trend of consumers wanting to purchase

mattresses online." Appx14841. Forty-three U.S. producers reported that they had experienced

changes in relation to their supply chain arrangements, production, employment, and sales relating

to mattresses as a result of COVID-19. Appx14875.

### 2. U.S. Producers Have Gained Share in the MiB Segment, Despite Declines in the FPM segment.

U.S. producers have significantly increased MiB capacity and production since 2017. As

detailed in the table below, the absolute increases in U.S. MiB capacity and production mirror the

reductions in FPM capacity and production over the same periods. This shows that the domestic

industry responded to shifts in market demand by reorienting its production to serve the MiB

market.

**U.S. Producers Shifted Production from FPMs to MiBs During the POI**

|  | 2017-2019, Change in: | | PY 2019-PY 2020, Change in: | |
|---|---|---|---|---|
|  | **Units** | **%** | **Units** | **%** |
| **MiB** | | | | |
| Capacity | 3,408,513 | 121.2% | 2,126,803 | 48.6% |
| Production | 2,141,716 | 133.2% | 405,372 | 14.3% |
| **FPM** | | | | |
| Capacity | -3,417,473 | -15.1% | -1,559,727 | -10.5% |
| Production | -2,823,056 | -16.1% | -427,289 | -3.8% |

Source: Appx14879.

MiB production now represents a sizeable portion of total U.S. production and [          ]

of apparent U.S. consumption overall. Appx124265. Between 2017 and 2019, U.S. producers'

MiB production grew by [                     ]. In terms of absolute volume, U.S. shipments of MiBs [                 ] during the full years of the period of interest, and increased by a further [      ] percent between the interim periods. Appx124263. MiBs grew from representing 8.4 percent of the domestic industry's production at the beginning of the POI to 20.3 percent of all U.S. mattress production in 2019 and 22.9 percent in part-year 2020. Appx14879. Domestic producers' share of the MiB market segment also [                          ]  percent in interim 2020. Appx124263. In other words, as a share of apparent U.S. consumption of MiBs, U.S. producers *gained* [      ] percentage points between 2017 and interim 2020. Domestic producers' 119.9 percent growth in MiB shipments from 2017 to 2019 [           ] the growth in U.S. shipments of subject imports to the MiB segment, which registered [     ] percent growth during the POI. *Id.* Simultaneously, U.S. producers maintained their near-exclusive hold on the FPM market segment, with a market share of [    ] percent in 2017 and [    ] percent in interim 2020. Appx124267.

The domestic industry has made these inroads into the MiB sector through significant investment. The questionnaire responses gathered by the Commission in the final phase describe notable changes in operations. For example:

- [                                            ]

- [                                            ]

- [                                  ]

- [                                              ]

- [                                        ]

**NON-CONFIDENTIAL VERSION**

- [                                                                              ]

Appx124202-124206.

Public information likewise reveals additional investment in production facilities in the

MiB segment and other adjustments to operations to account for the market shift to MiBs:

- Corsicana invested $22 million in new, 376,000 sq. ft. headquarters and manufacturing center. Appx11957-11958.

- Corsicana's investment of $8.6 Million in Indiana MiB production facility. Appx11961-11962.

- Purple invested in a new MiB production facility in Georgia. Appx11953-11955; *see also* Appx11964-11965.

- MLILY USA opens 650,000-square-foot facility in December 2019 and expands production to more than 6,000 units per day in 2020. Appx11967-11968; *see also* Appx11972, MLILY FAQ, mlilyusa.com (Stating that "MLILY memory foam and innerspring products are compressed and vacuumed sealed for shipping convenience. Do not use a knife to open the rolled mattress.").

- Bedding Industries of America schedules opening a new 80,000-square-foot manufacturing facility. Appx11979-11981.

- Brooklyn Bedding is investing more than $72 million to expand its U.S. manufacturing footprint with a new MiB factory located in Arizona. Appx11988-11989.

- Zinus announced plans to build a new production facility in McDonough, Georgia. Appx11991-11992.

- President of Diamond Mattress Shawn Pennington stated: "we increased our boxed bed product offering to enable more e-commerce and to ship nationwide." Appx11904.

- CEO of Englander, Kevin Toman stated: "We're also enhancing our ability to serve the retailers with bed-in-a-box programs and will strengthen our social media programs that have become important for brand awareness among consumers." Appx11948-11949.

**NON-CONFIDENTIAL VERSION**

These investments have led to a shift in the orientation of domestic mattress capacity toward MiBs and away from FPMs. In 2017, MiB capacity and FPM capacity accounted for 11 percent and 89 percent, respectively, of total domestic industry capacity. Appx14879. By interim 2020, those shares had shifted to 32.7 percent MiB and 67.3 percent FPM. *Id*. Put another way, domestic MiB capacity increased by 3,408,513 units over the period of interest, while FPM capacity declined by almost the same amount, 3,417,473 units. *Id*. It is clear that the domestic industry has been reorienting itself to meet future demand trends in the U.S. mattress market.

Because of the consistent increases in MiB capacity reported by U.S. producers throughout the period of interest, capacity utilization for MiBs increased only modestly, from 57.2 percent in 2017 to 60.3 percent in 2019. *Id*. To the extent capacity utilization fell in part-year 2020 (to 49.8 percent), this is attributable both to a 49 percent increase in capacity over interim 2019 and to

[

]  *Id*.;

*see also* Appx124477-124482.

U.S. producers' capacity utilization for FPMs was largely steady, despite reduced capacity and production commensurate with declining demand, decreasing by just one percentage point between 2017 and 2019 from 77.3 percent to 76.3 percent. Appx14879. Across the interim periods, FPM capacity utilization increased from 75.9 percent in part-year 2019 to 81.5 percent in part-year 2020. *Id*.

Moreover, the volume of domestic shipments would have been even greater but for supply-related factors. First, U.S. producers experienced substantial foam shortages throughout the period of interest, which affected their ability to produce MiBs in particular. Appx115065-115066, Appx115079-115089, Appx115092-115093. In interim 2020, 17 U.S. producers indicated supply

constraints linked to the pandemic (Appx14831), with leading U.S. MiB producers [

] all reporting reduced production in interim 2020 either because of local regulations, a lack of adequate raw materials, a repurposing of their production facilities toward PPE materials, or a combination thereof. Appx124478-124482. These factors adversely affected the domestic industry's ability to take even greater advantage of the growth in MiB demand during the period of interest, and to increase its shipment volume even more than it did. And, domestic producers had even greater difficulties in the most recent period, after the cutoff for the questionnaire response period, with severe weather in Texas that has further hampered their ability to produce product in a timely manner. *See*, *e.g.*, Appx12237-12238 (Glassman); Appx12245 (Merwin). None of these difficulties can be laid at the feet of subject imports.

3.   **Volume and Increases in Subject Product Import Volume Are Not Significant.**

The record shows that subject import volume and share of overall apparent U.S. consumption increased over the POI. Appx124461. However, these increases in volume and market share do not represent significant volume effects. Subject imports are [                    ] MiBs; [     ] percent in 2019. Appx124248. This is therefore the only segment of the market in which domestic producers and subject imports overlap to any significant degree.

In particular, U.S. shipments of subject imports from all sources increased from 5.2 million units in 2017 to 8.0 million units in 2019, or by 52.2 percent, and from 5.7 million units to 7.3 million units, or by 29.0 percent across the interim periods. Appx15130. Subject import shipments of MiBs increased from 4.9 million units in 2017 to 7.5 million units in 2019 (by 53.9 percent) and from 5.3 million units to 7.0 million units across the interim periods (by 30.9 percent). Appx14931.

Thus, subject import shipments of MiBs accounted for [      ] percent of total subject import shipment volume over the period of interest, [      ] percent of the increase from 2017 to 2019, and [             ] between the interim periods. Appx114518. As such, competition was highly attenuated between subject imports and FPMs, which (as discussed above) constitute the vast majority of U.S. producers' shipments, and the primary cause of the downturn in the industry's performance.

When considering only apparent U.S. consumption of MiBs, despite the increases described above, subject imports actually *lost* market share, while U.S. producers' share *increased*. As described above, subject import share of MiB consumption declined by [    ] percentage points between 2017 and interim 2020, while U.S. producers increased their share of the MiB market by [   ] percentage points over the same time period. Appx124263. Thus, despite increases in subject import volume during the period of interest, those volumes did not prevent U.S. producers from gaining share in the burgeoning MiB market. Subject import volume and market share were not significant as an indicator of any adverse volume effects in the context of the only market segment in which there is a meaningful competitive overlap with the domestic industry.

In other words, domestic MiB producers are successfully competing with imported MiBs, while FPM producers are failing to keep up with either. Domestic producers engaged in MiB production have experienced robust sales growth and financial performance, while domestic FPM producers' sales and financial performance languished during the period of interest. The shift from FPM to MiB is an industry paradigm change of speed and impact rarely observed by the Commission that disproportionately affected domestic producers wedded to FPM production, resulting in apparent declines having nothing to do with subject imports.

NON-CONFIDENTIAL VERSION

The Commission examined an almost identical demand scenario in the investigation of *Outboard Engines from Japan*, Inv. No. 731-TA-1069 (Final), USITC Pub. No. 3752, 2005 WL 630159 (Feb. 2005). In that case, demand for emissions-compliant two-stroke direct injection and four-stroke engines increased during the period of investigation, and the demand for non-compliant two-stroke carbureted and two-stroke EFI engines, mainly produced by the domestic industry, decreased during the same period. The record reflected that the growth in the U.S. market was largely due to increased demand for four-stroke outboard engines over the period of investigation. 2005 WL 630159, at *10. There had been a shift in demand in favor of these engines because they were reliable, quiet, and emissions-compliant. *Id.* Although the domestic industry also produced emissions-compliant engines, subject imports dominated the U.S. market for four-stroke engines, in particular the market for larger horsepower four-stroke engines. *Id.* at *12. The Commission concluded that although subject imports increased over the period of investigation, the increase in subject import market share was concentrated in subject imports of high horsepower four-stroke engines not made in the United States until recently. *Id.* at *18. The Commission found, therefore, that the market factors "mitigate{d} the significance of the volume and market share of subject imports during the period of investigation, particularly the increases in volume and market share." *Id.* at *19.

As in *Outboard Engines from Japan*, in the instant investigation attenuated competition exists because the subject import market share is concentrated in MiB imports. This demand segment was not served by domestic FPM producers, which represents the large majority of the production base in the United States. As in *Outboard Engines from Japan*, it is not the Commission's responsibility to intercede on behalf of an entire industry when a portion of the industry operates on a business model that the free market has turned against. Even without the

Commission's intercession, domestic MiB producers will continue to grow sales and capture market share from U.S. FPM producers.

III.     **The Commission's Findings That Subject Imports Had an Adverse Price Effect on the Domestic Like Product Were Not Supported by Substantial Evidence.**

The Commission based its determination of an adverse price effect on its finding of (1) price depression caused by "pervasive underselling" by subject imports; (2) an apparently high importance of price in purchasing decisions; and (3) a "moderately high" degree of substitutability between subject imports and the domestic like product. Appx14776. Substantial evidence did not support its determination of adverse price effect. For one, underselling alone is not sufficient to establish price suppression. *Certain Iron Mechanical Transfer Drive Components From Canada and China*, 81 Fed. Reg. 91,198 (USITC Dec. 16, 2016) (final determination). Second, the record reflects that there was no price depression caused by imports from the subject countries. Third, questionnaire responses show that price was not nearly as significant of a factor in purchasing decisions as the Commission's report reflects, and substantial evidence shows that there were numerous more important non-price factors that contributed to subject imports gaining sales. The Commission failed to properly interpret the record evidence pertaining to price, and the record as a whole undermines the Commission's conclusions.

   *A.     Record Evidence Showed No Price Depression.*

The Commission based its determination that "low-priced subject imports depressed domestic prices to a significant degree" largely based on two findings. Appx14777. First, that "{s}ubject imports undersold the domestic like product in [     ] of [       ] quarterly comparisons, or [     ] percent of the time." Appx124016. Second, that the domestic industry's sales prices declined for six of the eight pricing products "between the first and last quarters for which data

were collected" while the domestic industry experienced "increasing production costs," and consumption of mattresses as a whole in the United States increased by [      ] from 2017 to 2019. Appx116031, Appx116045, Appx116115-116117, Appx116236-116238, Appx116327, Appx124019. The Commission's statement that the "domestic industry's sales prices declined for six of eight pricing products" from 2017 to Q3 of 2020, while technically true, is somewhat misleading because, aside from the fundamental flaw of the Commission's calculation methodology discussed below, Product [ ] experienced a [      ] decrease of [      ]. Appx116115-116117. Thus, a fairer characterization of the record data is that sales prices for Product [ ] remained essentially stable. *Id.* These findings fail to consider substantial evidence that there was little to no price depression or convergence, especially for the MiB products.

The Commission's statistics on price changes for each particular domestic product are based on the simple calculation of taking the percentage difference between the price of a particular product in the first quarter of 2017 against the price of that product in the last quarter of measured dated, *i.e.* Q3 of 2020. For example, the Commission calculated a [      ] percent decrease in domestic prices for Product [ ] based on a weighted average per mattress price of [      ] in Q1 of 2017 compared to [         ] for that same product in Q3 of 2020. Appx 124019, Appx116051-116054. A closer look at the data reveals that the Commission's calculation is significantly flawed and not reflective of the actual price effects of subject imports on the domestic market.

The Commission's calculation does not accurately reflect the price effects on MiB products for the majority of subject countries entering the market because, for all but China, there is virtually no pricing data until Q1 of 2019 at the earliest. Appx116051-116054, Appx116057-116061, Appx116063-116067. The only pricing data that predates Q1 of 2019 for the subject countries

other than China is imports of Product [   ] from Vietnam in Q4 of 2018. However, the quantity of mattresses imported from Vietnam during that time period was [          ] − [      ] mattresses compared to [          ] domestic mattresses. Appx116051-116054. Imports of Product [   ] from Vietnam increased [          ] in Q1 of 2019 to [          ]. Appx116051-116054. Thus, using pricing data beginning in Q1 of 2019 for Vietnam is a more accurate reflection of the price effects of the subject imports, if any, on the domestic market. And any pricing data for domestic like products *before* Q1 of 2019 is irrelevant to demonstrate how domestic prices responded to increased quantities of imports from the subject countries other than China. Recalibrating the calculation to evaluate price for the domestic like product beginning in 2019 (when all subject countries other than China entered the market), the domestic market experienced a price ***increase*** of [          ], from [       ] to [       ] for Product [      ], an ***increase*** of [          ] from [          ] to [          ] for Product [   ], and a [                  ] decrease of [          ] for Product [   ] compared with the [       ] decrease used in the Commission's report. Appx116051-116054. Thus, substantial evidence reflects that there was no market-wide depression of domestic like MiB products caused by imports from the subject countries, given the fact that prices for [

          ] MiB products increased after the subject countries entered the market. This conclusion squares with the fact that demand for MiBs in the United States has increased [      ] from [          ] of the apparent U.S. consumption of all mattresses to [          ] in the interim 2020. Appx116034.

With respect to FPM products (Products [   ], [   ], [   ], and [   ]), the record reflects that domestic prices for Products [   ] and [   ] increased over the entire period. And, although domestic like Products [   ] and [   ] each decreased by approximately [                  ] over the entire

period, the quantity of imports of those products from the subject countries was [                    ].
Appx116055-116056, Appx116068-116069.

Even outside of these statistics, purchaser questionnaire responses reflect that pricing was not a primary reason for purchasing decisions, so any underselling by the subject countries would not have caused any [          ] price depression. Of the [                ] responding purchasers, [      ] stated that United States producers reduced prices to compete with subject imports. Appx116126. Of those [        ], [            ] stated that the reason for the price reduction was [                              ], but rather because the [                    ]. *Id*. On its face, this data undermines any finding of price depression, let alone price depression caused by subject imports. Additionally, of the [                    ] instances where a purchaser reported purchasing mattresses from subject countries instead of domestic, only [            ] reported that price was a [            ] reason for the shift. Appx116125. Were price a significant contributing factor in domestic prices losing business or ceding market share, one would expect domestic prices to fall in order to compete with subject imports. However, that anticipated outcome was not reflected in the record evidence.

Thus, the Commission's conclusion is ultimately based solely on the fact that subject imports were generally lower in price. However, underselling alone is not a sign of adverse price effects and is not by itself injurious, and the Commission has reached negative determinations in cases even where underselling is present. *See Certain Iron Mechanical Transfer Drive Components From Canada and China*, 81 Fed. Reg. 91,198 (USITC Dec. 16, 2016) (final determination); *Xanthan Gum From Austria and China*, 78 Fed. Reg. 13,379 (USITC Feb. 27, 2013) (final determination); *Bottom Mount Combination Refrigerator-Freezers from Korea and*

*Mexico*, 77 Fed. Reg. 28,623 (USITC May 15, 2012) (final determination), *remanded on other*

*grounds*, *Whirlpool Corp. v. United States,* Slip Op. 2013-155 at 21-23 (Ct. Int'l Trade 2013)).

For all these reasons, the Court should find the Commission's findings regarding price

depression unsupported by substantial evidence.

> **B.** ***Record Evidence Showed The Commission Vastly Overstated the Importance of Price in Purchasing Decisions in its Determination that Underselling Was Significant During the Period of Investigation.***

The Commission relied only on the purchaser questionnaire data that purportedly supported

its conclusions of significant price effects, failing to consider contrary data in the record reflecting

numerous non-price reasons for increased imports. For example, the Commission stated, "{w}e

are unpersuaded by respondents' argument that subject imports could have had no adverse price

effects because ***only [          ]*** responding purchasers reported switching from domestic producers

to subject imports ***with price as the [          ] reason***." Appx124018 (emphasis added). The

Commission discounts this significant statistic with vague data such as (i) "the [          ] of

responding purchasers report{ed} that price was ***among*** the top three factors influencing their

purchasing decisions and a very important factor"; and (ii) the purchasers who reported shifting

purchases from the domestic industry to subject imports ranked "price, cost, or profitability ***among***

the top three factors." Appx124018 (emphasis added). This conclusion is misleading and was not

supported by substantial evidence for several reasons.

First, with respect to the Commission's point about price being a top three factor

influencing the purchasing decisions for the "majority of responding purchasers," the Commission

failed to consider that, of those fifteen purchasers, only ***three*** listed "price/value" as their first

factor, and the majority listed price/value as the third most important factor, with only four listing

price/value as the second most important factor. Appx13688. Interestingly, the Commission

referred to the "price/value" factor cited in the record simply as "price." In other words, the Commission omitted the term "value" from that factor. Although not specified, "value" necessarily takes into account other factors, such as quality. The Commission does not address this distinction. Meanwhile, "quality" was by far the most important factor, with eighteen purchasers identifying quality as a top three factor, nine of which listed it as the most important factor and six as the second most important factor. Appx13688. Twelve purchasers listed "availability/capacity/scalability" as a top three factor, with five listing it as the most important factor, and five listing as the second most important factor. *Id*. Thus, ***twenty-five*** purchasers listed either "quality" or "availability/capacity/scalability" as the most or second most important purchasing factor compared to only ***seven*** that identified price/value. *Id*. Moreover, the record reflects that seven importers "indicated that subject imports (especially from China and/or Vietnam) were superior to product from the United States, describing imported mattresses as superior to U.S. mattresses in terms of quality, design, packaging, durability, reliability, and/or communication." Appx14857. The non-price differences in product from Vietnam are particularly significant given that the record shows Vietnam accounted for [                    ] increase in imports of the subject countries from 2018 to 2019, increasing total imports from [            ] to [                ] (a [      ] increase), a staggering [      ] of which were MiBs [                    ]. Appx116031, Appx116035.

Second, with respect to the Commission's point about price being a "very important" factor for the majority of responding purchasers, the record reflects that although thirteen of the responding purchasers identified price/value as a "very important" factor, there were ***seven*** other factors identified ***more frequently*** by purchasers than price:

- Reliability of supply (19 purchasers);

- Availability, overall (18 purchasers);

- Quality meets industry standards (17 purchasers);

- Product consistency (17 purchasers);

- Delivery time (16 purchasers);

- Quality exceeds industry standards (14 purchasers); and

- Availability of different sizes (14 purchasers).

Appx13689.

The data reflects that, for most of the above "very important" factors, purchasers frequently identified the United States as inferior to, or comparable with, the subject countries, with very few identifying the United States as superior. "Delivery time" was the only factor of the seven identified above where more purchasers identified the United States as being superior to the subject countries as opposed to inferior. With that said, thirty-three purchasers identified the subject countries as comparable to the United States with respect to delivery time. Appx13691-13693. For example, for "availability, overall" fifteen purchasers reported that the United States was inferior to the subject countries compared to ***only one*** that reported the United States was superior. *Id*. In the sole instance of a purchaser identifying the United States as superior to a subject country for "availability, overall," that subject country was China. *Id*. The data reflects that imports from China clearly [        ] over the relevant time period. Appx116031. For "reliability of supply," sixteen purchasers reported the United States as inferior to the subject countries compared to ten that reported the United States as being superior. Appx13691-13693. With respect to quality, seven purchasers reported that the United States was inferior to a subject country, compared to only two that reported the United States as being superior (China was the identified country in both instances). *Id*. For "product consistency," eleven listed the United States as inferior, compared

with only two that listed the United States as Superior (again, China was the identified country in both instances). *Id*.

Notably, even outside of the above seven factors, the subject countries were clearly preferable to the United States for the factors that pertain mostly, if not exclusively, to MiBs:

| Factor | Purchasers Identifying United States as Inferior to Subject Countries | Purchasers Identifying United States as Superior to Subject Countries |
|---|---|---|
| Ability to ship by common carrier (e.g., UPS, FedEx, USPS) | 18 | 2 |
| Consumer Online Ratings | 8 | 0 |
| Online Sales | 18 | 1 |
| Packaging (i.e., MiBs or flat-packed mattresses) | 18 | 0 |

Source: Appx13691-13693. In short, this data reflects that the Commission ignored several highly significant non-price reasons for an increase of imports from the subject countries. This failure undermines the Commission's conclusion that "low subject import prices contributed to the . . . shift in purchases from domestic producers to subject imports." Appx14777.

The Commission's analysis ignores even more market realities influencing the United States mattress market. For example, Respondents testified that the domestic market has seen increased demand due to non-price reasons for switching to MiB such as lower overhead costs, broader distribution channels and access to major delivery carriers, more nationwide coverage, the ability to centralize business practices into one large facility rather than having several smaller facilities spread throughout the country, and the ability to optimize sales to massive online retailers

like Amazon that afford preferable treatment to MiBs by, in Amazon's case, making it much easier for the product to be sold with an Amazon Prime tag. Appx12353-12359, Appx12364-12365. With these increased efficiencies, businesses can afford to increase inventory size, which therefore increases demand. Appx12354. However, since domestic producers do not have the capacity to meet this demand, the obvious solution is to import from subject countries. This is especially supported by substantial evidence (described above) reflecting that the subject countries commonly outperform the United States in key metrics and purchasing factors. Thus, while prices for imported mattresses are in fact lower, the record reflects that the real significant factors are increased demand and a market-wide shift to more efficient business practices—not lower prices.

## IV.   The Commission's Finding That Subject Imports Had a Significant Impact on the Domestic Industry was Unsupported by Substantial Evidence and Otherwise Contrary to Law.

Before considering impact on a domestic industry, the Commission must determine whether a material injury has occurred. "Material injury" is one that is not inconsequential, immaterial, or unimportant. 19 U.S.C. § 1677(7)(A). In assessing material injury, the Commission must consider (1) volume of subject imports, (2) effect on prices for the domestic like product, and (3) impact on domestic producers. Appx6526.

If the Commission has determined that the volume and price effects of subject imports are significant, the Commission must then assess "the impact of imports of such merchandise on domestic producers of domestic like products." *Tropicana Products, Inc. v. U.S.*, 31 CIT 548, 484 F. Supp. 2d 1330 (2007) (citing 19 U.S.C. § 1677(7)(B)(i)(III)). When examining the impact of subject imports, the Commission must "evaluate all relevant economic factors which have a bearing on the state of the {domestic} industry." 19 U.S.C. § 1677(7)(C)(iii). These factors include output, sales, inventories, capacity utilization, market share, employment, wages, productivity,

gross profits, net profits, operating profits, cash flow, ability to raise capital, return on capital, return on investment, ability to service debts, research and development, factors affecting domestic prices, growth, and investment. *Id.* § 1677(7)(B)(iii). All relevant factors are considered "within the context of the business cycle and conditions of competition that are distinctive to the affected industry." *Id.* No single factor is dispositive.

The Commission's material impact analysis was inadequate for three reasons. First, the Commission failed to conduct a market segmentation analysis. Second, the Commission failed to adequately assess certain indicia of improvements in the domestic industry during the POI. Third, the Commission did not consider alternative factors that may have caused certain declines in the domestic industry during the POI. The Commission's affirmative injury determinations are therefore unsupported by substantial evidence and otherwise contrary to law.

### A. *Record Evidence Showed Discrete MiB and FPM Market Segments Existed.*

The Commission should have conducted a segmented-market analysis, where MiBs and FPMs are wholly distinct in terms of design, consumer preference, method and speed of delivery, and packaging. Appx12381 (Jim Dougan of Economic Consulting Services {"ECS"} stating that that competition between MiBs and FPMs is highly attenuated, and an "injury analysis split between these two segments is not only possible, it is necessary.") *See Makita Corp. v. United States*, 974 F. Supp. 770, 788 (Ct. Int'l Trade 1997) (noting the Commission can apply a segmented-market analysis "in reaction to varying levels of customer demand, rather than to adjust for physical differences in the products themselves").

Mr. Dougan testified during the hearing that there is segmentation in the U.S. mattress market between MiBs and FPMs and that the data he reviewed supported a negative injury

determination. Appx12374. U.S. domestic producers are overwhelmingly concentrated in one segment or the other, and the majority of domestic production remains in the FPM segment.

The Commission's final decision did not recognize differences in consumer demand between MiBs and FPMs. The Commission stated that MiBs and FPMs are functionally interchangeable, but for the reasons stated above, such a characterization misses the mark. In *Mattresses from China*, No. 731-TA-1424, USITC Pub. No. 5000, at 39 (Dec. 2019), the Commission admitted MiBs and FPMs are different: "We recognize that MiBs offer . . . certain advantages over FPMs, such as the ability to drive a mattress home in the trunk of a car." Appx6551. In addition, Mr. Dougan testified during the hearing that the difference between MiBs and FPMs is not a mere matter of packaging, (Appx12375), and that petitioners' claims to the contrary do not align with their behavior in the real world (where they are investing in MiB production and hiring workers to produce MiBs). Appx12376. In summary, the Commission's failure to render a segmented-market analysis was erroneous and warrants remand.

**B.**  ***Record Evidence Showed Performance of the Domestic MiB Segment Improved Throughout the POI, the Domestic Industry Replaced its FPM Capacity and Production with MiB Production on Almost a One-To-One Basis over the POI, and Domestic Industry Increased its MiB Capacity Further in the Interim Period.***

As stated above, the Commission must consider all factors in rendering its decision regarding impact, and no one factor is dispositive. 19 U.S.C. § 1677(7)(C)(iii). The Commission failed to consider developments regarding MiBs relative to FPMs during the POI, including, but not limited to, the fact that: (1) the performance of the domestic MiB segment improved throughout the POI, (2) the domestic industry replaced its FPM capacity and production with MiB production on an almost one-to-one basis over the full years of the POI, and (3) domestic industry

increased its MiB capacity further in the interim period. This failure was erroneous and warrants remand.

The Commission referenced multiple factors in its final decision and determined the domestic industry's performance weakened according to most measures between 2017 and 2019. Appx14781. This finding is unfounded. Although certain aspects of the domestic industry declined over the POI, several other factors showed increases over that same period. U.S. producers focused in the MiB market and competing most directly with subject imports showed strong and significant improvements by increasing production, shipments, market share, and profitability for MiBs. More broadly, the financial sector, production numbers, capacity numbers, employment indicators, capital expenditures, and investment indicators all signaled no significant injury due to subject imports. Appx12383 (financial data); Appx12384 (investment and employment indicators); Appx12409 (U.S. mattress producers are replacing their mattress capacity and production of FPMs with MiBs, and "{are} pivoting to recognize that the composition of demand has changed"); Appx12454 (Cara Groden of ECS stating U.S. mattress producers are increasing capacity and production of MiBs "almost as fast as they can be."); Appx12459 (Ms. Groden stating production of MiBs in every year is at or above the MiB capacity from the prior year, and thus, the industry is "really ramping up their MiB production.").

Increased capacity and production signaled financial health in the industry, and were due to industry members' investments in the market during the POI to convert from FPM to MiB, in order to meet or increase consumer demand for MiBs. Appx12376. The one-for-one replacement of capacity from FPM to MiB reflects the reality of the market and demand shift.

In addition, several industry members reported plant openings, expansions, and acquisitions during the POI, such as [          ] and [                    ].   *See*   Appx89482,

**NON-CONFIDENTIAL VERSION**

Appx89531. These developments further evidence the industry's health, and should not be misconstrued as anything to the contrary. The Commission failed to adequately acknowledge and assign weight to these positive developments within the domestic industry.

Furthermore, U.S. consumption value increased every year from 2017 to 2020, from [      ] in 2017 to [        ] in 2018 to [          ], and an increase from [              ]    in interim 2019 to [          ] in interim 2020. Appx124464. U.S. shipments' unit value also went up each year during that period, from [       ] in 2017 to [      ] in 2017 to [       ] in 2019, and an increase from [        ] in interim 2019 to [      ] in interim 2020. *Id*. Additionally, unit labor costs for U.S. producers increased every year of the POI, from [         ] in 2017 to [         ] in 2018 to [         ] in 2019, and an increase from [         ] in interim 2019 to [         ] in interim 2020. *Id*. The net sales unit value for U.S. producers also increased from [      ] in 2017 to [      ] in 2018 to [        ] in 2019, and an increase from [           ] in interim 2019 to [          ] in interim 2020. *Id.* These increases across many facets of the domestic economy are significant, and the Commission's failure to acknowledge them in its decision is a basis for remand.

[

]

Source: Appx124464.

Moreover, as a proportion of shares of apparent MiB consumption, U.S. producers' domestic shipments increased from [      ] in 2017 to [      ] in 2018 to [      ] in 2019, and increased from [      ] in interim 2019 to [      ] in interim 2020. Appx124265. The Commission states that "[t]he industry's share of apparent U.S. consumption declined from [      ] percent in 2017 to [   ] percent in 2018 and to [   ] percent in 2019, a level [   ] percentage points lower than in 2017. The industry's share of apparent U.S. consumption was [      ] percent in interim 2020, compared to [   ] percent in interim 2019," *see* Appx124102, but the Commission conflated producers' share of U.S. consumption quantity (see Appx124464) with the *apparent* MiB consumption quantity figures above, found in Appx124265. Again, this is another example of a detail that either went unnoticed or unmentioned by the Commission; either way, this presents yet another reason for remand. [

] Source: Appx124265.

The Commission did not acknowledge any of these increases in its final decision. Therefore, the Commission's decision – which only cites *some*, but not *all*, of the relevant record evidence that would support a negative impact determination – provides an incomplete picture of the current state of the domestic industry. Such a failure warrants remand.

The Commission's failure to adequately acknowledge both the evidence in favor of and against a negative impact determination is the same type of error this Court found problematic in *Nevinnomysskiy Azot v. United States*, 31 CIT 1373, 29 ITRD 2352 (2007) (slip op.). In that case, the Commission considered whether subject imports of urea would depress U.S. urea prices. The Commission rendered an affirmative injury determination. On appeal, this Court observed that the Commission only cited data supporting its position. Due to the Commission's "total failure to consider or discuss record evidence" which "provides significant support for an alternative conclusion," the Court remanded the Commission's finding for further analysis of whether the subject imports likely would depress U.S. urea prices. *Id.* at 1392. On remand, the Commission was ordered to "look at the evidence as a whole and not draw conclusions from isolated points of data while ignoring the context of the industry's business cycle." *Id.* at 1394. Similarly, in this case, the Commission *ignored considerable record evidence*. Accordingly, this Court should follow the *Nevinnoymysskiy* ruling and should remand this case back to the Commission for a more objective assessment of the record evidence.

Another case that illustrates the extent to which the Commission must remain even-handed is *Nucor Corp.* In that case, the Commission made a negative injury determination and, on appeal, this Court considered, *inter alia*, whether substantial evidence supported the Commission's finding that subject imports did not adversely impact the domestic industry during the POI. *Nucor Corp. v. United States*, 28 CIT 188, 255, 318 F. Supp. 2d 1207, 1264 (2004), *aff'd*, 414 F.3d 1331, 251-255 (Fed. Cir. 2005). This Court found the Commission's negative impact decision was supported by substantial evidence, because the Commission had properly considered evidence of both decreases and increases on various factors affecting the domestic industry – rather than solely

citing evidence supporting a negative impact determination. *Id.* at 255. By contrast, in this case, the Commission failed to properly acknowledge all the factors that bear on the impact analysis.

As in *Nevinnomysskiy* and *Nucor*, the Commission's failure to adequately consider all evidence requires remand.

### C.    Record Evidence Showed Alternative Factors Affected the Domestic Industry's Financial Performance, such as the Decreasing Demand for FPMs and the Increasing Competition in the U.S. in the MiB Segment During the POI

The Commission did not sufficiently acknowledge the decreasing demand for FPMs (due to the rise in MiBs) and the increased competition within the U.S. MiB segment to acquire share as alternative factors that played a contributory role. Mattress demand growth during the POI was "explained by the increase in demand for MiBs as the demand for FPMs fell over the full years of the POI and between the interim periods." Appx12374, and Appx12382 ("The domestic {mattress} industry's capacity and production accounts for the entirety of any decline in the industry's capacity and production."). MiBs as a whole grew as a share of the mattress market and domestic mattress producers grew as a share of the MiB market. Appx12407-12408 (Dougan opining that "to {him}, that doesn't look like injury"). The Commission did not fully acknowledge these developments and their impact on domestic industry.

In addition, the Commission did not sufficiently consider the impact of raw material shortages. Domestic MiB producers likely would have captured even more of the overall mattress market vacated by FPMs during the partial year 2020 if not for supply constraints on raw materials. Appx12377. The Commission was mistaken when it attributed the domestic industry's inability to capitalize on strong demand growth to an increase in low-priced subject imports, *see* Appx14781, when in fact, the raw material shortage was the culprit for such an inability to capitalize. Foam is a critical component of mattress construction, and although foam capacity was abundant in the

domestic industry, the chemicals that would be necessary in order to actually produce foam were in short supply. Appx12458 (Dougan noting there was "plenty of foam capacity" but domestic producers "needed the necessary chemicals in order to do that, and they were unable to obtain those chemicals"); Appx12395 (Dougan analogizing restrictions on raw material inputs to an automobile: "…{T}hat's a bit like saying, I have no constraint on how far I can drive because I have a 15-gallon tank . . . but if I can't get gas, that's irrelevant.").

Like this case, in *Outboard Engines of Japan*, there were alternative factors that the Commission failed to consider that accounted for adverse impacts to the domestic industry. *Outboard Engines from Japan*, Inv. No. 731-TA-1069 (Final), USITC Pub. No. 3752, 2005 WL 630159 (Feb. 2005). There are clear parallels between the two-stroke versus four-stroke engines in *Outboard Engines from Japan* and the MiB/FPM mattresses in this case. As described above, in *Outboard Engines*, demand for emissions-compliant two-stroke direct injection and four-stroke engines increased during the POI, and the demand for non-compliant two-stroke carbureted and two-stroke EFI engines, mainly produced by the domestic industry, decreased during the same period. 2005 WL 630159, at *10. Although domestic industry did not fully keep up with overall consumption increases over the POI, the Commission found that imports did not have a significant effect on the domestic industry's performance because the growing demand for four-stroke engines was in fact the cause of the declines in financial performance of the domestic industry. *Id.* at *22-24. Thus, *Outboard Engines* stands for the notion that a decline in share for a domestic product (here, FPMs) is not necessarily a sign of injury by reason of subject imports (here, MiBs).

The same logic applies here—although the importation of MiBs increased during the POI, that increase did not translate to a significant adverse impact on the domestic industry for MiBs.

NON-CONFIDENTIAL VERSION

*Uncoated Groundwood Paper from Canada* is another example of a case in which alternative factors were the primary cause of harm to domestic injury, as opposed to subject imports. *See generally* Inv. No. 701-TA-584, USITC Pub. No. 4822 (Sept. 2018). In that case, the Commission found no material impact from subject imports because certain losses in market share were due to an inability of domestic producers to produce enough of the product to meet demand, not due to subject imports. *Id.* at *36-37. Although some share had been lost to imports, the Commission determined those losses were due to a shift in corporate strategy. *Id.* at 37. This Court should make a similar finding in this case.

For the foregoing reasons, the Commission's determination that subject imports had a significant impact on the domestic industry was unsupported by substantial evidence and otherwise not in accordance with law.

### CONCLUSION

For the foregoing reasons, the Court should hold unlawful the Commission's affirmative final injury determinations and should remand with instructions for the Commission to issue a determination consistent with the Court's decision.

Dated: March 28, 2022                     Respectfully submitted,


                                          /s/ Geoffrey M. Goodale
                                          Geoffrey M. Goodale
                                          Andrew R. Sperl
                                          Nathan J. Heeter
                                          DUANE MORRIS LLP
                                          505 9th Street, N.W. – Suite 1000
                                          Washington, D.C. 20004
                                          Tel: 202-776-5211
                                          gmgoodale@duanemorris.com

**<u>NON-CONFIDENTIAL VERSION</u>**

Stephen G. Larson
Robert C. O'Brien
Paul A. Rigali
LARSON LLP
555 South Flower Street, Suite 4400
Los Angeles, CA 90071
Tel: 213-436-4864
slarson@larsonllp.com

*Counsel for Plaintiff CVB, Inc.*

**NON-CONFIDENTIAL VERSION**

**Certificate of Compliance with Chambers Procedures 2(B)(1)**

The undersigned hereby certifies that the foregoing brief contains 13,759 words, exclusive of the caption block, table of contents, table of authorities, signature block, and certificates of counsel, and therefore complies with the maximum 14,000 word count limitation set forth in the Standard Chambers Procedures of the U.S. Court of International Trade.

/s/ Geoffrey M. Goodale