*PUBLIC VERSION*

---

## UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE:  THE HONORABLE STEPHEN ALEXANDER VADEN

---

Court No. 21-00288

---

**CVB, INC.,**

*Plaintiff,*

v.

**UNITED STATES,**

*Defendant,*

and

**BROOKLYN BEDDING, LLC, *et. al.*,**

*Defendant-Intervenors.*

---

## DEFENDANT UNITED STATES INTERNATIONAL TRADE COMMISSION'S MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR JUDGMENT ON THE AGENCY RECORD

---

BRIAN R. SOISET
Attorney for Defendant
Office of the General Counsel
U.S. International Trade Commission
500 E Street, SW
Washington, DC  20436
Telephone (202) 205-3399
Fax: (202) 205-3111

ANDREA C. CASSON
 Assistant General
 Counsel for Litigation
 (202) 205-3105

**DATED:  JUNE 13, 2022**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................... iv

I.  STATEMENT PURSUANT TO RULE 56.2 ...........................................1

    A.  Administrative Determination Sought to be Reviewed .....................1

    B.  Questions Presented and Summary of Argument................................2

        1.  Are the Commission's Conditions of Competition Findings, Including that Mattresses-in-a-Box ("MiBs") and Flat Packed Mattresses ("FPMs") Compete in the U.S. Market and that Price Was an Important Purchasing Factor, Supported by Substantial Evidence and in Accordance with Law?...................................2

        2.  Is the Commission's Volume Finding Supported by Substantial Evidence and in Accordance with Law? ................................2

        3.  Are the Commission's Price Findings Supported by Substantial Evidence and in Accordance with Law?...................................3

        4.  Are the Commission's Impact Findings Supported by Substantial Evidence and in Accordance with Law?...................................4

II.  STATEMENT OF FACTS ..................................................................4

III.  ARGUMENT ..................................................................................13

    A.  Standard of Review.........................................................................13

    B.  The Commission Acted in Accordance with Law in Applying the Statutory Factors and Properly Explained the Basis for its Findings ..................16

    C.  The Commission's Analysis of Substitutability and Market Segments Was Supported by Substantial Evidence.................................17

    D.  The Commission's Finding that Price Was an Important Purchasing Factor Was Supported by Substantial Evidence ................................26

    E.  The Commission's Volume Findings are Supported by Substantial Evidence and in Accordance with Law ................................................29

        1.  The Commission's Volume Findings are in Accordance with Law ................................................................29

        2.  The Commission's Volume Findings are Supported by Substantial Evidence................................................................31

**TABLE OF CONTENTS (cont'd)**

F.   The Commission's Price Effects Findings are Supported by
     Substantial Evidence and in Accordance with Law.................................33

     1.   The Commission's Finding of Significant Underselling is
          Supported by Substantial Evidence ...........................................34

     2.   The Commission's Price Depression Finding is Supported
          by Substantial Evidence...........................................................36

G.   The Commission's Impact Finding is Supported by Substantial
     Evidence and in Accordance with Law ..................................................41

     1.   The Commission's Impact Finding is in Accordance with
          Law ...........................................................................................41

     2.   The Commission's Impact Finding is Supported by
          Substantial Evidence ...............................................................41

     3.   The Commission's Analysis of Other Factors is Supported
          by Substantial Evidence...........................................................46

**CONCLUSION** .............................................................................................**48**

## **TABLE OF AUTHORITIES**

**Cases**                                                                                          **Page(s)**

*Acciai Speciali Terni, S.p.A. v. United States*,
  19 CIT 1051 (1995) ....................................................................................................27

*Altx, Inc. v. United States*,
  370 F.3d 1108 (Fed. Cir. 2004).............................................................................15, 30

*Arlanxeo USA LLC v. United States*,
  389 F. Supp. 3d 1330 (Ct. Int'l Trade 2019), *aff'd*, 819 F. App'x 925 (Fed.
  Cir. 2020) ...................................................................................................................29

*AWP Indus., Inc. v. United States*,
  35 CIT 774, 783 F. Supp. 2d 1266 (2011) ........................................................25, 48

*BIC Corp. v. United States*,
  21 CIT 448, 964 F. Supp. 391 (1997) ...............................................................43, 44

*Cleo, Inc. v. United States*,
  30 CIT 1380 (2006), *aff'd*, 501 F.3d 1291 (Fed. Cir. 2007)...........................25, 33

*Coal. of Gulf Shrimp Indus. v. United States*,
  71 F. Supp. 3d 1356 (Ct. Int'l Trade 2015) ....................................................25, 46

*Consolo v. Fed. Mar. Comm'n*,
  383 U.S. 607 (1966)....................................................................................................14

*DAK Americas LLC v. United States*,
  517 F. Supp. 3d 1349 (Ct. Int'l Trade 2021) ........................................................10

*Encon Indus., Inc. v. United States*,
  16 CIT 840 (1992) ...........................................................................................22, 23, 33

*Goss Graphics Sys., Inc. v. United States*,
  22 CIT 983, 33 F. Supp. 2d 1082 (1998),
  *aff'd*, 216 F.3d 1357 (Fed. Cir. 2000)....................................................................15

*Hitachi Metals, Ltd. v. United States*,
  949 F.3d 710 (Fed. Cir. 2020).....................................................................14, 15, 43

*Hitachi Metals, Ltd. v. United States*,
  No. 17-140, Order (Ct. Int'l Trade Sept. 1, 2017) (ECF 35) (*unpublished*) ...........................1

*Hynix Semiconductor, Inc. v. United States*,
  30 CIT 1208, 431 F. Supp. 2d 1302 (2006)............................................................29

# TABLE OF AUTHORITIES (cont'd)

**Cases (cont'd)**                                                                                         **Page(s)**

*ITG Voma Corp. v. U.S. Int'l Trade Comm'n*,
   253 F. Supp. 3d. 1339 (Ct. Int'l Trade 2017), *aff'd*, 753 F. App'x 913 (Fed.
   Cir. 2019) ...............................................................................................................3, 30, 32

*JMC Steel Grp. v. United States*,
   70 F. Supp. 3d 1309 (Ct. Int'l Trade 2015) ........................................................16, 25, 38, 46

*Makita Corp. v. United States*,
   21 CIT 734, 974 F. Supp. 770 (1997) ....................................................................................43

*Nevinnomysskiy Azot v. United States*,
   31 CIT 1373 (2007) ................................................................................................................45

*Nippon Steel Corp. v. United States*,
   458 F.3d 1345 (Fed. Cir. 2006).........................................................................................14, 15

*Nucor Corp. v. United States*,
   28 CIT 188, 318 F. Supp. 2d 1207 (2004) ........................................................................15, 45

*Nucor Corp. v. United States*,
   414 F.3d 1331 (Fed. Cir. 2005).............................................................................................43

*OCTAL Inc. v. United States*,
   539 F. Supp. 3d 1291 (Ct. Int'l Trade 2021) ...........................................................3, 27, 30, 32, 39

*Sandvik Steel Co. v. United States*,
   164 F.3d 596 (Fed. Cir. 1998)..........................................................................................22, 39

*Shandong TTCA Biochem. Co., Ltd. v. United States*,
   34 CIT 582, 710 F. Supp. 2d 1368 (2010) ..............................................................................1

*Shandong TTCA Biochem. Co., Ltd. v. United States*,
   35 CIT 545, 774 F. Supp. 2d 1317 (2011) ...........................................................................16

*Siemens Am., Inc. v. United States*,
   2 CIT 136 (1981), *aff'd*, 692 F.2d 1382 (Fed. Cir. 1982)................................................24, 25

*Siemens Energy, Inc. v. United States*,
   806 F.3d 1367 (Fed. Cir. 2015)............................................................................................14

*Swiff-Train Co. v. United States*,
   793 F.3d 1355 (Fed. Cir. 2015)............................................................................................41

*Timken U.S. Corp. v. United States*,
   421 F.3d 1350 (Fed. Cir. 2005)............................................................................................15

## TABLE OF AUTHORITIES (cont'd)

**Cases (cont'd)**                                                      **Page(s)**

*Tropi-Cal v. United States*,
    63 Cust. Ct. 518 (1969)........................................................................................25

*U.S. Steel Grp. v. United States*,
    96 F.3d 1352 (Fed. Cir. 1996)............................................................15, 25, 37, 48

*Universal Camera Corp. v. NLRB*,
    340 U.S. 474 (1951)............................................................................................14

*USEC Inc. v. United States*,
    34 F. App'x 725 (Fed. Cir. 2002) .......................................................................15

*Usinor v. United States*,
    28 CIT 1107, 342 F. Supp. 2d 1267 (2004)..................................................25, 46

**Statutes**

19 U.S.C. § 1516a(b)(1)(B)(i)................................................................................13

19 U.S.C. § 1671d(b)(1) .........................................................................................41

19 U.S.C. § 1673d(b)(1) .........................................................................................41

19 U.S.C. § 1677(7)(B) ...........................................................................................30

19 U.S.C. § 1677(7)(B)(i) ........................................................................................41

19 U.S.C. § 1677(7)(B)(i)(I) ....................................................................................29

19 U.S.C. § 1677(7)(C)(i) ..................................................................................29, 30

19 U.S.C. § 1677(7)(C)(ii)..........................................................................30, 33, 34

19 U.S.C. § 1677(7)(C)(iii)......................................................................................41

19 U.S.C. § 1677(7)(G)(i).......................................................................................39

19 U.S.C. § 2411.......................................................................................................8

28 U.S.C. § 2639(a)(1)........................................................................................13, 14

**TABLE OF AUTHORITIES (cont'd)**

**Legislative Materials**                                                    **Page(s)**

Statement of Administrative Action accompanying the Uruguay Round
    Agreements Act, H.R. Rep. No. 103-316, vol. I (1994) ...................................................15, 41

S. Rep. No. 96-249 (1979) ...........................................................................................29, 41

H.R. Rep. No. 96-317 (1979)...............................................................................................41

**USITC Publications**

*Outboard Engines from Japan*,
    Inv. No. 731-TA-1069 (Final), USITC Pub. 3752 (Feb. 2005) ...................................32, 43, 44

*Uncoated Groundwood Paper from Canada*,
    Inv. Nos. 701-TA-584 and 731-TA-1382 (Final), USITC Pub. 4822 (Sept.
    2018) .........................................................................................................................43, 44

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

Defendant U.S. International Trade Commission opposes plaintiff's motion for judgment upon the agency record.  Plaintiff, CVB, Inc. ("CVB"), which also does business as "Malouf Sleep," imports subject mattresses, from [███████████████████████████████ ███████].   APPX124045; *see also* APPX124224-124225 (individual firm imports by country in 2019).  The Commission respectfully asks the Court to affirm the Commission's determinations because they are supported by substantial evidence and in accordance with law.

## I.   STATEMENT PURSUANT TO RULE 56.2

### A.   Administrative Determination Sought to be Reviewed

Plaintiff seeks review of the Commission's unanimous final affirmative determinations in the countervailing and antidumping duty investigations of *Mattresses from Cambodia, China, Indonesia, Malaysia, Serbia, Thailand, Turkey, and Vietnam,* Inv. Nos. 701-TA-645 and 731-TA-1495-1501 (Final).[1]  Notice of these determinations was published at 86 Fed. Reg. 26,545 (May 14, 2021) (APPX14715).  The public version of the Commission's Views and Staff Report for these investigations is contained in USITC Pub. 5191 (May 2021) (APPX14727-15238).  The confidential version of the Commission's Views is at APPX124045-124115 and the confidential report is at APPX124117-124570.

---

[1] CVB did not import subject merchandise from [██████] during the period of investigation ("POI").  *See* [████████████].  Accordingly, it does not have standing to challenge the Commission's determination concerning the dumped imports from that country. *See generally Hitachi Metals, Ltd. v. United States,* Ct. Int'l Trade No. 17-140, Order dated Sept. 1, 2017 (ECF 35); *Shandong TTCA Biochem. Co., Ltd. v. United States,* 34 CIT 582, 710 F. Supp. 2d 1368 (2010).

1

**B.      Questions Presented and Summary of Argument**

    **1.      Are the Commission's Conditions of Competition Findings, Including that Mattresses-in-a-Box ("MiBs") and Flat Packed Mattresses ("FPMs") Compete in the U.S. Market and that Price Was an Important Purchasing Factor, Supported by Substantial Evidence and in Accordance with Law?**

Yes.  The Commission properly considered record evidence concerning MiBs and FPMs, and it reasonably found that these products are interchangeable and comparable, made to the same specifications and with many of the same materials, and compete for the same purchasers and consumers.  Likewise supported by substantial evidence is the Commission's finding that wholesalers, retailers or purchasers generally do not focus on or prefer mattresses packaged in a particular way.  Rather, the record showed that most responding purchasers purchased both MiBs and FPMs, marketed and sold them side-by-side, and that sleep studies indicated that consumers prioritized price and were indifferent to packaging.  The record also supports the Commission's finding that price was an important purchasing factor, as evidenced by the purchaser responses indicating that price was one of three most important purchasing factors and generally very important, although certain non-price factors, such as quality (but not including packaging), were also important.

    **2.      Is the Commission's Volume Finding Supported by Substantial Evidence and in Accordance with Law?**

Yes.  The Commission's findings that the volume and increase in subject imports were significant, both absolutely and relative to apparent U.S. consumption, were supported by substantial evidence.  Plaintiff does not contest that the import data in fact showed increases in the subject import volume and market share.  Rather, CVB argues that the Commission should have conducted an extra-statutory analysis of "volume effects" so as to incorporate into the volume findings a discussion of the domestic industry's performance and of respondents' market

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

segmentation contentions.  As this Court has previously recognized, however, the statute does not require the Commission to consider the effects of subject imports in its volume analysis.  *See OCTAL Inc. v. United States*, 539 F. Supp. 3d 1291, 1300 (2021); *ITG Voma Corp. v. U.S. Int'l Trade Comm'n*, 253 F. Supp. 3d 1339, 1357 (2017), *aff'd*, 753 F. App'x 913 (Fed. Cir. 2019). Further, as the Commission discussed elsewhere in its Views, the record did not support respondents' market segmentation allegations for purposes of any aspect of the Commission's injury analysis.

### 3.    Are the Commission's Price Findings Supported by Substantial Evidence and in Accordance with Law?

Yes.  The Commission found that subject imports significantly undersold the domestic like product based on pricing data and purchase cost data showing that subject imports were lower priced in [          ] comparisons.  Additionally, given the importance of price and changes in purchasers' purchases during the POI, the Commission reasonably found that subject imports' significant underselling had contributed to their gaining sales and market share at the domestic industry's expense.  Further, the Commission found that subject imports depressed domestic prices based on the pricing data, which indicated that domestic prices decreased for most products during a time of increasing apparent U.S. consumption and rising production costs.  In challenging these price findings, CVB does not show that the Commission's methodology was unreasonable, but rather faults the Commission for not instead using plaintiff's proffered—and results-oriented—methodologies.  Nor has CVB shown that the Commission's factual findings were not supported by substantial record evidence; rather plaintiff asks this Court to reweigh the evidence in a manner that leads to the conclusions plaintiff would prefer.

**4.      Are the Commission's Impact Findings Supported by Substantial Evidence and in Accordance with Law?**

Yes.  The Commission considered all relevant economic factors.  It observed that in a period of strong demand growth and available domestic capacity, the domestic industry lost market share to subject imports and experienced declining performance across most measures between 2017 and 2019.  Further, the domestic industry's declining prices and increasing costs resulted in stagnant net sales revenues and gross profits, and declining operating income and net income between 2017 and 2019.  While acknowledging improvements in many indicia in 2020, the Commission noted that these improvements resulted from the imposition of antidumping duty and section 301 tariffs on imports of mattresses from China in 2018-19, and that these improvements were less than they would have been absent the significant increases in low-priced subject imports in 2020.  The Commission considered respondents' arguments that subject imports' impact on the domestic industry was attenuated by market segmentation between MiBs and FPMs, but it found that the record indicated that these products competed in the market and thus did not support market segmentation based on packaging type.  It further found that neither demand trends nor nonsubject imports explained changes in the domestic industry's performance during the POI.

Here again, Plaintiff provides no legitimate basis for disturbing the Commission's findings.  Instead, as with its arguments pertaining to other aspects of the Commission's determination, CVB mischaracterizes the Commission's analysis and improperly invites this Court to reweigh the evidence.

## II.    STATEMENT OF FACTS

On March 31, 2020, seven domestic mattress producers, as well as two unions representing workers at domestic mattress facilities, filed petitions with the Department of

Commerce and the Commission alleging that an industry in the United States was materially injured or threatened with material injury by reason of subsidized imports of mattresses from China and dumped imports of mattresses from Cambodia, Indonesia, Malaysia, Serbia, Thailand, Turkey, and Vietnam.  APPX80000-80001.  During the preliminary phase of these investigations, respondent parties, including CVB, alleged that the U.S. market for mattresses was segmented between MiBs and FPMs, and it requested that the Commission collect additional data regarding these products in any final phase of the investigations.  APPX94094-94097.  The Commission reached affirmative preliminary determinations.  85 Fed. Reg. 30,984 (May 21, 2020); APPX9046.  In addressing respondents' allegations of market segmentation between MiBs and FPMs, the Commission noted that it had declined to find any such U.S. market segmentation in its recently completed antidumping investigation of *Mattresses from China*, because the record of that investigation—completed just six months prior[2]—lacked support for that allegation.  The Commission further noted that it had not collected data specific to MiBs and FPMs in the preliminary phase of the current investigations, but that it would seek to further examine the issue in any final phase of the investigations.  APPX101413-101414.

The Commission subsequently issued draft questionnaires for the final phase of the investigations and requested that parties provide suggestions for additional data that they believed the Commission should collect.  APPX9700-9701.  CVB (with other respondent parties)

---

[2] The public version of the Commission Views for the China antidumping investigation is contained in *Mattresses from China*, Inv. No. 731-TA-1424 (Final), USITC Pub. 5000 (Dec. 2019).  The confidential version of those Views was also included on the record of these underlying investigations and is available at APPX92946-93011.  The discussion of alleged market segmentation between MiBs and FPMs appears at APPX92991-93002.  For clarity, we note that the instant investigations cover imports from China found by Commerce to be subsidized, whereas the earlier investigation addressed only dumped imports from China.

submitted comments requesting the collection of data regarding MiBs and FPMs.[3]  In this regard,

they sought the incorporation of questions from the *Mattresses from China* antidumping

investigation, such as U.S. shipments and pricing data that were segregated by packaging types.

They also requested the addition of new questions, for instance asking purchasers (*e.g.*,

wholesalers and retailers that purchase mattresses from producers and importers) to distinguish

between MiB and FPM purchases and to rank factors such as the ability to use a common carrier

for a mattress product.  APPX9908-9918.  The Commission incorporated these suggestions into

its questionnaires and sought the data identified by CVB regarding MiBs and FPMs from

domestic producers, importers, purchasers, and foreign producers for the final phase.

APPX10198-10417.  In December 2020, the Commission issued the questionnaires to domestic

producers, importers, foreign producers, and U.S. purchaser firms.  APPX4182.

After Commerce reached affirmative dumping and subsidization determinations, the

Commission continued its final investigations and unanimously determined that an industry in

the United States was materially injured by reason of imports of subject mattresses.

APPX124043.  The Commission's determinations were based on its collection and evaluation of

data covering the POI from January 2017 to September 2020.  In addition to data for full years

2017, 2018, and 2019, the Commission's report contained data comparing January-September

2019 to January-September 2020 ("interim periods").  The Commission defined a single

---

[3] In October 2020, after submission of its final phase questionnaire comments, CVB filed
a complaint in a Utah federal district court alleging that the domestic industry's petitions in these
underlying investigations violated antitrust laws.  On May 23, 2022, the Utah district court
entered an order dismissing with prejudice CVB's claims concerning the underlying petitions.
The court found that the petitioning domestic mattress firms were immune to antitrust claims
under the *Noerr-Pennington* doctrine.  It further found that CVB had not pleaded sufficient facts
to establish fraud on the part of petitioners or that any such fraud had altered the result of the
petitions given the extensive investigation and record compiled by the Commission.  *See* Order,
No. 1:20-CV-00144 (D. Utah May 23, 2022) (ECF 79).

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

domestic like product encompassing all mattresses within the scope of the investigations, and it also defined a single domestic industry including all domestic producers of mattresses with the exception of firms excluded pursuant to the related parties provision.  It cumulated subject imports from all sources for its material injury analysis.  APPX124047-124073.  During the final phase, CVB did not argue for another domestic like product definition or against cumulation, and it does not challenge the Commission's findings on these issues.

The Commission considered the conditions of competition for the U.S. market for mattresses, and particularly that the U.S. market encompassed a variety of mattress types, including innerspring mattresses, foam mattresses, hybrid mattresses, each type of which were packaged both as MiBs and FPMs.  APPX124080.  The Commission noted that demand for mattresses is tied to housing sales and economic activity, which had led to an increase in apparent U.S. consumption over the POI.  APPX124077-124079.  While recognizing that apparent U.S. consumption of MiBs increased during the POI and that for FPMs declined, the Commission observed that FPMs nevertheless continued to account for a larger share of apparent U.S. consumption throughout the POI and that majorities of responding producers, importers, and purchasers reported that demand for FPMs was stable or increasing.  APPX124078.

Domestic producers produced all types of mattresses and packaged them as both FPMs and MiBs during the POI.  APPX124079-124080.  While domestic firms tended to specialize in particular mattress types, they had more overlap regarding packaging types used, with firms that produced both MiBs and FPMs accounting for [＿＿＿＿] of U.S. MiB production in 2019.[4] APPX124080.  The Commission further noted the shift in supply for subject imports during the

---

[4] In 2019, 12 of 53 responding domestic producers reported producing both MiBs and FPMs; these 12 firms accounted for [＿＿] percent of domestic MiB production that year. APPX124080.

**BUSINESS PROPRIETARY INFORMATION**
**SUBJECT TO PROTECTIVE ORDER REDACTED**

POI from China to other subject countries, as imports from these other countries surged following imposition of the antidumping and section 301 tariffs on merchandise from China.[5] APPX124081-124082.  Even with this shift, subject imports accounted for the second largest supply to the U.S. market throughout the POI.  APPX124079.  The Commission noted that many mattress producers in Cambodia, Indonesia, Malaysia, Serbia, Thailand, Turkey, and Vietnam were China-based firms that had switched the location of production facilities from which they supplied the U.S. market during the POI.  APPX124081-124082.

Regarding substitutability, the Commission found that domestically produced mattresses and subject imports had a moderately high degree of substitutability.  In particular, most responding U.S. producers, importers, and purchasers reported that domestic and subject mattresses are always or frequently interchangeable, and are comparable with respect to all 26 purchasing factors (including with respect to packaging types and ability to ship by common carrier).  APPX124083.  While noting that subject imports were more often shipped as MiBs and domestic mattresses more often shipped as FPMs, the Commission found that MiBs competed with FPMs in the U.S. market.  APPX124083-124086.  Sleep studies indicated that packaging was among the least important purchasing factors for consumers, and respondents conceded that consumers cross-shop between MiBs and FPMs.  APPX124084-124085.  These consumer preferences were consistent with questionnaire responses from both wholesale purchasers and retail firms who purchase directly from producers or importers.  Eleven of 19 responding

---

[5] *See* 19 U.S.C. § 2411.  In 2017 and 2018, subject imports from China accounted for over [ ▮ ] percent of cumulated subject imports in the U.S. market.  After the imposition of duties under section 301 of the Trade Act of 1974 ("section 301 duties") in 2018 and provisional measures in the prior antidumping investigations for mattresses from China in 2019, subject imports from China declined precipitously while those from other subject countries increased [ ▮▮▮ ] percent between 2018 and 2019.  APPX124081-124082.

**BUSINESS PROPRIETARY INFORMATION**
**SUBJECT TO PROTECTIVE ORDER REDACTED**

purchasers reported purchasing or importing both MiBs and FPMs, including [████████

████]. APPX124085-124086.  Further, retailers displayed MiBs and FPMs side-by-side

without distinction; online retailers did not offer search filters for packaging type; and only two

of 19 responding purchasers ranked packaging as one of the three most important purchasing

factors for mattresses.  APPX124085-124086.

      The Commission emphasized that price was an important purchasing factor for

mattresses.  More responding purchasers ranked price as one of the three most important

purchasing factors than any other factor, and price was among the most frequently cited factors

as being very important, along with factors such as availability, quality, delivery time, and

reliability of supply.  APPX124086-124087.  Four purchasers also reported that they usually or

always purchased the lowest priced mattresses, while 16 reported that they sometimes did.

APPX124086-124087.

      The Commission next found that the volume and increase in volume of cumulated

subject imports was significant, both absolutely and relative to apparent U.S. consumption.

Subject import volumes increased from 5.5 million units in 2017 to 7.0 million units in 2018 and

7.8 million units in 2019; their volume was higher in interim 2020 at 7.4 million units than in

interim 2019 at 5.3 million units.  APPX124090.  Their U.S. shipments also increased from [████

████] units in 2017 to [████████] units in 2018 and [████████] units in 2019, and were

higher in interim 2020 ([████████] units) than in interim 2019 ([████████] units).

APPX124090.  Subject imports' share of apparent U.S. consumption also increased throughout

the POI, from [████] percent in 2017 to [████] percent in 2018 and [████] percent in 2019, and it

increased from [████] percent in interim 2019 to [████] percent in interim 2020.  APPX124090.

**BUSINESS PROPRIETARY INFORMATION**
**SUBJECT TO PROTECTIVE ORDER REDACTED**

The Commission also noted the increases in subject imports' share of apparent U.S. consumption mirrored similar decreases in the domestic industry's market share.[6]  APPX124090.

The Commission found that subject imports significantly undersold the domestic like product.  Examining the pricing data for eight mattress products, subject imports undersold the domestic like product in [███] of [███] quarterly comparisons, or in [███] percent of comparisons, at margins averaging [███] percent.  The quarters with underselling also accounted for [███] percent of reported volumes of subject imports in the pricing data.  APPX124092.  The Commission also collected purchase cost data for the same pricing product definitions,[7] and these data also indicated that subject imports had a lower price-cost differential in [████████████] of comparisons.[8]  APPX124092-124093.

Reiterating the moderately high substitutability between subject imports and the domestic like product and the importance of price, the Commission observed that seven purchasers reported that subject imports were lower priced than the domestic like product, and further that responding purchasers had overall reduced the domestic industry's share of their purchases by [███] percentage points while increasing their share of subject import purchases by [███]

---

[6] Between 2017 and 2019, subject imports gained [███] percentage points of market share while the domestic industry lost [███] percentage points of market share.  Between interim 2019 and interim 2020, subject imports gained [███] percentage points of market share while the domestic industry lost [███] percentage points of market share.  APPX124090.

[7] The Commission uses the term "price data" to refer to U.S. importers' and domestic producers' sales price for shipments to unrelated customers, whereas it uses the term "purchase cost data" to refer to the landed duty-paid ("LDP") *value* of imports made by U.S. importers for their internal consumption or for retail sale.  *See DAK Americas LLC v. United States*, 517 F. Supp. 3d 1349, 1356 (Ct. Int'l Trade 2021).

[8] These data indicated that the LDP costs for subject imports were below those for U.S. mattresses in [███] of [███] quarterly comparisons involving [███] percent of subject import units in these data, and at price-cost differentials averaging [███] percent.  APPX124092-124094.

percentage points between 2017 and 2019.  APPX124094.  While acknowledging that few responding purchasers reported switching purchases from the domestic product to subject imports because of price, the Commission explained that the questionnaire evidence nonetheless indicated that purchasers at the wholesale level as well as consumers found price to be an important factor, that purchasers had shifted purchases from the domestic industry to subject imports during the POI, and that the pricing data showed subject imports to be lower-priced. APPX124094-124095.  The Commission thus found that subject imports' significant underselling contributed to subject imports' gaining sales and market share at the domestic industry's expense.  APPX124094-124095.

The Commission found that the significant and growing quantity of low-priced subject imports depressed prices to a significant degree.[9]  It noted that for six of the eight pricing production definitions, domestic producers' prices declined between the first and last quarters of the POI.  These price declines occurred as apparent U.S. consumption increased, nonsubject imports' share of that consumption declined, and the domestic industry's production costs increased.  APPX124095.  The Commission also considered arguments that other factors explained domestic price declines, including declining demand for FPMs.  It found this argument inconsistent with domestic price increases for two FPM pricing products, questionnaire responses indicating that purchasers did not perceive demand for FPMs to be declining, and that MiB products competed with FPM products in the U.S. market.  APPX124096-124097.

---

[9] The Commission also considered whether subject imports had suppressed prices for the domestic like product to a significant degree, but ultimately did not reach a conclusion on this issue.  APPX124098 (n.238).

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

The Commission concluded that because cumulated subject imports significantly undersold the domestic like product leading to lost sales and significant price depression, subject imports had significant adverse price effects.  APPX124098.

Finally, the Commission found that cumulated subject imports had a significant impact on the domestic industry.  APPX124099-124107.  Despite strong growing demand in the U.S. market between 2017 and 2019, the domestic industry experienced declining capacity, production, capacity utilization, employment, and U.S. shipments.  Further, as growing volumes of subject imports undersold the domestic product and depressed domestic prices, the domestic industry between 2017 and 2019 experienced stagnant net sales, revenues, and gross profits, as well as declining operating income and net income.  APPX124105-124106.  Notwithstanding some improvement in the domestic industry's performance in 2019, its performance remained below that of 2017, and increases in performance factors in interim 2020 as compared to interim 2019 were less than would be expected during strong demand growth, as evidenced by the domestic industry's flat production and U.S. shipments even as apparent U.S. consumption increased [█] percent.  APPX124106-124107.

The Commission considered respondents' arguments that subject imports' impact on the domestic industry was attenuated by market segmentation between MiBs and FPMs, but it found that the record did not support these arguments.  The Commission referred again to the evidence showing that MiBs compete with FPMs in the U.S. market, including:  purchaser responses indicating that domestic mattresses were interchangeable with and comparable to subject imports; and questionnaire responses and testimony indicating that MiBs and FPMs are made from the same materials and to the same specifications, and that both wholesale purchasers and consumers prioritize price over packaging.  APPX124107-124108.  Further, contrary to CVB's

own arguments, the purchaser questionnaire information solicited at its request indicated that

most responding firms purchased both MiBs and FPMs during the POI, and that domestic

producers and importers were competing for the same purchasers in the same channels of

distribution.  APPX124109.

Even aside from its statutorily-proper analysis of the impact of subject imports on the

domestic industry as a whole, the Commission noted that subject imports also had an impact on

the subset of domestic producers of MiBs.  The Commission explained that the performance of

domestic MiB producers would have been stronger but for the significant volumes of low-priced

subject imports that displaced domestic industry shipments during the POI.  APPX124110-

124112.

In addition to allegations of market segmentation between MiBs and FPMs, the

Commission considered the effects of demand trends, nonsubject imports, and raw material

shortages on the domestic industry so as not to attribute injury from these other factors to the

subject imports, but it found that none of these other alleged factors explained declines in the

domestic industry's performance during the POI.  APPX124112-124113 (n.308); APPX124114-

124115.

Based on all of the foregoing, the Commission determined that an industry in the United

States is materially injured by reason of subject imports of mattresses.  APPX124115.

## III.   ARGUMENT

### A.   Standard of Review

This Court reviews the Commission's final determinations by assessing whether they are

"unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19

U.S.C. § 1516a(b)(1)(B)(i).  The Commission's determinations are presumed to be correct, and

the burden is on the party challenging the determination to demonstrate otherwise.  28 U.S.C. § 2639(a)(1).

The Supreme Court has defined "substantial evidence" as being "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951).  The Federal Circuit has explained, "in the hierarchy of the four most common standards of review, substantial evidence is the second most deferential, and can be translated roughly to mean, 'is {the determination} unreasonable?'"  *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1351 (Fed. Cir. 2006) (internal citation omitted).

Substantial evidence is "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence."  *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966).  Indeed, "{a}lthough individual Commissioners reach{} divergent conclusions, '{t}he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence.'"  *Siemens Energy, Inc. v. United States,* 806 F.3d 1367, 1372 (Fed. Cir. 2015) (quoting *Consolo*, 383 U.S. at 620).  Thus, under the substantial evidence standard, a court may not, "even as to matters not requiring expertise … displace the {agency's} choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo*."  *Universal Camera*, 340 U.S. at 488.  Rather, a court "must affirm a Commission determination if it is reasonable and supported by the record as a whole, even if some evidence detracts from the Commission's conclusion."  *Hitachi Metals,*

*Ltd. v. United States*, 949 F.3d 710, 716 (Fed. Cir. 2020) (citing *Altx, Inc. v. United States*, 370 F.3d 1108, 1121 (Fed. Cir. 2004)).

In injury investigations, the Commission is the trier of fact.  As such, "{i}t is the Commission's task to evaluate the evidence it collects during its investigation" and "{c}ertain decisions, such as the weight to be assigned a particular piece of evidence, lie at the core of that evaluative process."  *U.S. Steel Grp. v. United States*, 96 F.3d 1352, 1357 (Fed. Cir. 1996); *Nippon Steel*, 458 F.3d at 1350.  Accordingly, the Commission has "discretion to make reasonable interpretations of the evidence and to determine the overall significance of any particular factor in its analysis."  *Goss Graphics Sys., Inc. v. United States*, 22 CIT 983, 1004, 33 F. Supp. 2d 1082, 1100 (1998), *aff'd*, 216 F.3d 1357 (Fed. Cir. 2000).  As the Federal Circuit has stated, if "the totality of the evidence does not illuminate a black-and-white answer to a disputed issue, it is the role of the expert fact-finder—here the majority of the Presidentially-appointed, Senate-approved Commissioners—to decide which side's evidence to believe."  *Nippon Steel*, 458 F.3d at 1359.

Furthermore, since the Commission "'is presumed to have considered all of the evidence on the record,'" it is "'not required to explicitly address every piece of evidence presented by the parties'" during an investigation.  *Nucor Corp. v. United States*, 28 CIT 188, 234, 318 F. Supp. 2d 1207, 1247 (2004) (quoting *USEC Inc. v. United States*, 34 F. App'x 725, 731 (Fed. Cir. 2002)).  Instead, the Commission need only address the "issues material to {its} determination" so that the "path of the agency may reasonably be discerned."  Statement of Administrative Action accompanying the Uruguay Round Agreements Act, H.R. Rep. No. 103-316, vol. I at 892 (1994) ("SAA"); *see also Timken U.S. Corp. v. United States*, 421 F.3d 1350, 1354–57 (Fed. Cir. 2005).

"When evaluating challenges to the ITC's choice of methodology," the Court has explained, "the court will affirm the chosen methodology as long as it is reasonable." *JMC Steel Grp. v. United States*, 70 F. Supp. 3d 1309, 1316-17 & n.4 (Ct. Int'l Trade 2015) (citing *Shandong TTCA Biochem. Co., Ltd. v. United States*, 35 CIT 545, 556, 774 F. Supp. 2d 1317, 1327-28 (2011)).

### B.    The Commission Acted in Accordance with Law in Applying the Statutory Factors and Properly Explained the Basis for its Findings

While Plaintiff challenges a number of findings in the Commission's determinations, its arguments in large part derive from two assertions: (i) the Commission did not rely on methodologies preferred by CVB, particularly in not using a segmented market analysis for mattresses (*see, e.g*., PlBr. at 2, 9, 17 & 30-31) and (ii) the Commission failed to address record evidence and arguments preferred by CVB (*see, e.g*., *id*. at 3, 33-34, & 39-41).  Both arguments fail.

Regarding the Commission's methodologies, reviewing Courts have affirmed the Commission's choice so long as it is reasonable. *JMC Steel Grp.*, 70 F. Supp. 3d at 1316-17 & n.4.  In each instance identified by Plaintiff, and as further explained *infra*, the Commission's analysis and methodology were reasonable and supported by substantial record evidence.  CVB has not shown, let alone argued, that the Commission's methodologies were unreasonable. Rather, CVB proposes its own, results-driven methodologies that would diminish record evidence not supportive of its arguments.  It has thus failed to provide a basis why this Court should reject the Commission's methodologies.

Plaintiff's repeated assertions that the Commission "failed to address" arguments or record evidence preferred by it are similarly unavailing.  In particular, CVB's claim that the Commission "largely failed to address {its} arguments on attenuated competition" (PlBr. at 9) is

belied by a simple reading of the Commission's Views, which contains extensive analysis of the

record evidence and CVB's arguments regarding the competition of MiBs and FPMs in the U.S.

market.  *See* APPX124083-124086; APPX124108-124112.  Likewise, CVB's claims that the

Commission failed to acknowledge the importance of certain non-price factors in purchasing

decisions (PlBr. at 33), or that it failed to address the improvements in performance of domestic

producers of MiBs (*id*. at 39-40), ignore the analysis of these issues in the Commission's Views.

*See* APPX124086 (discussing importance of non-price factors in addition to price);

APPX124111-124112 (discussing performance improvements of domestic producers of MiBs).

As discussed in detail below, CVB's arguments rest on inaccurate characterizations of the

Commission's determinations and should be rejected.

C.     **The Commission's Analysis of Substitutability and Market Segments Was Supported by Substantial Evidence**

The Commission's findings that the domestic like product and subject imports compete

meaningfully with each other in the U.S. market is supported by substantial evidence.

APPX124083-124084.[10]  First, examining the broader U.S. market of all mattress types, the

Commission found that domestic mattresses and subject imports were both interchangeable and

comparable.  Responding domestic producers, importers, and purchasers overwhelmingly

reported that domestic mattresses and imports from each subject country were always or

frequently interchangeable with each other.  APPX124083.  Most purchasers further rated

domestic mattresses as comparable to mattresses from each subject country with respect to all 26

purchasing factors, and they also reported that domestic mattresses and those from each subject

---

[10] Related to its analysis of market segments, the Commission found that there was a moderately high degree of substitutability between domestically produced mattresses and subject imports.  APPX124070-124071; APPX124083.  Plaintiff does not challenge this finding in its arguments before the Court.

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

country always or usually met minimum quality specifications.  APPX124083.  Given that

subject imports primarily consisted of MiBs and domestic mattresses of FPMs (although [███]

percent of domestic producers' U.S. shipments in 2019 were MiBs), APPX124248, these overall

comparisons supported that MiBs and FPMs were both comparable and interchangeable.

In addition to wholesale purchasers' perceptions, other record evidence likewise showed

that MiBs and FPMs compete at the consumer level.  Sleep studies indicated that packaging was

among the least important purchasing factors for consumers.  APPX124085.  The Commission

requested that parties submit studies in their posthearing briefs that discussed consumer

packaging preferences.  APPX124085 (n.179).  Domestic producers submitted numerous such

studies from between 2016 and 2020 that generally indicated MiB packaging was not a primary

consideration for consumers.  APPX114728-114279.  These included: [



], APPX114979-114981;

*see also* APPX114729; [

], APPX114989-114990; *see also* APPX114729; and the 2020 Better Sleep Council study,

which found that a majority of consumers considered "free setup" and "old mattress removal,"

both of which are correlated with delivery of FPMs, to be important factors in purchasing a

mattress, APPX114739; *see also* APPX114729.  *See generally* APPX124085 (n.179);

APPX114732-114767 (2020 Better Sleep Council Study); APPX114980-114990 ([███

███]).  Respondents, in contrast, failed to submit any such study supporting their argument,

other than citing third hand to data from an article discussing the [███] Better Sleep Council

study.  APPX124085 (n.179).

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

In arguing that consumers are segmented between those preferring MiBs or FPMs, Plaintiff argues that consumer preference for MiBs stems from a desire to "avoid in-store sales pitches" (PlBr. at 12).  As an initial matter, Plaintiff's argument presumes that brick and mortar and internet channels are exclusive to either MiBs or FPMs, yet the record does not support such a division.  Numerous online retailers, including [█████], reported purchases of both MiBs and FPMs over the POI.  APPX124085-124086 (n.181) (citing [███████████████████████████████████████████████████████████████]).  Significant shipments of subject imports, [████] percent of which were MiBs (APPX124248), were also sent to brick and mortar stores throughout the POI.  APPX124087-124088; *see also* APPX124156-124158 (showing that subject import shipments to the brick and mortar channel of distribution ranged between 14.8 and 20.0 percent of total shipments during POI).  Further, the very sleep study relied on by Plaintiff for its argument in fact supports the opposite conclusion, *i.e.*, that most consumers prefer shopping for mattresses in brick and mortar stores rather than online.  APPX11709-11710 (indicating that half of consumers aged 36 to 55 and 74 percent of consumers 56 and older prefer shopping at brick-and-mortar stores to online shopping, and that the percentage of overall consumers that preferred shopping in brick-and-mortar stores increased from 85 percent in 2016 to 87 percent in 2020).

Likewise, as the Commission considered and discussed, APPX124085 (n.179), several articles or studies in the record indicated that, if anything, a majority of consumers preferred the services that came with the purchase of a FPM, such as delivery, set-up and removing old mattresses.  For example, according to the [███████████████████████████████████████ ████████████████████████████████████████████████].

APPX114980-114981.  Consistent with this, the 2020 Better Sleep Council study found that over

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

half of surveyed customers considered "free setup" and "old mattress removal" important in

mattress purchasing decisions, suggesting a preference for FPMs.   APPX114732-114767.

Similarly, [███████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████].  APPX114984-114985.

The Commission further found that mattresses packaged as MiBs and FPMs are produced

to the same specifications, with many of the same materials, and are indistinguishable once

unpackaged.  APPX124084.  This finding was based in part on testimony from a CVB official,

who conceded that (i) MiBs and FPMs "may be identical once unpackaged" and that (ii)

consumers cross-shop between MiBs and FPMs.  APPX124084 (n.176) (citing APPX123669)

(CVB director of E-Commerce Steven Douglas stating that "{w}e agree that individual

consumers often consider both MiBs and FPMs in making their purchasing decisions").  As

conceded by CVB's own official, the record did not support the proposition that consumers as a

whole considered MiB and FPM distinctions important, let alone that consumers were segmented

between these product types, or would forgo purchase of a mattress altogether if their preferred

packaging were not available.

Given this consumer indifference, CVB alternatively argues that market segmentation

between MiBs and FPMs occurs at the producer and wholesaler levels of the U.S. market.  PlBr.

at 9-13.  Here again, Plaintiff's citation to the record is selective and ignores the credible and

substantial evidence relied on by the Commission that belies such segmentation.  As the

Commission found, 12 of 54 responding U.S. producers produced both MiBs and FPMs during

the POI, and that these firms accounted for [███] percent of MiB production in 2019.

APPX124080.  While numerically this may mean there were fewer producers who produced both

**BUSINESS PROPRIETARY INFORMATION**
**SUBJECT TO PROTECTIVE ORDER REDACTED**

(*see* PlBr. at 14-15), this does not undermine the salient fact given weight by the Commission that domestic producers accounting for a [ ▮ ] of U.S. MiB shipments produced and sold mattresses packaged in both formats.

Notably, while Plaintiff selectively cites to statements from U.S. producers Corsicana and Legett & Platt to argue that the MiB market is distinct from the FPM market, PlBr. at 11-12, it omits that [ ▮ ].  APPX124195-124198.  Moreover, CVB's reliance on these firms' recognition of changing trends fails to take into account that the changes described cut across mattress types.  For example, Plaintiff relies on witness testimony about a trend away from innerspring mattresses and toward "non-innerspring, hybrid, and MiB mattresses."  PlBr. at 13.  But non-innerspring and hybrid mattresses are shipped in both types of packaging.  APPX124242-124247 (U.S. shipment data for MiBs and FPMs by product type).  As the Commission found, a degree of product specialization is consistent across mattress types, not just for MiBs and FPMs but also for [ ▮ ].  APPX124080.

In support of its segmentation argument, Plaintiff also cites to statements from Ashley Furniture Industries, [ ▮ ], that there are physical differences between MiBs and FPMs, such as foam density and the availability of encased foam or mattress edge support.  PlBr. at 11 (citing APPX12437-12438).  As noted in the Commission's Views, however, a plethora of statements from other domestic producers, [ ▮ ], indicated that inputs and materials were largely the same between MiBs and FPMs.  APPX124084 (n.176) (*e.g.*, stating that "100 percent there's nothing different in {MiBs and

FPMs} … from a design and material aspect").  Nor does the data collected during the investigations support Ashley's references to physical traits that supposedly distinguish MiBs and FPMs.  To the contrary, the record shows that among MiBs and FPMs there are a range of foam densities and other factors.  For instance, the Commission added foam specifications to its pricing product definitions in the final phase at CVB's request, *see* APPX9913-9917, and the resulting pricing data indicated that mattresses with identical foam specifications were shipped as both MiBs and FPMs.  *See, e.g.*, APPX124279-124284 (pricing data for products 1 and 2, mattresses with identical foam specifications but shipped as either MiB or FPM); *see also* APPX124084 (n.176).

In trying to distinguish between the production processes and physical characteristics of MiBs and FPMs, CVB's arguments not only are contradicted by the record as discussed above, but also veer into a matter not challenged by it, the Commission's definition of domestic like product, which entails a consideration of such criteria.  *See* APPX124047-124048 (discussing criteria considered when defining domestic like product, including physical characteristics and uses and manufacturing facilities/production processes).[11]  As this Court has recognized, when a party fails to challenge the like product definition, it cannot rely on product differences alone to argue for a segmented analysis of domestic producers.  *Encon Indus*., *Inc. v. United States*, 16 CIT 840, 841-42 (1992) (plaintiff's argument that imports of low-end fans could not injure producers of high-end fans was "a back-door way of saying that the like product determination"

---

[11] At no point during the Commission's proceedings did CVB contest this definition or argue that MiBs and FPMs should be defined as separate domestic like products.  APPX124053. Nor does it raise this issue in its arguments before this Court (or could it given exhaustion-of-administrative-remedy principles).  CVB has accordingly waived any possible challenge to the definition of domestic like product.  *Sandvik Steel Co. v. United States,* 164 F.3d 596, 599 (Fed. Cir. 1998).

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

was wrong; finding that the plaintiff's failure to challenge the like product definition "protects the process from the type of maneuvering attempted by plaintiff").

The purchaser questionnaires also indicated that at the wholesaler and retailer level, there was not a marked segmentation between firms dealing in MiBs or FPMs.  Eleven of 19 responding purchasers, representing wholesalers and retailers,[12] reported purchasing or importing *both* MiBs and FPMs during the POI.  APPX124009-124010.  Further, the record indicated that retailers displayed MiBs and FPMs side-by-side without distinction, and online retailers did not offer search filters for packaging type.  Moreover, only two of 19 responding purchasers ranked packaging as one of the three most important purchasing factors for mattresses.  APPX124008-124010.

Of note, CVB had argued in the preliminary phase that gathering additional data on MiBs from purchasers would confirm the importance of packaging and that purchasers specialized in either MiBs or FPMs.  APPX94094-94098 (CVB postconference brief arguing that the Commission should collect more data on MiBs in final phase).  In response to CVB's request, the Commission collected these additional data from purchasers in the final phase of the investigations.  APPX9908-9917 (CVB comments on draft questionnaires requesting additional data from purchasers, including (i) separately reported purchases of MiBs and FPMs, (ii) more specificity in ranking the importance of MiB and FPM packaging, and (iii) ranking the importance being able to ship a mattress with a common carrier); *see also* APPX10370-10401 (blank purchaser questionnaires incorporating MiB questions at II-1 & III-27).

Yet the data requested by CVB did not support its arguments.  As described above, a majority of responding purchasers, including some of the largest such as [█████████

---

[12] *See* APPX124351 (complete list of responding purchasers).

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

███████████████████████████], reported purchasing and/or importing both MiBs and

FPMs.  APPX124085-124086 (text & n.181) (citing [████████████████████████

███████████████████████████]).  Responses were at best mixed regarding the

importance of packaging or shipping via common carrier.  Purchasers were equally divided as to

whether packaging was very important or only somewhat/not important, and a majority of these

firms ranked ability to ship with a common carrier as only somewhat or not important.[13]

APPX124180.  Further, few purchasers listed anything related to these factors as among their

three most important purchasing factors.  APPX124179.  Indeed, while Plaintiff focuses on

Amazon as being "the best example" of a firm that specializes in MiBs (PlBr. at 16), it omits that

[████████████████████████████████████████████████████████

████████████████████████████████████].  [████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████]).  Thus, far from supporting CVB's allegation that purchasers focus on either MiBs

or FPMs, the data requested by it instead showed significant overlap in firms' purchases and

general ambivalence to their logistical advantages.

CVB also relies on statements made by its economic consultants in presenting argument

at the Commission hearing.  PlBr. at 38-40 & 45.  Statements by retained counsel and

consultants, however, cannot in themselves constitute evidence in the absence of supporting

record material.  *See Siemens Am., Inc. v. United States*, 2 CIT 136, 139 (1981) (noting that

"statements by counsel in a brief are not evidence"), *aff'd on other grounds*, 692 F.2d 1382 (Fed.

---

[13] For packaging, 11 responding purchasers ranked this factor as very important, and 11 as either somewhat or not important.  For ability to ship by common carrier, 9 purchasers reported this factor as very important and 12 as somewhat or not important.  APPX124180.

Cir. 1982); *Tropi-Cal v. United States*, 63 Cust. Ct. 518, 521, 1969 WL 13848, at *3 (1969)

("{W}here other than statements of counsel . . . there is no evidence to support the plaintiff's

assertion of a material fact . . . statements of counsel would not justify a favorable finding of

fact.").  Further, it is within the Commission's role as fact finder to weigh the credibility of such

statements from interested parties against the totality of record evidence.  *See, e.g.*, *U.S. Steel*

*Grp.*, 96 F.3d at 1357-58; *see also AWP Indus., Inc. v. United States*, 35 CIT 774, 794, 783 F.

Supp. 2d 1266, 1285 (2011) ("{I}t is the Commission's duty to evaluate the record evidence and

determine the credibility of the submitted evidence, . . . even where testimony comes from an

interested party.") (citation omitted); *Cleo, Inc. v. United States*, 30 CIT 1380, 1395 (2006),

*aff'd*, 501 F.3d 1291 (Fed. Cir. 2007) (declining to re-evaluate evidence where Commission gave

more weight to testimony proffered on behalf of certain producers than those of other witnesses).

The Commission reasonably weighed CVB's consultants' statements against the other record

evidence described above—including the testimony of several industry participants with actual

experience in the mattress industry, and it concluded that the record did not support market

segmentation between MiBs and FPMs.  This Court has repeatedly held that it will not "reweigh

the evidence or substitute its own judgment for that of the agency."  *E.g.*, *Coal. of Gulf Shrimp*

*Indus. v. United States*, 71 F. Supp. 3d, 1356, 1361 (Ct. Int'l Trade 2015) (quoting *Usinor v.*

*United States*, 28 CIT 1107, 1111, 342 F. Supp. 2d 1267, 1272 (2004)); *JMC Steel Grp.*, 70 F.

Supp. 3d at 1315.

Finally, Plaintiff argues that increasing demand for MiBs supports that these products do

not compete with FPMs.  PlBr. at 12-13.  Demand trends actually support the opposite

conclusion.  As the Commission noted, a majority of responding domestic producers, importers,

and purchasers reported that, in their experience, demand for FPMs was stable or increasing and

that FPMs accounted for a larger portion of apparent U.S. consumption than MiBs over the POI. APPX124078.  But the Commission also observed that apparent U.S. consumption data indicated that shipments of MiBs increased while those of FPMs decreased during the POI.  APPX124078 (citing APPX124263 and APPX124267).  Contrary to CVB's argument, these apparent consumption trends, showing shifts between the types of packaging, lend further support to the fact of real competition between these products in the U.S. market.  Indeed, even CVB concedes that the increase in MiBs share of apparent U.S. consumption was "at the expense of FPMs." PlBr. at 2-3.

### D.  The Commission's Finding that Price Was an Important Purchasing Factor Was Supported by Substantial Evidence

The record supports the Commission's finding that price was an important factor in purchasing decisions for mattresses.  APPX124086.  Upon consideration of the purchaser questionnaire responses, the Commission noted that purchasers ranked price as a top three purchasing factor more often than any factor except quality, and that price was also one of the factors most often identified as very important by responding purchasers (along with availability, quality, delivery time, and reliability of supply).  APPX124086; *see also* APPX124178-124180. The Commission further observed that four responding purchasers reported usually or always purchasing the lowest priced mattress, that 16 reported sometimes purchasing the lowest priced mattress, and that domestic producers testified that competition in the U.S. market was primarily based on price.  APPX124086-124087; *see also* APPX124179.

The Commission's Views explicitly dispel CVB's claim that the Commission "failed to consider" evidence reflecting non-price reasons for purchasing decisions.  PlBr. at 33.  In fact, while finding that price was *an* important factor, the Commission recognized that other factors,

such as availability, quality, delivery time, and reliability of supply were also very important to purchasing decisions:

> We further find that price is an important factor in purchasing decisions for mattresses, *although non-price factors are also important*. Responding purchasers ranked price among the top three factors influencing their purchasing decisions more than any other factor *except quality*. Price was also among the listed factors that responding purchasers cited most often as being very important to their purchasing decisions, *although a greater number of purchasers cited factors such as availability, quality, delivery time, and reliability of supply as very important purchasing factors*.

APPX124086 (citing APPX124178-124180) (emphasis added). The Commission fully acknowledged the importance of non-price purchasing factors identified by purchasers, disproving Plaintiff's allegation that the Commission's conclusion was "misleading" for failure to take into account purchasers' frequent citations to these other factors. PlBr. at 33. Plaintiff might have preferred that the Commission had weighed the purchasers' responses in a different manner, but CVB's preference does not change the fact that the Commission considered all aspects of the purchasers' rankings, and reasonably found that price is an important factor.

Similarly, CVB emphasizes that there were seven factors other than price identified more frequently than price by responding purchasers (none of which refer to packaging). PlBr. at 34. That other factors were also important in purchasing, however, does not undermine the Commission's finding that price was an important factor, including that it was ranked in the top three factors by purchasers more than any other factor except quality. Price need not be the *most* important factor in purchasing decisions to be *an* important factor in purchasing decisions. *See OCTAL,* 539 F. Supp. 3d at 1305-06; *Acciai Speciali Terni, S.p.A. v. United States*, 19 CIT 1051, 1059-60 (1995).

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

Plaintiff suggests that only the alleged superiority of the subject imports from China and Vietnam, and not their prices, accounted for the increased shipments and market share of these products.  PlBr. at 34.  As discussed, *infra,* the comparative quarterly pricing data and lost sales information show otherwise.  Regardless, Plaintiff's citation to selective evidence ignores other record evidence indicating that subject imports from these sources and the domestic like product were both comparable and interchangeable.  The overwhelming majority of responding purchasers indicated that the domestic like product and subject imports from China and Vietnam were comparable with respect to all purchasing factors, including quality meeting or exceeding industry standards.  APPX124182-124184.  Additionally, majorities of responding U.S. producers, U.S. importers, and purchasers reported that mattresses produced in the United States were always or frequently interchangeable with subject imports from China and Vietnam.  APPX124185.  Plaintiff relies on responses from just seven importers (out of 26 responding importers) for its claim that subject imports are superior to domestic mattresses, but these responses do not outweigh the bulk of record evidence reasonably relied on by the Commission.

Noting that the Commission alternately referred to "price/value" or "price" when describing this top three purchasing factor, Plaintiff proposes that "value" may also have indicated quality concerns with purchasers.  PlBr. at 34.  The question asking that purchasers identify their top three purchasing factors did not list specific factors and invited firms to provide their own terminology and description.  APPX10388 (blank questionnaire); *e.g.*, *compare* [███████] (listing "price" as top purchasing factor) *with* [███████] (listing "value" as top factor, and indicating that value encompasses "quality, price, warranty service, etc.").  Thus, these differing terms reflect the diversity of responses from responding firms rather than an inconsistency on the Commission's part.  Even to the degree that responses of "price/value"

might be indicative of quality issues as well as price, this is consistent with purchaser responses

that *both* price and quality are important purchasing factors.  *See* APPX124180 (*e.g.*, 13 of 21

responding purchasers ranked price as very important, 17 of 21 ranked quality meets industry

standards as very important).

     **E.**     **The Commission's Volume Findings are Supported by Substantial Evidence and in Accordance with Law**

     **1.**     **The Commission's Volume Findings are in Accordance with Law**

The statute directs the Commission to consider "the volume of imports of the subject

merchandise" when making an injury determination.  19 U.S.C. § 1677(7)(B)(i)(I).  It further

provides as follows:

> In evaluating the volume of imports of merchandise, the Commission shall consider whether the volume of imports of the merchandise, or any increase in that volume, either in absolute terms or relative to production or consumption in the United States, is significant.

19 U.S.C. § 1677(7)(C)(i).

The statute allows that an affirmative volume finding may be based on an absolute

volume increase, an increase that is relative to consumption or production, or a combination

thereof.  *Hynix Semiconductor, Inc. v. United States*, 30 CIT 1208, 1212, 431 F. Supp. 2d 1302,

1308 (2006).  The Commission must evaluate what is "significant" in a volume determination on

a case-by-case basis.  *Arlanxeo USA LLC v. United States*, 389 F. Supp. 3d 1330, 1338 (Ct. Int'l

Trade 2019), *aff'd*, 819 F. App'x 925 (Fed. Cir. 2020).  "The statute does not define what is

considered 'significant' because, {f}or one industry, an apparently small volume of imports may

have a significant impact on the market; for another, the small volume might not be significant."

*Id*. (quoting S. Rep. No. 96-249, at 88 (1979), *reprinted in* 1979 U.S.C.C.A.N. 381, 474).

Rather than address the Commission's actual record-based analysis of the data concerning subject import volumes, Plaintiff argues that the Commission is supposedly required to conduct an analysis of "volume effects" or "adverse volume effects." *See, e.g.*, PlBr. at 26 & 27. Indeed, Plaintiff concedes that there was an increase in subject import volumes and market share, but argues that this increase had no effect because of different product concentrations between subject imports and the domestic industry. PlBr. at 18-28. Insofar as Plaintiff argues that the statute imposes an obligation on the Commission to perform a more expansive analysis as part of its consideration of volume, the statute on its face shows otherwise. Unlike the statutory price and impact provisions, the volume provision contains no mention of effects. *Compare* 19 U.S.C. § 1677(7)(C)(i) *with id.* at § 1677(7)(C)(ii) ("In evaluating the effect of imports of such merchandise on prices. . . ."); *see also id.* at § 1677(7)(B) (bifurcating the Commission's injury assessment between an analysis of subject import "volume," on the one hand, and its "*consequent* impact" (*i.e.*, its effects), on the other) (emphasis added).

As this Court has previously held, "the statute does not require that the Commission consider the effects of subject imports in its volume analysis." *OCTAL*, 539 F. Supp. 3d at 1300; *see also ITG Voma*, 253 F. Supp. 3d at 1357 (finding that the Commission is not required to consider additional factors not listed in the statute in its volume analysis, such as the domestic industry's condition and financial performance). Indeed, this Court has confirmed that "volume and consequent impact are separate inquiries" under the statute. *OCTAL*, 539 F. Supp. 3d at 1300. The Court should decline to "ask more of the Commission than required by the statute." *Altx,* 370 F.3d at 1123.

**BUSINESS PROPRIETARY INFORMATION**
**SUBJECT TO PROTECTIVE ORDER REDACTED**

### 2.    The Commission's Volume Findings are Supported by Substantial Evidence

Based on the evidentiary record, the Commission found that the volume and increase of subject imports was significant, absolutely and relative to apparent U.S. consumption. APPX124090.  As the Commission noted, subject import volumes increased throughout the POI, however measured.  Cumulated subject import volumes and U.S. shipments of subject imports increased throughout the POI.  Between 2017 and 2019, their volumes increased 40.6 percent, from 5.5 million units to 7.8 million units, and their U.S. shipments increased [      ] percent, from [          ] units to [          ] units.  APPX124090.  Imports and shipments of subject imports were both also higher in interim 2020 than in interim 2019.  APPX124090.  Subject imports' share of apparent U.S. consumption also steadily increased, from [      ] percent in 2017 to [    ] percent in 2018 and [      ] percent in 2019, and their share was also higher in interim 2020 ([      ] percent) than in interim 2019 ([      ] percent).  APPX124090.  As the Commission further observed, the record data indicated that the increase in subject imports' share of apparent U.S. consumption closely mirrored the declines in the domestic industry's share over this period. APPX124090.

CVB does not contest this analysis or the underlying data and concedes that subject import volumes and market share increased.  PlBr. at 26 (stating that "{t}he record shows that subject import volume and share of overall apparent U.S. consumption increased over the POI").  Rather, its arguments are premised again on the mistaken assumption that there was no competition between MiBs and FPMs, such that this increase in subject import volumes had no significant "volume effects" on the domestic industry. PlBr. at 18-24.

Much of the Plaintiff's argument concerning subject import volumes focuses not on these volumes, but on the domestic industry's condition.  PlBr. at 22-26 (discussing domestic

producer's capacity, production, utilization rates, and investments).  As reflected in the statutory language and the case law (*e.g.*, *OCTAL* and *ITG Voma*) outlined above, the Commission is not required to consider such factors in its volume analysis.  Plaintiff cites to the Commission's negative determinations in *Outboard Engines* as an example where product differences attenuated competition between subject imports and the domestic industry, but it omits that the Commission actually found that subject import volumes were significant in those investigations. PlBr. at 28; *see Outboard Engines from Japan*, Inv. No. 731-TA-1069 (Final), USITC Pub. 3752 at 25 (Feb. 2005) ("{W}e find the absolute volume of subject imports to be significant, and we find the absolute volumes of subject imports to be significant in relation to consumption and production.").  Thus, even where the record of a particular investigation might show market segmentation or attenuated competition, this alone would not negate that subject import volumes may be significant for purposes of the Commission's volume analysis.

In any event, the record in these investigations does not support, let alone dictate, a finding of segmented markets or attenuated competition between MiBs and FPMs.  Rather, as detailed above, the record indicated that MiB packaging was not important to consumers, that MiBs and FPMs were marketed and sold side-by-side on websites and in brick and mortar stores, that the products were made to similar specifications and identical once unpackaged, and that MiBs and FPMs competed for the same purchasers in the same channels of distribution. APPX124083-124086.  The growth in subject import volumes of MiBs acknowledged by CVB (PlBr. at 18-21) was therefore very much "at the expense of FPMs," as elsewhere conceded by it. *Id.* at 2-3.

Plaintiff further argues that focusing on the domestic industry's increasing market share of MiBs in the U.S. market would have negated the increase in subject import volumes over the

POI.  *Id.* at 19-20.  An exclusive focus on only the MiB portion of domestic industry shipments would be inconsistent with the statutory requirement for the Commission to consider the volumes of cumulated subject imports relative to the shipments and production of the entire domestic industry defined by the Commission, which was a single industry encompassing producers of both MiBs and FPMs.  APPX124067 (defining domestic industry); *Cleo*, 30 CIT at 1400 (noting ITC's task is to assess whether the "industry as a whole" has been injured by subject imports, rejecting argument that ITC was required to conduct segmented market analysis); *see also Encon*, 16 CIT at 842 (finding that "{a}nalysis by {individual} producer or on a market segment basis is not required" under the statute and that Commission must instead examine domestic industry "as a whole").

Regardless, the Commission found the domestic industry's increases in U.S. shipments and market share of MiBs were less than they would have been precisely because of the increasing volume of subject imports that displaced domestic industry shipments.  APPX124111-124112.  Further, the Commission found that the absolute volume and increase of subject imports (*e.g.*, the volume of subject imports without reference to apparent U.S. consumption or domestic industry shipments) was significant, so domestic industry shipments of MiBs cannot negate the Commission's volume findings.  APPX124090.

### F.     The Commission's Price Effects Findings are Supported by Substantial Evidence and in Accordance with Law

The statutory provision regarding the Commission's price effects analysis provides as follows:

> In evaluating the effect of imports of such merchandise on prices, the Commission shall consider whether—

**BUSINESS PROPRIETARY INFORMATION**
**SUBJECT TO PROTECTIVE ORDER REDACTED**

(I)     there has been significant price underselling by the imported merchandise as compared with the price of domestic like products of the United States, and

(II)    the effect of imports of such merchandise otherwise depresses prices to a significant degree or prevents price increases, which otherwise would have occurred, to a significant degree.

19 U.S.C. § 1677(7)(C)(ii).  As explained below, the Commission's price effects analysis fully complied with the statute.  Plaintiff's challenges to this analysis are factual in nature and subject to the substantial evidence standard of review.

## 1.    The Commission's Finding of Significant Underselling is Supported by Substantial Evidence

In considering underselling, the Commission examined pricing data that compared average quarterly prices of domestic mattresses and subject imports for eight mattress products. These data showed that subject imports undersold the domestic like product in [ ] of [ ] quarterly comparisons, or in [ ] percent of comparisons, at margins averaging [ ] percent. APPX124092.  The quarters with underselling also accounted for [ ] percent of reported volumes of subject imports in the pricing data.  APPX124092.  The Commission also collected purchase cost data for the same pricing product definitions, and these data also indicated that subject imports had a lower price-cost differential in [ ] of comparisons, even accounting for any cost savings from importing.  APPX124092-124093.  Based on these data, the Commission found that subject imports' underselling was significant.  APPX124094.

The Commission further found that this underselling contributed to subject imports gaining sales and market share at the domestic industry's expense.  This finding is supported by the cited evidence that seven purchasers reported that subject imports were lower priced than the domestic like product, and that responding purchasers overall reduced the domestic industry's share of their purchases by [ ] percentage points while increasing their share of subject

**BUSINESS PROPRIETARY INFORMATION**
**SUBJECT TO PROTECTIVE ORDER REDACTED**

imports by [███] percentage points between 2017 and 2019.  APPX124094 (n.225).  While acknowledging that only two purchasers reported switching purchases from the domestic product to subject imports because of price, the Commission reasonably weighed these responses against its finding that there was a moderately high degree of substitutability between domestic mattresses and subject imports and purchaser responses that price was an important purchasing factor.  APPX124094 (n.225).  Given these findings and the [████████] level of subject import underselling, the Commission reasonably concluded that subject imports underselling had contributed to the shift in sales and market share.  APPX124094 (n.225).

Plaintiff does not contest the validity of the pricing data showing that subject imports [████████] undersold the domestic like product.  Of note, CVB had argued in the preliminary phase that the pricing data should be discounted entirely because the pricing product definitions were overly broad and compared unlike products.  APPX94112-94114.  In response, for purposes of the final investigations, the Commission revised the pricing product definitions as suggested by CVB, including the addition of foam density specifications and differentiation between products shipped as MiBs or FPMs.  APPX9913-9917; *see also* APPX124091-124092.  Even with these modifications, the results of the pricing data comparisons were consistent with those of the preliminary phase, *i.e.*, subject imports consistently undersold the equivalent domestic like product.  *Compare* APPX101404-101407 *with* APPX124091-124094.

Without a basis to challenge the Commission's underselling findings or the underlying data, Plaintiff argues that price was not an important purchasing factor such that subject imports' uncontested underselling did not cause a market share shift or significant price effects.  PlBr. at 33-36.  As explained above, however, the Commission's conditions of competition finding that price was an important purchasing factor is supported by substantial evidence, including

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

(i) purchaser responses identifying price as one of the three most important purchasing factors, (ii) purchaser responses describing price as very important in purchasing decisions, and (iii) purchaser responses indicating they purchased the lowest priced product. *See* APPX124086-124087. Additional evidence further buttresses the Commission's reliance on the importance of price in its price effects analysis. In addition to the three categories of purchaser responses summarized above, seven purchasers reported that subject imports were lower priced than domestic mattresses. APPX124094 (n.225) (citing APPX124352-124353). Moreover, the record showed that responding purchasers had shifted a substantial share of their overall purchases from domestic products to subject imports between 2017 and 2019. APPX124094 (n.225); *see also* APPX124351.[14]

## 2. The Commission's Price Depression Finding is Supported by Substantial Evidence

The record likewise supports the Commission's finding that subject imports depressed domestic prices to a significant degree. As the Commission observed, for six of the eight pricing product definitions, domestic producers' prices declined between the first quarter of 2017 and the third quarter of 2020 covering the POI. APPX124095 (citing APPX124343-124345; APPX124555).[15] It further observed the context of these price declines, including that apparent U.S. consumption increased over this period, the domestic industry's production costs increased between 2017 and 2019, and nonsubject imports declined as a share of apparent U.S.

---

[14] Between 2017 and 2019, responding purchasers reported that their share of purchases from domestic producers had declined by [ ] percent, whereas their share of purchases of subject imports had increased by [ ] percent. APPX124351.

[15] The domestic industry's sales price declined between the first and last quarters for which data were collected by [ ] percent for product 1, by [ ] percent for product 2, by [ ] percent for product 3, by [ ] percent for product 5, by [ ] percent for product 6, and by [ ] percent for product 8. APPX124095 (citing APPX124343-124345 & APPX124555).

**BUSINESS PROPRIETARY INFORMATION**
**SUBJECT TO PROTECTIVE ORDER REDACTED**

consumption.  APPX124095 (citing APPX124464-124466).[16]  The Commission also considered arguments that other factors explained domestic price declines, including declining demand for FPMs.  It found, however, that this argument was not consistent with domestic price increases for two of the four FPM pricing products,[17] questionnaire responses indicating that many purchasers did not perceive demand for FPMs to be declining, and evidence (discussed *supra* that MiB products competed with FPM products in the U.S. market.  APPX124096-124097; APPX124172.

Plaintiff requests that this Court reweigh the Commission's price depression finding by recategorizing the price for product 8 as "essentially stable" because its price decline was less than for other domestic price products.  PlBr. at 30.  CVB again overlooks, however, that such evaluation and weighing of evidence is the Commission's responsibility.  *See, e.g.*, *U.S. Steel Grp.*, 96 F.3d at 1357.  The Commission examined the context of this price decline, including rising apparent U.S. consumption and production costs, and reasonably found that low-priced subject imports had depressed domestic prices during a period when they might otherwise be expected to rise.  APPX124095.[18]  Plaintiff's argument to recategorize a price decline as

---

[16] Between 2017 and 2019, apparent U.S. consumption increased by [ ] percent, the domestic industry's cost of goods sold increased by [ ] percent, and nonsubject imports' share of apparent U.S. consumption declined by [ ] percent.  APPX124464-124466.

[17] The domestic industry's sales prices between the first and last quarters were higher for pricing product 4, increasing by [ ] percent, and for product 7, increasing by [ ] percent.  APPX124343-124345.  Both of these pricing product definitions were for mattresses shipped as FPMs.  APPX124277-124278.

[18] Also, cumulated subject imports undersold the domestic like product in [ ] quarterly comparisons for product 8 at underselling margins ranging from [ ] percent to [ ] percent.  *See* APPX124299-124300.

**BUSINESS PROPRIETARY INFORMATION**
**SUBJECT TO PROTECTIVE ORDER REDACTED**

"essentially stable" amounts to an effort to have the Court reweigh the evidence and act as the factfinder in the Commission's stead.

Similarly, Plaintiff argues that domestic price declines for products 2 and 6 should be discounted because subject import quantities for these products were [███].  PlBr. at 31-32.  It is unclear how this argument advances Plaintiff's case, given that the Commission found, and the pricing comparisons show, underselling by the subject imports in [████████] of comparisons across the board for all products.  *See* APPX124091-124094.  Additionally, as the Commission found, the fact that MiBs and FPMs compete in the U.S. market meant that subject imports for pricing products 2 and 6 (both FPMs) competed in the U.S. market with their respective identical products 1 and 5, shipped as MiBs.  APPX124097.  As the Commission found, and the data show, subject imports within products 1 and 5 undersold domestic industry products 2 and 6 in [███] quarterly comparisons, and subject imports quantities for products 1 and 5 were also greater than those subject import quantities for products 2 and 6.  APPX124097; *see also* APPX124282; APPX124556 (showing quantities for these pricing products).[19]

Plaintiff next claims that the Commission's methodology was flawed because it examined subject imports on a cumulated basis across the entire POI, rather than focusing on the period beginning in 2019 with a focus on subject imports from Vietnam.  PlBr. at 30-31.  This Court has found, however, that it will uphold a methodology employed by the Commission "as long as it is reasonable."  *JMC Steel Grp.*, 70 F. Supp. 3d at 1316-17 & n.4.  Plaintiff has not shown that the Commission's methodology was unreasonable.  Rather, CVB seeks to replace its

---

[19] Plaintiff also fails to acknowledge the large additional quantities of subject imports reported by importers in the purchase cost data for products 2 and 6.  APPX124309-124327.  *See* APPX124315 (reporting product 2 purchase-cost data for [███] mattresses); APPX124326 (reporting product 6 purchase cost data for [███] mattresses).

own results-driven methodology with the reasonable one used by the Commission so as to diminish pricing data not supportive of its arguments.

Indeed, the Commission's methodology (but not Plaintiff's) is consistent with the statutory requirement for the price effects analysis where the criteria for cumulation are met, *viz*, that the Commission "*shall* cumulatively assess the volume and effect of imports of the subject merchandise *from all countries*." *See* 19 U.S.C. § 1677(7)(G)(i) (emphasis added). CVB did not argue against cumulation during the final phase of the Commission proceedings.[20] APPX124069. In fact, respondents specifically argued that, if the Commission found that the cumulation criteria were met, it should treat all subject imports the same. APPX124069 (noting respondents' argument that the Commission should not treat the cumulated subject imports from China differently). Having found that the criteria for cumulation were met, the Commission properly cumulated subject imports from each source for its present material injury analysis, including its price effects analysis. *See* APPX124070-124073. Such a cumulated analysis requires that the Commission consider the price effects of subject imports from all cumulated countries, and it would not permit the piecemeal and selective analysis preferred by Plaintiff. *See OCTAL*, 539 F. Supp. 3d at 1298-99 (Court looked to cumulated data as discussed in the Commission's Views, not solely the Omani data preferred by plaintiff).

Furthermore, CVB's argument is predicated on facts inconsistent with the Commission's uncontested findings concerning cumulation. As the Commission discussed in its cumulation analysis, subject imports from each country offered a complete range of mattresses, were always or frequently interchangeable with each other, and were comparable with respect to all

---

[20] Nor could CVB challenge cumulation on appeal given that it never raised any arguments pertaining to this issue to the Commission. *Sandvik*, 164 F.3d at 599.

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

purchasing factors.  APPX124070-124071 (citing APPX124182-124186).  The Commission

further observed that the shift in subject imports from China to other subject countries occurred

after the imposition of antidumping and section 301 duties on imports of mattresses from China

in 2018 and 2019, and that many of the foreign producers in Cambodia, Indonesia, Malaysia,

Serbia, Thailand, Turkey, and Vietnam were related to the same China-based firms.

APPX124081-124082 (citing APPX80133-80134).  Thus, opposite to CVB's claim that subject

imports from Vietnam represented "a more accurate reflection of the price effects" (PlBr. at 31),

the record indicated that imports from all of the subject countries were largely of the same

product, with the same specifications, and produced by related firms.

Finally, Plaintiff argues that purchaser responses contradict the Commission's finding of

price depression because few firms reported that they had switched purchases to subject imports

because of price or that domestic producers had reduced prices to compete with subject imports.

PlBr. at 32.  The Commission, however, reasonably weighed these responses against other record

evidence supporting the importance of price to purchasers and the shifts in their purchasing

patterns over the POI.  APPX124094-124095.  In particular, the Commission observed that

responding purchasers who acknowledged switching purchases to subject imports from the

domestic like product over the POI also reported both that (i) subject imports were lower priced

than domestic mattresses, and (ii) price was a top three factor in their purchases (with the

exception of one firm).  APPX124094 (citing APPX124352-124353 and relying on purchaser

responses from [███████████████████████████████████████

███████]).  As the Commission further observed, the record showed that price was likewise

important for consumers; in turn, retailers and wholesalers demanded mattresses that would meet

the consumers' price concerns.  APPX124095 (citing APPX114979-114990).  The Commission

reasonably weighed this record evidence in finding that purchaser responses supported

significant price effects.  Plaintiff's attempts to reweigh this evidence are unavailing.

### G.   The Commission's Impact Finding is Supported by Substantial Evidence and in Accordance with Law

#### 1.   The Commission's Impact Finding is in Accordance with Law

The Commission complied with its statutory mandate to determine whether the domestic

industry is "materially injured or threatened with material injury by reason of" unfairly traded

imports.  19 U.S.C. §§ 1671d(b)(1) & 1673d(b)(1).  As discussed below, the Commission

performed a proper causation analysis by "consider{ing} the statutory factors of the volume of

subject imports, their price effects, and their impact on the domestic industry, 19 U.S.C.

§ 1677(7)(B)(i), and {finding} substantial record evidence established a causal link between

subject imports and material injury to the domestic industry."  *Swiff-Train Co. v. United States*,

793 F.3d 1355, 1361 (Fed. Cir. 2015).  The Commission also met it statutory obligation to

examine factors other than subject imports to ensure that it did not attribute injury from other

factors to the subject imports.  *See* SAA at 851-52; S. Rep. No. 96-249 at 75 (1979); H.R. Rep.

No. 96-317 at 47 (1979).

#### 2.   The Commission's Impact Finding is Supported by Substantial Evidence

The statute provides that in examining the impact of subject imports, the Commission

"shall evaluate all relevant economic factors which have a bearing on the state of the industry."

19 U.S.C. § 1677(7)(C)(iii).  These factors encompass a range of production, shipment, financial,

employment and investment data, as well as factors affecting domestic prices.  No single factor

is dispositive, and all relevant factors are considered "within the context of the business cycle

and conditions of competition that are distinctive to the affected industry."  *Id.*

In accordance with the statutory mandate, the Commission considered all relevant economic factors.  The Commission examined data on the domestic industry including its production capacity, production, rate of capacity utilization, employment, U.S. shipments and market share, inventories, financial performance, capital expenditures, and investments/expansions.  APPX124100-124105.  The Commission observed that notwithstanding strong demand growth and the availability of domestic capacity, the domestic industry lost market share to subject imports and experienced declining performance across most measures between 2017 and 2019, including declines in capacity, production, capacity utilization, employment, and U.S. shipments.  APPX124105.  Further, as subject imports depressed domestic prices to a significant degree, the domestic industry's declining prices and increasing costs resulted in stagnant net sales revenues and gross profits, and declining operating income and net income between 2017 and 2019.  APPX124105-124106.  Even with some improvements between interim 2019 and interim 2020, which the Commission noted was largely due to the imposition of tariffs on imports of mattresses from China, the domestic industry could not fully capitalize on growing U.S. demand because of increasing volumes of lower priced subject imports that replaced those from China.  APPX124106-124107.  Based on the record, the Commission found that there was a causal nexus between subject imports and the domestic industry's performance and that they had a significant impact on the domestic industry.  APPX124115.

In challenging the impact analysis, Plaintiff again primarily relies on its unfounded allegation that the Commission should have conducted a segmented market analysis between MiBs and FPMs.  PlBr. at 38-39.  The Commission explained again in its impact analysis that the record did not support such a segmented analysis because MiBs and FPMs compete in the U.S.

**BUSINESS PROPRIETARY INFORMATION**
**SUBJECT TO PROTECTIVE ORDER REDACTED**

market.  APPX124108-124109.  The record showed that MiBs and FPMs were comparable and

interchangeable, made from the same materials and to the same specifications, and that

consumers cross-shopped between them and were more concerned with price than with

packaging.  APPX124108-124109.  Further, purchasers (encompassing retailers and wholesalers

of mattresses) were not committed to either MiBs or FPMs, as alleged by CVB, but rather most

such firms reported purchasing both products and displayed them side-by-side in stores or on

websites.  APPX124108-124109.  Further, these products competed for the same customers, as

shown by (i) domestic producers [█████████████████████████████████], and (ii)

domestic producers and importers competing for sales to the same purchasers in the same

channels of distribution.  APPX124108-124109.  Given this level of competition and overlap, the

Commission reasonably found that the record did not support a segmented market analysis

between these products.

Plaintiff cites to the Commission's decisions in *Outboard Engines* and *Uncoated Paper*

to argue that product differences between MiBs and FPMs supported a segmented market

analysis.  PlBr. at 46-47.  As an initial matter, each of the Commission's injury investigations "is

*sui generis*, involving a unique combination and interaction of many economic variables," such

that prior investigations of distinct industries cannot override the record evidence of the

underlying investigations.  *Hitachi Metals*, 949 F.3d at 718 (quoting *Nucor Corp. v. United*

*States*, 414 F.3d 1331, 1340 (Fed. Cir. 2005)).  Indeed, even where customer demand or physical

differences might support market segments, the statute does not require that the Commission

undertake a segmented market analysis.  *See Makita Corp. v. United States*, 21 CIT 734, 741-42,

974 F. Supp. 770, 778 (1997); *BIC Corp. v. United States*, 21 CIT 448, 451-53, 964 F. Supp.

391, 397-98 (1997) (finding that market segments "may differ according to context" and that

reviewing courts have thus "deferred to the Commission's findings regarding the existence and importance of such segments").

Regardless, the cases cited by Plaintiff only highlight why any differences between MiBs and FPMs were insufficient to support a segmented analysis. In *Outboard Engines*, the record indicated that consumers strongly preferred four-stroke engines to two-stroke engines because of their superior durability and reliability (not to mention the phasing out of many two-stroke engines by environmental regulations). *Outboard Engines*, USITC Pub. 3752 at 14. In *Uncoated Paper*, the record indicated there were "limits on substitutability" between different types of uncoated paper products (*e.g.*, newspaper print, high bright paper, and book paper), such that the admitted inability of domestic producers to make certain of these paper types necessitated supply from imports. *Uncoated Groundwood Paper from Canada*, Inv. Nos. 701-TA-584 and 731-TA-1382 (Final), USITC Pub. 4822, at 22-24 (Sept. 2018). In contrast, as explained above, the underlying record here indicated that consumers are largely indifferent to packaging differences of mattresses, and that MiBs and FPMs have the same uses and are, as CVB acknowledged, "identical once unpackaged." APPX124084.

Plaintiff further argues that the Commission "failed to consider" the improving performance of domestic producers focused on MiBs. PlBr. at 39-40, 42-43 (arguing that "{t}he Commission did not acknowledge" increases in shipments and performances for domestic producers' of MiBs). CVB overlooks that the Commission in fact not only considered, but specifically discussed the improvements for domestic producers of MiBs. While the record neither supported nor necessitated a segmented analysis focused on MiB firms, the Commission nonetheless observed that the record did not support respondents' arguments that domestic producers of MiBs had not been injured by subject imports. Rather the Commission explained

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

that observed improvements in these firms' indicia would have been larger but for subject

imports:

> *Domestic producers of MiBs improved their performance by most measures during the period of investigation, as would be expected in light of the domestic industry's increases in U.S. shipments of MiBs and its substantial investments in MiB capacity during the period of investigation.*  Nevertheless, the performance of domestic MiB producers would have been appreciably stronger during the period of investigation but for the significant volume and increase in volume of low-priced subject imports that displaced domestic industry shipments from the U.S. market and depressed domestic like product prices to a significant degree, including the prices of MiB products.  Moreover, despite the substantial increase in apparent U.S. consumption of MiBs during the period of investigation, domestic producers' MiB capacity utilization remained low over the POI.  Capacity utilization was 57.2 percent in 2017, 62.0 percent in 2018, 60.3 percent in 2019, and 49.8 percent in interim 2020, down from 64.7 percent in interim 2019.

APPX124111-124112 (emphasis added; citations in footnotes omitted).

To bolster its mistaken allegation that the Commission did not consider the improvements

for the MiB producers, Plaintiff relies on decisions in *Nevinnomysskiy Azot* and *Nucor* to argue

that the Commission's alleged failure to address record evidence not supportive of its findings

requires a remand.  PlBr. at 44-45 (citing *Nevinnomysskiy Azot v. United States*, 31 CIT 1373

(2007), and *Nucor Corp.*, 28 CIT at 188, 318 F. Supp. 2d at 1207).  As illustrated above,

however, these cases are inapposite because the Commission did address the information

highlighted by CVB.

CVB also selectively cites to domestic industry indicia to argue that these data did not

support an injured domestic industry, PlBr. at 40-41, but its arguments rely on examining these

data in isolation.  For instance, Plaintiff notes that certain domestic firms reported plant

expansions or openings, while ignoring that other firms reported plant closures during the POI.

*See* APPX124202 (indicating that domestic producers [███████████████████████████]

*BUSINESS PROPRIETARY INFORMATION*
*SUBJECT TO PROTECTIVE ORDER REDACTED*

███ ] reported closing [ ██ ] separate facilities over the POI).  Plaintiff also cites to increases in

the domestic industry's unit value for U.S. shipments and unit net sales values.  PlBr. at 41.  As

the Commission explained, however, such averages could reflect changes in product mix by

domestic producers given the large range of prices for mattresses.  APPX124096.  Further, the

domestic industry's operating income and net income declined between 2017 and 2019,

indicating that even changes in product mix did little to benefit domestic producers' overall

performance.  APPX124103.

At bottom, Plaintiff might prefer to focus only on evidence it believes to be supportive of

a negative determination while ignoring the substantial record evidence considered by the

Commission.  This Court has repeatedly held that it will not engage in such a reweighing of the

evidence.  *E.g.*, *Gulf Shrimp Indus.*, 71 F. Supp. 3d at 1361; *JMC Steel Grp.*, 70 F. Supp. 3d at

1315; *Usinor*, 28 CIT at 1111, 342 F. Supp. 2d at 1272.

### 3.    The Commission's Analysis of Other Factors is Supported by Substantial Evidence

The Commission considered whether other factors may have had an impact on the

domestic industry to ensure that it did not attribute injury from such factors to subject imports.  It

found that no other factors caused injury to the domestic industry.  First, demand trends did not

explain the domestic industry's declining performance given the increases in apparent U.S.

consumption over the POI.  APPX124114 (citing APPX124464-124466).  And the volume of

nonsubject imports remained flat over the POI, was far less than that of subject imports, and

declined as a share of apparent U.S. consumption.  APPX124114-124115 (citing APPX124464-

124466).  The Commission further found that the record did not support that raw material

shortages had impaired domestic producers' ability to supply the U.S. market.  APPX124112

(n.308).

As with many of its other arguments, Plaintiff relies on its segmented market claims to argue that the Commission's analysis of demand trends should have focused separately on demand for MiBs and FPMs.  PlBr. at 45.  Again, such an analysis was unwarranted given that the record indicated these products competed in the U.S. market and were in fact marketed side-by-side as consumers cross-shopped between them.  *See* APPX124108-124109.  Thus, the relative growth of MiBs was not in isolation from FPMs as a segmented market, but rather a reflection of competition across products within the U.S. mattress market as customers compared these products.  APPX124108-124109.   The record evidence indicating that price was a more important factor for both purchasers and consumers than was packaging confirms that the increased apparent U.S. consumption of MiBs resulted from their lower price, not from any alleged preference for MiBs' logistical advantages.  APPX124110.

Plaintiff further claims that raw material shortages, rather than the growth in subject imports, prevented domestic MiB producers from taking a greater share of apparent U.S. consumption.  PlBr. at 45-46.  The Commission observed, however, that raw material shortages arose primarily in interim 2020 and stemmed from COVID-19 related disruptions, yet domestic MiB producers' capacity utilization rates had been low throughout the POI, with rates of 57.2 percent in 2017, 62.0 percent in 2018, and 60.3 percent in 2019.  APPX124112 (n.308).  Further, the Commission found that respondents had provided no evidence supporting these allegations.  Plaintiff again in its brief cites only to conclusory statements from its own consultants during the Commission hearing to support its allegations.  PlBr. at 46.  The Commission reasonably afforded more weight to the record evidence indicating that raw material shortages did not explain low capacity-utilization rates throughout the POI.  APPX124112 (n.308) (citing APPX124210-124211).  Its conclusion that these rates resulted from the increase in low-priced

47

subject imports is thus supported by substantial evidence.  *See, e.g.*, *U.S. Steel Grp.*, 96 F.3d at

1357; *see also AWP Indus., Inc.,* 783 F. Supp. 2d at 1285.

## CONCLUSION

As demonstrated above, the Commission's unanimous findings on volume, price effects,

and impact, as well as its ultimate affirmative determinations are supported by substantial

evidence and otherwise fully in accordance with law.  The Court should decline Plaintiff's

invitation to reweigh the evidence and to replace the Commission's reasonable analysis of the

effects of all cumulated subject imports on the domestic industry as a whole with a segmented

market analysis differentiated by the packaging type.  We respectfully request that the Court

affirm the Commission's determinations in their entirety.

Respectfully submitted,


*/s/ Andrea C. Casson*
Andrea C. Casson
Assistant General Counsel for Litigation

*/s/ Brian R. Soiset*
Brian R. Soiset
Attorney-Advisor
Office of the General Counsel
U.S. International Trade Commission
500 E Street, SW
Washington, DC 20436
Telephone: (202) 205-3399
Facsimile: (202) 205-3111
brian.soiset@usitc.gov


*Attorneys for Defendant United States*

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Chambers Procedures 2(B)(1) and (2), I hereby certify that the attached

**DEFENDANT UNITED STATES INTERNATIONAL TRADE COMMISSION'S PUBLIC**

**MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR JUDGMENT ON**

**THE AGENCY RECORD** contains 13,980 words, according to the word-count function of the

word processing system used to prepare this brief (Microsoft Word 2010).

Dated: June 13, 2022

*/s/ Brian R. Soiset*
Brian R. Soiset
Attorney-Advisor
Office of the General Counsel
U.S. International Trade Commission
500 E Street, SW
Washington, DC 20436
Telephone: (202) 205-3399
Facsimile: (202) 205-3111
brian.soiset@usitc.gov