NON-CONFIDENTIAL VERSION

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: THE HONORABLE STEPHEN ALEXANDER VADEN, JUDGE

| | |
|---|---|
| CVB, INC., <br><br>                 Plaintiff <br><br>     v. <br><br> UNITED STATES, <br><br>                 Defendant, <br><br>     and <br><br> BROOKLYN BEDDING, LLC, *et. al.*, <br><br>                 Defendant-Intervenors. | No. 21-cv-00288 <br><br> **NON-CONFIDENTIAL VERSION** <br><br> Bracketing of Proprietary Information Is Final <br><br> Proprietary Information Removed From Pages: 8-12, 15, 16, 18, and 19 |

PLAINTIFF'S REPLY BRIEF IN SUPPORT OF
PLAINTIFF'S RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD

Geoffrey M. Goodale
Andrew R. Sperl
Nathan J. Heeter
DUANE MORRIS LLP
505 9th Street, N.W. – Suite 1000
Washington, DC 20004
(202) 776-5211
gmgoodale@duanemorris.com

Stephen G. Larson
Robert C. O'Brien
Paul A. Rigali
LARSON LLP
555 South Flower Street, Suite 4400
Los Angeles, CA 90071
(213) 436-4864
slarson@larsonllp.com

*Counsel for Plaintiff CVB, Inc.*

Dated:  August 1, 2022

NON-CONFIDENTIAL VERSION

## TABLE OF CONTENTS

**Page**

RULE 56.2 STATEMENT ................................................................................................ 1

    I.     Administrative Determination Under Review ........................................................1

    II.    Issues Presented (as Previously Set Forth in CVB's Rule 56.2 Brief at 2-4) ...........2

ARGUMENT .................................................................................................................... 2

    I.     Defendants Mischaracterize the Standard of Review and Overstate the Deference Owed to the Commission. ........................................................................2

    II.    Contrary to Defendants' Assertions, the Commission's Finding That There Was No Market Segmentation Was Not Supported by Substantial Evidence. ....................................................................................................................4

            A.    Physical Differences and Differences in Production Distinguish FPMs and MiBs. ........................................................................................ 5

            B.    Channels of Domestic Production Are Polarized Between FPMs and MiBs........................................................................................................ 8

            C.    End Consumers Demonstrate Preferences Between MiBs and FPMs. ...................................................................................................... 9

            D.    Wholesalers Likewise Exhibit Preferences Between MiBs and FPMs. .................................................................................................... 11

    III.   The Commission's Findings Regarding the Significance of Subject Import Volume Are Not Supported by Substantial Evidence............................................12

            A.    CVB Appropriately Requested that the Commission Consider the Volume of Subject Imports in the Competitive Context. ........................ 12

            B.    The Volume of Subject Imports Was Not Significant Given the Conditions of Competition........................................................................ 13

    IV.   Defendants Fail to Justify the Commission's Erroneous Conclusion of Price Effects Caused by Subject Imports. ....................................................................14

            A.    The Commission Admits that Price Did Not Contribute Significantly to Increased Sales of Subject Imports Over the POI........... 15

**NON-CONFIDENTIAL VERSION**

       B.     CVB's Proposed Methodology for Assessing Price Effects Is Consistent with Cumulation Requirements and Provides a More Accurate Reflection of the Market............................................................ 17

V.     Contrary to Defendants' Assertions, Subject Imports Did Not Adversely Affect the Domestic Industry..................................................................19

CONCLUSION.......................................................................................................... 21

NON-CONFIDENTIAL VERSION

## TABLE OF AUTHORITIES

**Cases**

*Arlanxeo USA LLC v. United States*,
  389 F. Supp. 3d 1330 (C.I.T. 2019) ................................................................... 13

*Cleo, Inc. v. United States,*
  30 CIT 1380 (2006) ........................................................................... 7-8, 13

*Hynix Semiconductor, Inc. v. United States*,
  30 CIT 1208, 431 F. Supp. 2d 1302 (2006) ............................................. 12-13

*JMC Steel Grp. v. United States*,
  70 F. Supp. 3d 1309 (Ct. Int'l Trade 2015) ........................................................ *3*

*Mittal Steel Point Lisas Ltd. v. United States*,
  542 F.3d 867 (Fed. Cir. 2008) ............................................................................ 3

*Pohang Iron & Steel Co., Ltd. v. United States*,
  23 CIT 778 (1999) ........................................................................................... 3-4

*Sandvik Steel Co. v. United States*,
  164 F.3d 596 (Fed. Cir. 1998) ............................................................................ 8

*Suramerica de Aleaciones Laminadas, C.A. v. United States*,
  818 F. Supp. 348 (Ct. Int'l Trade 1993) ......................................................... 2-4

*Taiwan Semiconductor Indus. Ass'n v. USITC*,
  2 F.3d 1339 (Fed. Cir. 2001) ............................................................................. 3

*Timken Co. v. United States*,
  699 F. Supp. 300 (Ct. Int'l Trade 1988) ......................................................... 2, 4

*Universal Camera Corp. v. NLRB*,
  340 U.S. 474 (1951) ............................................................................................ 2

**Statutes**

19 U.S.C. § 1516a(b)(1)(B)(i) .............................................................................. 2

19 U.S.C. § 1671d(b)(1) ....................................................................................... 3

19 U.S.C. § 1673d(b) ........................................................................................... 3

NON-CONFIDENTIAL VERSION

**Legislative Materials**

H.R. Rep. 96-317 ................................................................................................................3

S. Rep. 96-249 (1979) ........................................................................................................3

Uruguay Round Agreements Act, Statement of Administrative Action,
    H.R. Doc. No. 103-316, Vol. 1, at 851-52 (1994), reprinted in 1994
    U.S.C.C.A.N. 4040, 4184-85 ......................................................................................3

**USITC Publications**

*In re Outboard Engines from Japan*,
    Inv. No. 731-TA-1069, USITC Pub. No. 3752, 2005 WL 630159 (Feb. 2005).................7, 14

Plaintiff, CVB, Inc. ("CVB" or "Plaintiff"), hereby replies to the response briefs filed by the U.S. International Trade Commission ("ITC" or the "Commission") and the Mattress Petitioners that are Defendant-Intervenors in this case (the "Mattress Petitioners") (collectively, the "Defendants"). *See* Def. U.S. Int'l Trade Commission's Confidential Mem. in Opp'n to Pl.'s Mot. For J. on the Agency R. (June 13, 2022), ECF No. 51 ("Comm'n Resp. Br."); Def. Int. Mattress Petitioners' Resp. Br. in Opp'n to Pl.'s Mot. For J. on the Agency R. (July 1, 2022), ECF No. 53 ("Mattress Petitioners' Resp. Br."). As Defendants have failed to adequately rebut the arguments set forth in CVB's Rule 56.2 Brief in Support of its Motion for Judgment on the Agency Record, CVB respectfully requests that the Court grant CVB's motion for judgment on the agency record and grant it the relief requested therein. *See* Pl.'s Brief in Support of Rule 56.2 Mot. for J. on the Agency R. (March 29, 2022), ECF No. 48 ("CVB's Rule 56.2 Brief").

## RULE 56.2 STATEMENT

### I.  Administrative Determination Under Review

The administrative decisions challenged in this case are the final affirmative injury determinations of the Commission in the antidumping and countervailing duty investigations concerning mattresses from Cambodia, China, Indonesia, Malaysia, Serbia, Thailand, Turkey, and Vietnam. *See Mattresses from Cambodia, China, Indonesia, Malaysia, Serbia, Thailand, Turkey, and Vietnam*, 86 Fed. Reg. 26,545 (ITC May 14, 2021) (Appx14715) and accompanying Final Views of the Commission, USITC Pub. No. 5191 (May 2021) (Appx14727-15238).[1]

---

[1] Per *Joint Appendix Preparation in § 1581(c) Cases Assigned to Judge Vaden*, all record citations are to bates-numbered appendix pages.

NON-CONFIDENTIAL VERSION

## II.   Issues Presented (as Previously Set Forth in CVB's Rule 56.2 Brief at 2-4)

1.      The Commission's determinations that the U.S. market is not sharply segmented and that the competition between the MiB and FPM segments is not highly attenuated were unsupported by substantial evidence and contrary to law.

2.      The Commission's determination that the volume of subject imports had a significant volume effect on the domestic industry during the POI was unsupported by substantial evidence and contrary to law.

3.      The Commission's determination that subject imports depressed or suppressed the prices of the domestic like product was unsupported by substantial evidence and contrary to law.

4.      The Commission's determination that subject imports had a significant impact on the domestic industry was unsupported by substantial evidence and contrary to law.

## ARGUMENT

## I.   Defendants Mischaracterize the Standard of Review and Overstate the Deference Owed to the Commission.

While the Commission's findings are entitled to some deference under the applicable standard of review, the Commission is not entitled to ignore relevant evidence or escape the conclusions demanded by that evidence. This Court reviews the Commission's determinations in antidumping duty proceedings to determine whether they are "unsupported by substantial evidence on the record or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). In describing the standard of review, the Commission leans heavily on the statement that "substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951).  However, it is insufficient for this Court "to merely examine the evidence that sustains the agency's conclusion," *Timken Co. v. United States*, 699 F. Supp. 300, 306 (Ct. Int'l Trade 1988), *aff'd* 894 F.2d 385 (Fed. Cir. 1990), or to find "that the evidence supporting {the agency's} decision is substantial when considered by itself." *Suramerica de Aleaciones Laminadas, C.A. v. United States*, 818 F. Supp.

348, 353 (Ct. Int'l Trade 1993), *aff'd*, 44 F.3d 978 (Fed. Cir. 1994) (citation omitted). "The substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Id.*

In the context of an appeal of a final injury determination, the need to examine the evidence detracting from the Commission's determination is particularly acute. Pursuant to statute, the Commission must determine whether a domestic industry is materially injured or threatened with material injury "*by reason of*" the subject imports. *See* 19 U.S.C. §§ 1671d(b)(1), 1673d(b) (emphasis added). Thus, the Commission is required to "examine other factors to ensure that it is not attributing injury from other sources to the subject imports." Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103-316, Vol. 1, at 851-52 (1994), reprinted in 1994 U.S.C.C.A.N. 4040, 4184-85; *accord* S. Rep. 96-249 at 75 (1979); H.R. Rep. 96-317 at 47; *Mittal Steel Point Lisas Ltd. v. United States*, 542 F.3d 867, 877 (Fed. Cir. 2008); *Taiwan Semiconductor Indus. Ass'n v. USITC*, 2 F.3d 1339, 1345 (Fed. Cir. 2001). In doing so, the Commission "is not free to prescribe what inference from the evidence it will accept or reject, but must draw all those inferences that the evidence fairly demands." *Pohang Iron & Steel Co., Ltd. v. United States*, 23 CIT 778, 789 (1999).

For this reason, the Commission's reliance on *JMC Steel Grp. v. United States*, 70 F. Supp. 3d 1309 (Ct. Int'l Trade 2015), is misplaced. *JMC Steel Grp.* involved a challenge to the Commission's determination to use a certain *methodology* of measuring lost sales volume over another alternative methodology. While the Court may affirm a choice among two acceptable methodologies, the Court is not required to affirm the Commission's evaluation of the evidence where the Commission has failed to consider some evidence or failed to adopt the conclusions

**NON-CONFIDENTIAL VERSION**

demanded by that evidence. As this Court has noted, the Commission "is not free to prescribe what inference from the evidence it will accept or reject, but must draw all those inferences that the evidence fairly demands." *Pohang Iron & Steel Co.,* 23 C.I.T. at 789. As discussed below, under this proper and required standard of review, it is clear that the Commission's determinations that are being challenged in this case were not supported by substantial evidence and were otherwise not in accordance with law.

II.     **Contrary to Defendants' Assertions, the Commission's Finding That There Was No Market Segmentation Was Not Supported by Substantial Evidence.**

Central to nearly all of the Commission's findings and conclusions was its refusal to analyze FPMs and MiBs as separate, distinct market segments. Only by treating FPMs and MiBs alike – ignoring the substantial evidence that requires their differentiation into distinct market segments – can the Commission justify its findings that subject imports were significant in volume; that subject imports had a significant effect on price; and that subject imports had a significant impact on the domestic industry. However, the Commission's refusal to treat the FPM and MiB segments as distinct is unsupported by substantial evidence and is contrary to law.

As explained in CVB's opening brief, competition between the MiB and FPM segments is highly attenuated. *See* CVB's Rule 56.2 Brief at 8-17. That is critical because – apart from any effect caused by the subject imports – demand for FPMs is decreasing, and demand for MiBs is increasing. *See id.* at 18-19. The Commission erred and ignored substantial evidence by attributing those trends to the effect of the subject imports. In its opposition brief, the Commission attempts to bolster its findings with several arguments, each of which is meritless and ignores significant evidence unfavorable to the Commission.

NON-CONFIDENTIAL VERSION

A.    *Physical Differences and Differences in Production Distinguish FPMs and MiBs.*

The distinction between MiBs and FPMs begins with their physical differences. *See* CVB's Rule 56.2 Brief at 9-13. The Commission attempts to brush aside these significant differences, arguing that a "plethora" of statements from domestic producers establishes that there is no real difference between the inputs and materials in MiBs and FPMs. *See* Comm'n Resp. Br. at 21 (citing APPX124084 n.176). That both ignores evidence that the Commission itself acknowledges in its report, and misses the fundamental point. Indeed, the footnote that the Commission cites to includes comments that acknowledge particular differences between FPMs and MiBs, including that "{T}he wire that would go all the way around, you're not able to do that in a rolled and compressed mattress" (APPX124084 n.176 (citing Adams testimony)), and that "{I}nner-springs used to have a real solid border rod around the edge of it, and so, in order to roll-pack a mattress, you have to remake that border rod." *Id.* (citing Merwin testimony). In contrast to these general statements, the record includes undisputed evidence – unaddressed by the Commission – that domestic producers have actually made significant investments into manufacturing infrastructure in order to expand their manufacturing into MiBs. *See* CVB's Rule 56.2 Brief at 10-12. Such investment would be unnecessary if MiBs and FPMs were as similar as the Commission insists.

Further, even if FPMs and MiBs have similar "inputs and materials" including "foam densities" (*see* Comm'n Resp. Br. at 21-22), that does not mean that the *manufacturing process* or equipment for FPMs and MiBs are interchangeable. None of the comments cited by the Commission contradict the specific evidence, cited by CVB, that the manufacturing processes are different and that manufacturers cannot simply switch over from manufacturing one type of mattress to another. *Cf.* APPX124084 with CVB's Rule 56.2 Brief at 10-11. Similarly, in supposed

contradiction of evidence establishing that foam and coils are designed to different specifications for MiBs and FPMs, the Commission relies on evidence that mattresses with particular foam specifications can be shipped as MiBs and FPMs. *See* Comm'n Resp. Br. at 22. However, that evidence only consists of *pricing* data, not evidence about the required manufacturing differences to produce FPMs and MiBs. Ultimately, the evidence relied upon by the Commission consists of general statements about the similarities between MiBs and FPMs that does not address the specific differences in their manufacturing.

The Commission also cites the finding, with respect to substitutability, that producers, importers, and purchasers reported that there was interchangeability between domestically produced mattresses and mattresses from the subject countries. *See* Comm'n Resp. Br. at 8, 17, 28. However, by itself, that finding is irrelevant because it does not focus on the distinction between FPMs and MiBs.

The Commission also advances a misplaced argument that CVB somehow waived its segmentation argument by not challenging the Commission's definition of a domestic like product. *See* Comm'n Resp. Br. at 22-23. That ignores the procedural history of this case and relevant law. First, throughout these proceedings, CVB has consistently argued that MiBs and FPMs should be treated as distinct segments of the market, and that failure to do so necessarily attributes an effect to subject imports that is really a reflection of the market differences between FPMs and MiBs.

More fundamentally, the Commission is wrong to the extent it argues that CVB was required to challenge the Commission's definition of domestic like product in order to advocate for a segmented market analysis. That is contrary to the Commission's determination in *In re Outboard Engines from Japan*, Inv. No. 731-TA-1069, USITC Pub. No. 3752, 2005 WL 630159

**NON-CONFIDENTIAL VERSION**

(Feb. 2005), in which imports did not have a significant effect on the domestic industry's performance because the growing demand for a particular type of engine – comprising one segment of the market – was in fact the cause of the declines in financial performance of the domestic industry. *Id.* at *22-24. The Commission properly made that determination without bifurcation in the definition of domestic like market. *See id.* at *6 (finding "a single domestic like product, outboard engines and powerheads"). So too, here, the Commission need not have modified its definition of domestic like product in order to recognize that the relative performance of different segments of the market was a factor that caused a decline in certain aspects of the domestic market.

This Court's decision in *Encon Industries, Inc. v. United States*, 16 CIT 840, 841-42 (1992) is not to the contrary. *Encon* is readily distinguishable. In *Encon*, the plaintiffs argued that the market should be segmented into high-end and low-end ceiling fans for the purposes of assessing causation; the subject imports from China were generally low-end ceiling fans. *See id.* at 840. The plaintiffs asserted that the Commission was "required to determine if a majority of U.S. producers are materially injured by reason of the LTFV imports, not whether the material injury to the industry as a whole is caused in some part by the imports in a class found to be sold at LTFV." *Id.* at 842. That argument, which this Court rejected in *Encon*, is not the argument that CVB makes here. Instead, in this case, a recognition of the segmented nature of the market necessarily leads to the conclusion that the "industry as a whole" was *not* injured by reason of the subject imports – i.e., neither FPMs (which are declining because of other market forces), nor MiBs (for which even domestic producers are not in decline). That is fundamentally different than the situation in *Encon*,

**NON-CONFIDENTIAL VERSION**

in which – even if the "like market" had been bifurcated – "in all likelihood the producer or producers at the lower end would still be found to be injured." *Id.* at 842.[2]

> **B.    Channels of Domestic Production Are Polarized Between FPMs and MiBs.**

The Commission also claims that the failure to treat FPMs and MiBs as separate segments of the domestic market is justified because "{d}omestic producers produced all types of mattresses." Comm'n Resp. Br. at 7; *see also id.* at 20. However, even to the extent it is true that a minority (12 of 53) of domestic producers made both types of mattresses, that says nothing about whether those producers manufactured both types of mattresses in any significant amount. As described in CVB's opening brief, almost all firms specialize in production of either MiB or FPM mattresses. *See* CVB's Rule 56.2 Brief at 14. The Commission does nothing to rebut the evidence that the Commission ignored on that point, which reflects that – of 53 U.S. producers, [

].

CVB's Rule 56.2 Brief at 14 (citing APPX114520).

In addition, the Commission fails to rebut that the top producers of each product have little if any production of the other. *See id.* at 15 (chart describing production of top three MiB producers and top three FPM producers). For instance, the Commission points out that both [          ] and [                ] – whose public statements demonstrate the distinctness of the MiB and FPM segments – [                              ]. *See* Comm'n Resp. Br. at 21. However, the fact that *some* producers may produce *some* of each type of mattress does not negate the overall

---

[2] The Commission also cites *Sandvik Steel Co. v. United States*, 164 F.3d 596, 599 (Fed. Cir. 1998) for the general proposition that a party must exhaust administrative remedies. *See* Comm'n Resp. Br. at 22 n.11, 39 n.20. However, that case has nothing to do with challenges to a domestic like market or market segmentation.

polarization in the industry. The Commission's insistence that producers comprising [          ] of U.S. production produced both FPMs and MiBs at some point during the period of interest (*see* Comm'n Resp. Br. at 20) is undermined by the fact that statistic includes producers like [                                        ], which each produced [          ] MiBs. *See* CVB's Rule 56.2 Brief at 15.

### C.    *End Consumers Demonstrate Preferences Between MiBs and FPMs.*

As explained in CVB's opening brief, one of the key differences between MiBs and FPMs is the experience of consumers in shopping for and taking delivery of each type of mattress. *See* CVB's Rule 56.2 Brief at 12-13. The Commission claims that FPMs and MiBs may be indistinguishable once they are unpackaged (Comm'n Resp. Br. at 20), but that ignores consumer preferences that drive purchasing decisions at the shopping and delivery stages.

Consumer preference for direct delivery is reflected in the fact that a plurality of purchasers indicated that the ability to ship by common carrier is "very important" to them. *See* APPX14848. The Commission does not dispute that 71% of consumers between 18 and 35 years old prefer to shop online. APPX11710. The Commission instead insists that "sleep studies" suggest that packaging is relatively unimportant to consumers. Comm'n Resp. Br. at 8, 18. However, significant problems affect the selected data that the Commission identifies. For instance, it is unsurprising that [          ] does not include a filter to separate FPMs from MiBs, (*see* Comm'n Resp. Br. at 9) when only a small percentage of the mattresses it purchases are FPMs. *See* CVB's Rule 56.2 Brief at 16. With respect to the [

]. *See* Comm'n Resp. Br. at

18; APPX114990. The Commission also ignores that [

]. APPX114990. Likewise, the Commission acknowledges that [

]. *See* Comm'n Resp. Br. at 18; *see also* APPX114739 (also noting importance of [                    ] to consumers). Despite the Commission's contention that factors like "free setup" are "correlated with delivery of FPMs", in actuality, the survey did not ask consumers whether they considered delivery-related factors to correlate with FPMs or MiBs. Comm'n Resp. Br. at 18; APPX114739. In fact, unlike FPMs, MiBs can be delivered by common carrier (and therefore do not require a set delivery time) and can be set up easily by the consumer (so do not require paid setup). The Commission also does not dispute that the Mattress Petitioners' own testimony admitted that consumers have distinct preferences for how to shop for and take delivery of a mattress. *See* CVB's Rule 56.2 Brief at 12 (citing APPX12251-52 (Fallen testimony)); APPX12309 (Baisburd argument).

The Commission's attempt to rebut evidence showing that consumers prefer the experience of shopping for MiBs, as opposed to receiving an in-store sales pitch, also falls flat. First, the Commission argues that the sales channels of internet sales and brick and mortar stores are not exclusive to FPMs or MiBs. *See* Comm'n Resp. Br. at 19. However, the fact that *some* brick and mortar stores sell some MiBs, and vice versa, does not change the fact that there is significant polarization in those sales channels. For instance, as described below, although [      ] sold both MiBs and FPMs during the period of interest, its sales of MiBs were only a small fraction of its overall sales. The Commission's own findings illustrate the polarization in channels of

**NON-CONFIDENTIAL VERSION**

distribution: the share of subject imports, which the Commission concedes were predominantly MiBs, that were sold to brick and mortar retailers was only 14.8 percent to 20.0 percent. *See* Comm'n Resp. Br. at 19. Further, even if it were the case that consumers had a distinct preference for shopping in a brick or mortar store (*see id.*), that would still support a finding that competition between MiBs and FPMs is attenuated.

### D.   *Wholesalers Likewise Exhibit Preferences Between MiBs and FPMs.*

The Commission does not dispute that, in general, consumer preferences for one type of mattress or another are reflected at the wholesaler level. *See* CVB's Rule 56.2 Brief at 16; Comm'n Resp. Br. at 23-24. Instead, the Commission claims that wholesalers do not have a significant preference for one type of mattress. The Commission bases that claim in large part on the fact that 11 of 19 responding purchasers reported purchases of *some* quantity of both MiBs and FPMs. *See* Comm'n Resp. Br. at 23. But that analysis suffers from the same defect as the Commission's analysis of domestic production – just because a wholesaler may purchase *some* quantity of both types of mattresses is meaningless without consideration of what that quantity was. Tellingly, the Commission does not dispute the statistics regarding [          ] purchases – i.e., that [          ] accounts for over [      ] of total MiB purchases, and nearly [      ] of its purchases were of MiBs. *See* CVB's Rule 56.2 Brief at 16. The fact that [          ] may have made purchases of [    ] or less FPMs only serves to illustrate the degree of polarization in the market. Similarly, for a majority of those purchasers that the Commission specifically identifies as purchasing both types of mattresses in some quantity (*See* Comm'n Resp. Br. at 23-24), purchases were predominantly either MiB or FPM:

| Purchaser | MiBs | FPMs |
|-----------|------|------|
| [ ] | [ ] | [ ] |
| [ ] | [ ] | [ ] |
| [ ] | [ ] | [ ] |

*See* APPX102935, APPX103051, APPX103156.

**III.    The Commission's Findings Regarding the Significance of Subject Import Volume Are Not Supported by Substantial Evidence.**

> **A.    *CVB Appropriately Requested that the Commission Consider the Volume of Subject Imports in the Competitive Context.***

The Commission is wrong that CVB's analysis of volume is inconsistent with the statute. *See* Comm'n Resp. Br. at 30. As the Commission acknowledges, it is not enough for the Commission to simply identify the volume of subject imports or the increase in any such volume. Instead, the statute requires the Commission to affirmatively find that the volume of subject imports, or any increase in such volume, "is significant" on either a relative or absolute basis. Comm'n Resp. Br. at 29 (quoting 19 U.S.C. § 1677(7)(C)(i)). Here, the volume of subject imports is not significant, because almost that entire volume consisted of MiBs – a segment of the market in which no injury occurred in the domestic market. Contrary to the Commission's argument, that reasoning follows from the language of the statute, and does not impose a requirement not found in the statute.

The authority cited by the Commission is not to the contrary. For instance, in *Hynix Semiconductor*, this Court acknowledged that the Commission "must analyze the volume and market share data in the context of conditions of competition." 431 F. Supp. 2d 1302, 1308 (C.I.T. 2006) (quotation marks and citation omitted). Accordingly, in reviewing the Commission's

determination that subject import volume was significant, this Court considered "the substantial degree of substitutability and the commodity-like properties of" the subject imports and domestic like product in that case. *Id.* In other words, the Court implicitly acknowledged that in determining whether volume is *significant*, it must determine whether the subject imports actually compete with the domestic like product. Likewise, the Commission's reliance on *Cleo* and *Encon* is unavailing and is nothing more than a reprisal of the Commission's insistence that the market not be considered on a segmented basis. *See* Comm'n Resp. Br. at 33. Further, *Encon* is distinguishable for the reasons described above (at 7-8), and *Cleo* merely stands for the proposition that – unlike in this case – the plaintiffs there failed to demonstrate how the Commission's refusal to segment the markets was unsupported by the evidence. 30 C.I.T. at 1400.

That is consistent with the statute's legislative history – as the Commission acknowledges, the reason that the statute does not define "significant" is because "{f}or one industry, an apparently small volume of imports may have a significant *impact* on the market; for another, the same volume may not be significant." *Arlanxeo USA LLC v. United States*, 389 F. Supp. 3d 1330, 1338 (C.I.T. 2019) (quoting S. Rep. No. 96-249, at 88 (1979), reprinted in 1979 U.S.C.C.A.N. 381, 474)) (emphasis added); *see also* Comm'n Resp. Br. at 29. In other words, a determination of the significance of subject import volume necessarily is informed by the impact that subject imports have on the domestic market.

**B.     *The Volume of Subject Imports Was Not Significant Given the Conditions of Competition.***

The Commission does little to argue that the volume of subject imports was significant in light of the conditions of competition that actually prevail. In particular, the Commission does not explain how the volume of subject imports or any increase in that volume was significant, other

than to reference data establishing that the volume of such imports have, in fact, increased. However, that does not establish that the volume is significant, and the Commission does not propose any yardstick for this Court to make that determination. As described above, the correct standard is whether volume was significant in light of competitive conditions – and when the segmented nature of the market is considered, as it must be, then it is clear that the volume of subject imports – which consist almost entirely of MiBs – was not significant.

The Commission's selective quotation from *Outboard Engines from Japan* obscures the Commission's actual reasoning in that case. *See* Comm'n Resp. Br. at 32. Although the Commission commented that the volume of subject imports was significant, it went on to explain that "the conditions of competition for this industry and the composition of the imports over the period of investigation reduce the apparent significance of the subject import volume and particularly any increases in volume." 2005 WL 630159, at *18. Following a detailed analysis of market trends – including the segmentation between the two engine types at issue – the Commission found "that certain market factors mitigate the significance of the volume and market share of subject imports during the period of investigation, particularly the increases in volume and market share." *Id.* at *19. It was that type of analysis that was missing from the Commission's determinations in this case, and that cause its ultimate conclusion on volume to be unsupported by substantial evidence.

## IV.   <u>Defendants Fail to Justify the Commission's Erroneous Conclusion of Price Effects Caused by Subject Imports.</u>

Both the Commission's and the Mattress Petitioners' respective response briefs fail to justify the Commission's improper findings of price depression. For one, Defendants fail to account for the Commission's erroneous determination that price – as opposed to a litany of other

non-price factors – contributed significantly to the increased sales of subject imports over the POI. Second, the Commission's arguments with respect to cumulation are misplaced, and it is Plaintiff's proposed methodology for calculating price effect – not the Commission's – that is consistent with cumulation.

### A.      The Commission Admits that Price Did Not Contribute Significantly to Increased Sales of Subject Imports Over the POI.

The Commission's admission that "*only two* { of the [                    ] responding } purchasers reported switching purchases from the domestic product to subject imports because of price," (Comm'n Resp. Br. at 11, 34-35 (emphasis added)) undermines, if not contradicts, Defendants' arguments that underselling contributed to increased sales of subject imports or depressed prices. Indeed, no matter how Defendants attempt to frame the purchaser response data, the reality is that lower prices ultimately did not impact the purchasing decisions for the vast majority of responding purchasers, and the analysis should end there.

Defendants attempt to negate this fatal admission by arguing that the Commission adequately justified its finding of price effects by "reasonably weigh{ing} { purchaser } responses against its finding that there was a moderately high degree of substitutability between domestic mattresses and subject imports and purchaser responses that price was an important purchasing factor." *Id.* at 35. As explained at length in CVB's Rule 56.2 Brief, the Commission's findings both (a) ignored or downplayed critical non-price purchasing factors such as quality, availability, reliability of supply, product consistency, and delivery time which responding purchasers overwhelmingly ranked as more important than price; and (b) overstated the importance of price as a purchasing factor. *See* CVB's Rule 56.2 Br. at 33-36.

15

**NON-CONFIDENTIAL VERSION**

Although CVB will not belabor those arguments in this Reply Brief since they were discussed in detail in CVB's Rule 56.2 Brief, Defendants made two additional arguments in their respective response briefs that are particularly flawed and merit addressing. First, Mattress Petitioners curiously assert that the Commission "properly focused on the competition . . . at the wholesale level" as opposed to consumers, and that "{i}t is the importance of price at the wholesale level to purchasers that played a pivotal role in their choice to buy lower-priced { subject imports }." Mattress Petitioners' Resp. Br. at 4. There is no dispute that the purchaser questionnaires on which the Commission relied – and which reflect the numerous non-price factors influencing purchase decisions – were submitted by retailers or wholesalers, not the end consumer. The distinction, or clarification, makes no difference to the price effects analysis because the fact that consumers generally prefer lower-priced goods does not change the fact that the record reflects numerous other non-price factors drove the purchasing decisions at the retailer and wholesaler level.

Second, Mattress Petitioners state that "{i}n purchaser questionnaires, 20 of the 23 responding purchasers stated that they at least sometimes, if not usually or always, purchase the lowest-priced product." *Id.* at 5.[3] This statement is, at best, misleading. The *correct* statement of the record is as follows: "[          ] purchasers reported that they only sometimes purchase the lowest-priced product, [       ] stated that they never did, [       ] stated that they usually did, and [       ] stated that it always does." Appx124179. Put differently (but accurately), only [

---

[3] The Commission also misleadingly wielded this statistic in its brief. *See* Comm'n Br. at 35-36 ("{T}he Commission's conditions of competition finding that price was an important purchasing factor is supported by substantial evidence, including . . . purchaser responses indicating they purchased the lowest priced product.").

] responding purchasers stated that they usually or always purchase the lowest-priced product. Thus, when framed correctly, this statistic cuts directly against Defendants' position.

In short, and as argued at length in CVB's Rule 56.2 Brief, the record is clear that, while price is certainly considered by many purchasers, it was not a significant contributing factor to the increased mattress sales from subject imports. Rather, the increase was driven by several other non-price factors and market dynamics.

    **B.**      *CVB's Proposed Methodology for Assessing Price Effects Is Consistent with Cumulation Requirements and Provides a More Accurate Reflection of the Market.*

The Commission alleges that CVB proposes a "results-driven" methodology to evaluate whether subject imports caused price depression over the POI. Comm'n Resp. Br. at 38-39. Respectfully, it is the Commission's methodology that is "results-driven," and inconsistent with cumulation. As explained in CVB's Rule 56.2 Brief, the Commission determined price depression by using a simple calculation of taking the percentage difference between the price of a particular product in the first quarter of 2017 against the last quarter of measured data (Q3 of 2020). CVB's Rule 56.2 Br. at 30.

The primary problem with this methodology is that it compares apples to oranges, since the market for MiBs in Q1 of 2017 was dramatically different than it was in Q3 of 2020. That is, there is virtually zero MiB pricing data for subject countries other than China before Q1 of 2019. As the Commission rightly points out, cumulation requires the Commission to "consider the price effects of subject imports from *all cumulated countries*." Comm'n Resp. Br. at 39 (emphasis added). By beginning the calculation at Q1 of 2017, the Commission necessarily did not consider the volume and effect of imports from all subject countries. Rather, it considered the price

differences of essentially two different markets: (1) a virtually two-player market (domestic and China); and (2) a market including all subject countries. This approach clearly skews the data to fit the Commission's desired outcome, and violates the cumulation principle. Moreover, the differences between Q1 of 2017 and Q1 of 2019 are even more significant when considering the Commission's acknowledgement that antidumping and section 301 duties on imports of mattresses from China did not occur until 2018 and 2019. *Id.* at 40. Such duties undeniably impact the market and cannot be ignored or watered-down by comparing prices from before and after the imposition of the duties.

To be clear, CVB does not take issue with the Commission's approach of taking the percentage difference between the price of a particular product across a certain time period to evaluate price effects. Indeed, CVB uses that same approach in its suggested methodology. The difference is that CVB's methodology adheres to cumulation because it compares price differences across a period when all subject countries were market participants. The Commission's methodology, on the other hand, does not.

Finally, the Commission either misconstrues or misrepresents CVB's argument with respect to data from Vietnam. Contrary to the Commission's representations, CVB did not argue that "subject imports from Vietnam represented a more accurate reflection of the price effects," generally. *Id.* (citing CVB's Rule 56.2 Br. 31). Putting the quoted snippet in the proper context, CVB simply stated that, for [                ], using data beginning in [                ] (consistent with CVB's suggested methodology for evaluating price effects of the other MiB products) was a "more accurate reflection of the price effects," than using [            ], because the quantity of imports from Vietnam in [            ] was [            ]. That said, the fact that Vietnam

**NON-CONFIDENTIAL VERSION**

accounted for a [                              ] of subject imports of MiBs from [              ], but had [          ] imports before 2019, only underscores the fact that beginning the price effects calculation in 2019 is a far better and more accurate approach.

**V.      Contrary to Defendants' Assertions, Subject Imports Did Not Adversely Affect the Domestic Industry.**

Despite the Defendants' assertions that subject imports adversely impacted the domestic industry, record evidence demonstrates that any decline in the domestic industry was caused by declining demand for FPMs. This conclusion is demanded by the evidence, particularly because the domestic MiB industry – the domestic segment in direct competition with subject imports – improved its performance during the period of investigation.  CVB's Rule 56.2 Br. at 40. Strangely, the Commission acknowledges the disparate performance of the domestic FPM and MiB segments, but still refuses to seriously consider the logical implications of that disparate performance. Virtually all subject imports were MiBs, and still domestic producers of MiBs improved their performance during the period of investigation. *Id.* at 19-26.  Indeed, the Commission acknowledged that "{d}omestic producers of MiBs improved their performance by most measures during the period of investigation, as would be expected in light of the domestic industry's increases in U.S. shipments of MiBs and its substantial investments in MiB capacity during the period of investigation." Comm'n Resp. Br. at 45; *see also* APPX124111-124112.

Despite this acknowledgement, the Commission still characterized the domestic industry writ large as experiencing "declining capacity, production, capacity utilization, employment, and U.S. shipments," attributing these declines to imports of MiBs. Comm'n Resp. Br. at 12. Record evidence is clear, and the Commission acknowledges, that these declines were experienced by the domestic FPM industry, not the domestic MiB industry. It thus strains credulity to then attribute

declines in the domestic FPM industry to imports of MiBs, when the domestic MiB industry – the domestic industry in direct competition with imported MiBs – improved its performance. *Id.*

Further, the Commission makes no serious attempt to reconcile these inconsistent findings. In its Response Brief, the Commission's only answer for this paradoxical conclusion is to assert that the domestic MiB industry was also injured by subject imports, citing the Commission's finding that the performance of domestic MiB industry would have been "appreciably stronger" had it not been for the impact of subject imports. Comm'n Resp. Br. at 44-45. However, the Commission has offered no evidence in support of this conclusion. For the Commission to say that a domestic industry was harmed by subject imports because the industry would have performed more strongly but for those imports, is merely to restate the assumed conclusion using different words. The only actual record evidence cited by the Commission is the alleged unused domestic MiB production capacity during the period. *Id.* But again, the Commission merely assumes that the cause of the unused capacity was subject imports, and not some other cause such as raw material shortages or an inability to produce MiBs to the same standard as importing producers. CVB's Rule 56.2 Br. at 25-26, 45-46. Thus, the Commission's attempt to avoid the inescapable conclusion that declining demand for FPMs, and not subject imports, caused declines in the domestic industry is not supported by sufficient evidence.

**TEXT CONTINUES ON NEXT PAGE**

NON-CONFIDENTIAL VERSION

## **CONCLUSION**

For the foregoing reasons, the Court should hold unlawful the Commission's affirmative final injury determinations and should remand with instructions for the Commission to issue determinations consistent with the Court's decision.

Dated:  August 1, 2022                                    Respectfully submitted,


                                                                   /s/ Geoffrey M. Goodale
                                                                   Geoffrey M. Goodale
                                                                   Andrew R. Sperl
                                                                   Nathan J. Heeter
                                                                   DUANE MORRIS LLP
                                                                   505 9th Street, N.W. – Suite 1000
                                                                   Washington, D.C.  20004
                                                                   Tel: 202-776-5211
                                                                   gmgoodale@duanemorris.com

                                                                   Stephen G. Larson
                                                                   Robert C. O'Brien
                                                                   Paul A. Rigali
                                                                   LARSON LLP
                                                                   555 South Flower Street, Suite 4400
                                                                   Los Angeles, CA 90071
                                                                   Tel: 213-436-4864
                                                                   slarson@larsonllp.com

                                                                   *Counsel for Plaintiff CVB, Inc.*

**NON-CONFIDENTIAL VERSION**

## **Certificate of Compliance**

The undersigned hereby certifies that the foregoing brief contains 6,081 words, exclusive of the caption block, table of contents, table of authorities, signature block, and certificates of counsel, and therefore complies with word count limitations set forth in Paragraph 2(B) of the Standard Chambers Procedures of the U.S. Court of International Trade.


/s/ Geoffrey M. Goodale

Dated: August 1, 2022