*PUBLIC VERSION*

# ATTACHMENT B:

Proposed Confidentiality Redactions to
Slip Opinion 23-184

Slip Op. No. 23-184

# UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| CVB, INC.,<br><br>        *Plaintiff,*<br><br>v.<br><br>UNITED STATES,<br><br>        *Defendant,*<br><br>   and<br><br>BROOKLYN BEDDING, LLC, *et al.,*<br><br>        *Defendant-Intervenors.* | Before: Stephen Alexander Vaden, Judge<br><br>Court No. 1:21-cv-00288 (SAV) |

## <u>OPINION</u>

[Sustaining the International Trade Commission's final affirmative injury determination.]

Dated: December 19, 2023

*Geoffrey M. Goodale*, Duane Morris LLP, of Washington, DC, for Plaintiff CVB, Inc. With him on the briefs were *Andrew R. Sperl*, *Nathan J. Heeter*, and *Lauren E. Wyszomierski*, Duane Morris LLP, and *Stephen G. Larson*, *Robert C. O'Brien*, and *Paul A. Rigali*, Larson LLP, of Los Angeles, CA.

*Jane C. Dempsey*, Office of the General Counsel, United States International Trade Commission, of Washington, DC, for Defendant United States. With her on the briefs were *Dominic Bianchi*, General Counsel; *Andrea C. Casson*, Assistant General Counsel for Litigation; and *Brian R. Soiset*, Attorney-Advisor.

*Mary Jane Alves*, Cassidy Levy Kent (USA) LLP, of Washington, DC, for Defendant-Intervenors Brooklyn Bedding, LLC; Corsicana Mattress Company; Elite Comfort Solutions; FXI, Inc.; Innocor, Inc.; Kolcraft Enterprises, Inc.; Leggett & Platt, Inc.; the International Brotherhood of Teamsters; and United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO. With her on the briefs were *Yohai Baisburd* and *Sydney Reed*.

**Vaden, Judge:** CVB, Inc. (CVB) challenges the International Trade Commission's (ITC or the Commission) final affirmative injury determination in its antidumping and countervailing duty investigations of mattresses from Cambodia, China, Indonesia, Malaysia, Serbia, Thailand, Turkey, and Vietnam. *See* Compl. ¶ 1, ECF No. 8; *Mattresses from Cambodia, China, Indonesia, Malaysia, Serbia, Thailand, Turkey, and Vietnam*, 86 Fed. Reg. 26,545 (ITC May 14, 2021), J.A. at 14,715, ECF No. 60; *Mattresses from Cambodia, China, Indonesia, Malaysia, Serbia, Thailand, Turkey, and Vietnam* (Final Determination), Inv. Nos. 701–TA–645 and 731–TA–1495–1501 (Final), USITC Pub. No. 5,191 (May 2021), J.A. at 124,040, ECF No. 66. Defendant-Intervenors in support of the Commission's final affirmative injury determination are Brooklyn Bedding, LLC; Corsicana Mattress Co.; Elite Comfort Solutions; FXI, Inc.; Innocor, Inc.; Kolcraft Enterprises, Inc.; Leggett & Platt, Inc.; the International Brotherhood of Teamsters; and the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO (collectively, Defendant-Intervenors). *See* Def.-Ints.' Resp. to Pl.'s Mot. for J. on the Agency R. (Def.-Ints.' Resp.) at 1, ECF No. 53. Before the Court is CVB's Motion for Judgment on the Agency Record. Pl.'s Mot. for J. on the Agency R. (Pl.'s Br.), ECF No. 48. CVB contends that the Commission's final affirmative injury determination is unsupported by substantial evidence. *Id.* at 1–2. For the reasons set forth below, the Court **SUSTAINS** the Commission's determination.

## BACKGROUND

### A. Procedural History

On March 31, 2020, the Defendant-Intervenors petitioned the Department of Commerce and the Commission to impose antidumping and countervailing duties on imports of mattresses from Cambodia, China, Indonesia, Malaysia, Serbia, Thailand, Turkey, and Vietnam (the Subject Countries). *See Petition: Mattresses from Cambodia, China, Indonesia, Malaysia, Serbia, Thailand, Turkey, and Vietnam: Antidumping and Countervailing Duty Petitions*, J.A. at 1,000–3,951, ECF No. 60. The Commission's period of investigation covered calendar year 2017 through September 2020. Def.'s Resp. to Pl.'s Mot. for J. on the Agency R. (Def.'s Resp.) at 6, ECF No. 51. On May 15, 2020, the Commission issued its preliminary determination. *See Mattresses from Cambodia, China, Indonesia, Malaysia, Serbia, Thailand, Turkey, and Vietnam*, 85 Fed. Reg. 30,984 (ITC May 21, 2020), J.A. at 9,046, ECF No. 60; *Mattresses from Cambodia, China, Indonesia, Malaysia, Serbia, Thailand, Turkey, and Vietnam*, Inv. Nos. 701–TA–645 and 731–TA–1495–1501 (Preliminary), USITC Pub. No. 5,059 (May 2020), J.A. at 9,048–373, ECF No. 60. Nearly one year later, on May 14, 2021, the Commission published its final determination. *See* Final Determination, J.A. at 124,040–570, ECF No. 66.

### B. Prior Mattresses from China Investigation

In December 2019, three months before the underlying petition in this case, the Commission published its final affirmative injury determination in an

*BUSINESS PROPRIETARY INFORMATION SUBJECT*
*TO PROTECTIVE ORDER REDACTED*

investigation of Chinese mattress imports. *Mattresses from China*, Inv. No. 731–
TA–1424 (Final), USITC Pub. No. 5,000 (December 2019), J.A. at 6,505–62, ECF
No. 60. In 2017 and 2018, Chinese imports accounted for roughly ███████ of
cumulated subject imports. Final Determination at 39, J.A. at 124,081, ECF No. 66.
In 2019, Chinese imports constituted less than ██████ of all imports while subject
imports from other countries rose by ████████ percent. *Id.* at 39–40, J.A. at
124,081–82. Between interim 2019 and interim 2020, Chinese imports declined to
almost nothing; but subject imports from other countries rose a further ████████
percent. *Id.* at 40, J.A. at 124,082. These imports from other countries were often
from companies related to Chinese producers that no longer exported their products
to the United States. *Id.* At 39 n. 165, 40 n.168, J.A. at 124,081–82.

### C. The Present Factual Record

The Commission began its material injury investigation by defining the
"domestic like product." Final Determination at 7–9, J.A. at 124,049–51, ECF No.
66; *see also* 19 U.S.C. § 1677(10). The Commission defined the domestic like
product as:

> The products covered by this investigation are all types of
> youth and adult mattresses. The term "mattress" denotes
> an assembly of materials that at a minimum includes a
> "core," which provides the main support system of the
> mattress, and may consist of innersprings, foam, other
> resilient filling, or a combination of these materials.
> Mattresses may also contain (1) "upholstery," the material
> between the core and the top panel of the ticking on a
> single-sided mattress, or between the core and the top and
> bottom panel of the ticking on a double-sided mattress;

and/or (2) "ticking," the outermost layer of fabric or other material (e.g., vinyl) that encloses the core and any upholstery, also known as a cover.

The scope of this investigation is restricted to only "adult mattresses" and "youth mattresses." [. . . .] All adult and youth mattresses are included regardless of size or size description.

The scope encompasses all types of "innerspring mattresses," "non-innerspring mattresses," and "hybrid mattresses." [. . . .]

Mattresses covered by the scope of this investigation may be imported independently, as part of furniture or furniture mechanisms (e.g., convertible sofa bed mattresses, sofa bed mattresses imported with sofa bed mechanisms, corner group mattresses, day-bed mattresses, roll-away bed mattresses, high risers, trundle bed mattresses, crib mattresses), or as part of a set in combination with a "mattress foundation." [. . . .]

Excluded from the scope of this investigation are "futon" mattresses. [. . . . ]

Also excluded from the scope are airbeds (including inflatable mattresses) and waterbeds, which consist of air- or liquid-filled bladders as the core or main support system of the mattress. Also excluded is certain multifunctional furniture that is convertible from seating to sleeping [. . . .]  Such furniture may, and without limitation, be commonly referred to as "convertible sofas," "sofa beds," "sofa chaise sleepers," "futons," "ottoman sleepers" or a like description.

Also excluded from the scope of this investigation are any products covered by the existing antidumping duty orders on uncovered innerspring units from China or Vietnam.

Also excluded from the scope of this investigation are bassinet pads with a nominal length of less than 39

> inches, a nominal width less than 25 inches, and a nominal depth of less than 2 inches.
>
> Additionally, also excluded from the scope of this investigation are "mattress toppers." [. . . .]

Final Determination at 7–9, J.A. at 124,049–51, ECF No. 66 (internal citations omitted). No party challenges the like product definition, which includes many mattress varieties. *See* Def.'s Resp. at 7, ECF No. 51 ("During the final phase, CVB did not argue for another domestic like product definition or against cumulation, and it does not challenge the Commission's findings on these issues."); Pl.'s Reply at 6–7, ECF No. 58 (agreeing that CVB did not challenge the domestic like product determination and distinguishing its argument from a challenge to the domestic like product determination).

Mattresses are either boxed or flat-packed. Both packaging methods are included in the domestic like product definition. *See* Def.'s Resp. at 6–7, ECF No. 51; Pl.'s Reply at 4, ECF No. 58. Boxed mattresses are compressed and rolled into a box for shipping, while flat-packed mattresses are boxed as-is and not compressed. Statement of Brian Adams at 143:7–13, J.A. at 7,569, ECF No. 60. Shipping boxed mattresses is typically cheaper and easier than shipping flat-packed mattresses because boxed mattresses are smaller when packaged. *Id.* at 144:7–17, J.A. at 7,570. Consumers can transport boxed mattresses themselves or have them delivered to their door, whereas flat-packed mattresses require specialized delivery. *Id.* at 144:13–45:11, J.A. at 7,571–72. CVB argued throughout the administrative

proceeding that the two packaging methods represent distinct, segmented markets with little direct competition.  *See, e.g.*, Pl.'s Reply at 6, ECF No. 58 ("[C]ompetition between the [flat-packed] and [boxed mattress] segments is highly attenuated").

The Commission based its U.S. industry data on responses from fifty-three domestic producers that represented the vast majority of domestic production in 2019.  Final Determination at III-1, J.A. at 124,193, ECF No. 66.  It based its U.S. import data on questionnaire responses from forty-nine companies that represented the majority of U.S. imports from the subject countries.  *Id.* at IV-1, J.A. at 124,223.  The foreign producer and exporter data was based on nineteen questionnaire responses from companies that represent a significant portion of subject imports.  *Id.* at 4–5, J.A. at 124,046–47.[1]

The Commission may issue an affirmative injury determination when it concludes that an industry in the United States is materially injured or threatened with material injury by reason of certain imports.  19 U.S.C. §§ 1671d(b), 1673d(b).  In making this determination, the Commission must consider the volume of subject imports, their effect on prices for the domestic like product, and their impact on producers of the domestic like product.  19 U.S.C. § 1677(7)(B).  The statute defines "material injury" as "harm which is not inconsequential, immaterial, or unimportant."  19 U.S.C. § 1677(7)(A).  In assessing material injury, the

---

[1] The Commission noted that sixteen responses were received to the final phase questionnaires, and the Commission relied on three more preliminary phase questionnaires in the absence of better data from Cambodia, Serbia, and Thailand.  *See* Final Determination at 4–5, J.A. at 124,046–47, ECF No. 66.

BUSINESS PROPRIETARY INFORMATION SUBJECT
TO PROTECTIVE ORDER REDACTED

Commission considers all relevant economic factors that bear on the state of the industry in the United States. 19 U.S.C. § 1677(7)(C)(iii). No single factor is dispositive, and all relevant factors are considered "within the context of the business cycle and conditions of competition that are distinctive to the affected industry." *Id.*

The Commission began its Views by discussing the conditions of competition in the industry. It found that mattress demand "is tied to housing sales and economic activity, particularly new home sales, housing starts, home resales, interest rates, gross domestic product ("GDP") growth, and consumer sentiment." Final Determination at 35, J.A. at 124,077, ECF No. 66. The Commission found that demand trends were mixed, but up overall, with different types of mattresses having different sales trends. *Id.* at 36, J.A. at 124,078. Demand for boxed mattresses increased, but demand for flat-packed mattresses decreased. *Id.*

Turning to supply, the Commission noted that domestic production served about ▮▮▮▮▮▮ of the domestic needs; subject imports served less than ▮▮▮▮▮▮ and non-subject imports served the remainder. *Id.* at 37, J.A. at 124,079. The Commission found that many domestic producers specialize in certain kinds of mattresses, but a little less than a quarter of producers overlap between boxed mattresses and flat-packed mattresses. *Id.* at 38, J.A. at 124,080. After discussing industry consolidation and new investment, the Commission noted that domestic production capacity for boxed mattresses increased by 121.2 percent during the

period of investigation and a further 48.6 percent in interim 2020.  *Id.* at 38–39, J.A. at 124,080–81.  The Commission concluded its discussion of supply by describing the near-total shift in subject imports away from China and toward other countries during the period of investigation.  *Id.* at 39–40, J.A. at 124,081–82.

The Commission also considered substitutability.  *Id.* at 41, J.A. at 124,083.  The Commission found a "moderately high degree of substitutability between domestically produced mattresses and subject imports."  *Id.*  It further found that subject imports of boxed mattresses competed with flat-packed mattresses.  *Id.* at 41–42, J.A. at 124,083–84.  Although most domestic production was flat-packed mattresses and most imports were boxed mattresses, the Commission found "the vast majority of responding purchasers reported that domestically produced mattresses were interchangeable with and comparable to subject imported mattresses."  *Id.* at 42, J.A. at 124,084.  From reviewing the provided data, the Commission concluded that:  (1) boxed and flat-packed mattresses can usually be made to the same specifications and are functionally interchangeable once unpackaged; (2) packaging is unimportant to end consumers; (3) online retailers do not provide search filters for packaging; and (4) "[c]onsumer indifference towards mattress packaging is reflected in purchasing behavior at the wholesale level."  *Id.* at 42–43, J.A. at 124,084–85.

The ITC observed that "price is an important factor in purchasing decisions for mattresses, although non-price factors are also important."  *Id.* at 44, J.A. at

124,086.  Among those non-price factors, the Commission found that domestically
produced mattresses and subject imports were "comparable in terms of lead times
and channels of distribution" and "sold through the same channels of distribution."
*Id.* at 45, J.A. at 124,087.  The Commission noted that the domestic industry faced
about a ten percent increase in raw material costs during the period of
investigation.  *Id.* at 46, J.A. at 124,088.

Having considered the prevailing conditions of competition, the Commission
moved to the other statutory factors:  the volume, price effect, and impact of subject
imports.  19 U.S.C. § 1677(7)(B)(i).  In considering these factors, the Commission
must establish a causal connection between the subject imports and the material
injury.  *Gerald Metals, Inc. v. United States*, 132 F.3d 716, 720 (Fed. Cir. 1997).  The
statute ensures the Commission cannot "attribut[e] to subject imports an injury
whose cause lies elsewhere."  *OCP S.A. v. United States*, 47 CIT __, 2023 Ct. Intl.
Trade LEXIS 139 at *64 (citing *Hynix Semiconductor, Inc. v. United States*, 30 CIT
1208, 1222 (2006)).

Each of the factors requires the Commission to consider the effects of subject
imports on the domestic industry.  In its volume inquiry, the Commission must
consider the significance of the quantity of imports, not just the absolute number.
*Id.* at *39 (citing *USX Corp. v. United States*, 11 CIT 82, 85 (1987)).  In its price
inquiry, the Commission must consider whether there has been "significant price
underselling" and whether "the effect of imports . . . otherwise depresses prices to a

significant degree[.]" 19 U.S.C. § 1677(7)(C)(ii). Finally, in its impact inquiry, the
Commission must consider "all relevant economic factors which have a bearing on
the state of the industry[.]" 19 U.S.C. § 1677(7)(C)(iii).

The Commission found the volume of subject imports was significant, both in
absolute terms and relative to consumption. Final Determination at 48, J.A. at
124,090, ECF No. 66. For price effects, the Commission found that subject imports
sold for less than domestically produced mattresses in nearly every quarterly
comparison. *Id.* at 50, J.A. at 124,092.

> Based on the moderately high degree of substitutability between
> subject imports and the domestic like product, the importance of price
> in purchasing decisions, and the pervasive underselling, as well as the
> purchase cost data, we find that subject import underselling was
> significant during the period of investigation. The significant
> underselling by cumulated subject imports contributed to subject
> imports gaining sales and market share at the domestic industry's
> expense during the period of investigation.

*Id.* at 52, J.A. at 124,094. The Commission therefore determined that imports had
significant adverse effects on domestic like product prices. *Id.* at 56, J.A. at
124,098.

In its impact analysis, the Commission found that low-priced subject imports
kept prices low despite rising U.S. consumption. *Id.* at 58, J.A. at 124,100. The
Commission based its determination that imports significantly impacted the
domestic industry on reduced capacity utilization, high end-of-period inventories,
slight reductions in sales, and changes in research and development and capital
expenditures. *Id.* at 58–73, J.A. at 124,100–15. Having found that all three

statutory factors were satisfied under the prevailing conditions of competition, the Commission concluded that the domestic industry was "materially injured by reason of imports of mattresses" from the subject countries. *Id.* at 73, J.A. at 124,115.

### D. The Present Case

On July 13, 2021, CVB filed a complaint with this Court, alleging that the Commission's injury determination was unsupported by substantial evidence or otherwise not in accordance with law. Compl. ¶ 39, ECF No. 8. CVB argues that the Commission's determination is unsupported by substantial evidence because: (1) The Commission improperly ignored record evidence that the U.S. mattress market is sharply segmented and that competition in it is highly attenuated; (2) it improperly ignored record evidence showing significant non-price reasons for increases in subject imports; (3) its determination that subject imports depressed or suppressed the prices of domestic like products is unsupported without either price convergence or signs of falling domestic prices; and (4) its determination that subject imports had a significant impact on the domestic industry improperly failed to consider the mattress industry's segmentation between boxed and flat-packed mattresses. Pl.'s Br. at 2–4, ECF No. 48. CVB filed its Motion for Judgment on the Agency Record on March 28, 2022; the Commission filed its response on June 13, 2022; Intervenors filed their response on July 1, 2022; and CVB filed its reply on

August 1, 2022. Pl.'s Br., ECF No. 48; Def.'s Resp., ECF No. 51; Def.-Ints.' Resp., ECF No. 53; Pl.'s Reply, ECF No. 58.

The crux of CVB's argument is that boxed mattresses and flat-packed mattresses occupy different segments of the mattress market — with producers and purchasers concentrating on one or the other and only highly attenuated competition existing between the two. CVB argues that any domestic industry injury reflected a demand shift away from flat-packed mattresses toward boxed mattresses and was not a consequence of unfairly priced imports. The parties agree that boxed mattresses are, as a general matter, cheaper than flat-packed mattresses. Oral Argument Transcript (Oral Arg. Tr.) at 7:21–22; 37:19, ECF No. 75. Because the domestic industry produced mostly flat-packed mattresses and subject imports consisted almost exclusively of boxed mattresses, this demand shift resulted in an increased market share for imports at the expense of the domestic industry. *See* Pl.'s Br. at 9, ECF No. 48.

At oral argument, the Court focused on the Commission's use of statistics to support its conclusion that a significant share of producers and purchasers of mattresses overlapped between flat-packed and boxed mattresses. If true, this would tend to undermine CVB's claim of market segmentation and attenuated competition. First, the Court noted that the Commission opportunistically treated companies that merged during the period of investigation as single companies in order to reach the conclusion that "[n]early a quarter (12) of responding domestic

producers produced both [flat-packed] and [boxed mattresses] in 2019, with these
producers accounting for [a majority] of [boxed mattress] production that year[.]"
Final Determination at 38, J.A. at 124,080, ECF No. 66; Oral Arg. Tr. at 25:1–20,
ECF No. 75.  Tempur Sealy acquired Comfort in 2018, and Leggett & Platt acquired
Elite in 2019.  In each case, the acquiring company produced primarily flat-packed
mattress; and its merger target predominately produced boxed mattresses.  The ITC
treated them as four separate entities throughout its Final Determination — *except*
the one time it found it convenient to treat the four companies as only two entities
to inflate the market share of producers that manufactured *both* flat-packed and
boxed mattresses.  *See id.*  Second, the Court noted the Commission's questionable
purchaser data summary, which concluded that "[c]onsumer indifference toward
mattress packaging is reflected in purchasing behavior at the wholesale level" in
part because "[e]leven of [nineteen] responding purchasers reported purchasing
and/or importing both [boxed and flat-packed mattresses]."  Final Determination at
43, J.A. at 124,085, ECF No. 66; *see also* Oral Arg. Tr. at 27:22–28:1, ECF No. 75.
The Court noted that most purchasers who reported buying both packaging types
purchased vastly more of one mattress type than the other and that "there are only
two . . . that had anything close to parity in their purchases of [boxed mattresses]
and flat-pack mattresses."  Oral Arg. Tr. at 27:22–28:1, ECF No. 75.  The Court
characterized the Commission's use of statistics as "legerdemain."  *Id.* at 26:16.  The
Commission responded that, although these portions of its Final Determination

were "very inarticulately written," they amounted only to "harmless error." *Id.* at 65:2–3.

The Court recognized that the ITC changed its approach in the final pages of its Views. *Id.* at 41:16–25 (characterizing the last portion of the Views as an "alternative holding."). After spending much of the document struggling against the evidence for a polarized mattress market, the Commission directly answered CVB's rejoinder. It found that the domestic boxed mattress sector, considered separately from the domestic flat-packed mattress sector, was injured by subject imports. *See* Final Determination at 69–73, J.A. at 124,111–15, ECF No. 66. Specifically, the Commission found that, although domestic boxed mattress producers "improved their performance by most measures during the period of investigation," their performance "would have been appreciably stronger during the period of investigation but for the significant volume and increase in volume of low-priced subject imports that displaced domestic industry shipments from the U.S. market and depressed domestic like product prices to a significant degree, including the prices of [boxed mattress] products." *Id.* at 69–70, J.A. at 124,111–12. The Commission cited record evidence in support of this finding, including: (1) low factory capacity utilization despite increased U.S. boxed mattress consumption, (2) "subject imports of [boxed mattresses] increased their share of overall apparent U.S. consumption by more than domestically produced [boxed mattresses] during the period[,]" and (3) questionnaire responses from domestic boxed mattress producers

indicated that imports adversely impacted returns on their investments.  *See id.* at 70–72, J.A. at 124,112–14.  In other words, imports of boxed mattresses retarded the growth of domestic boxed mattress manufacturers' sales.

The Court ordered the parties to submit supplemental letter briefs addressing whether the Commission's "alternative holding" that considered the domestic boxed mattress industry in isolation allowed for the Commission's mishandling of market polarization statistics to be harmless error.  *See* Minute Order, ECF No. 71.  In its supplemental brief, the Commission argued (1) "there has been no error" with respect to its handling of statistics; (2) "any lack of perfect clarity is unfortunate, but not deceptive"; and (3) were the Court to find that the Commission's statistics were in error, "such error is harmless and does not warrant a remand."  Def.'s Supp. Br. at 2, ECF No. 79.  The Commission asserted that it derived its finding of a high degree of overlap between boxed and flat-packed mattress manufacturers from a table that used data from 2019 only, and the relevant corporate acquisitions took place in 2018 and 2019.  *See id.* at 2–4; *see also* Final Determination at III-3–6, J.A. at 124,195–98, ECF No. 66 (tabulating U.S. producer shares of flat-packed and boxed mattresses in 2019).  Although the table treated the four producers separately and the Commission combined them to make its finding, the Commission "indicat[ed] in the corresponding footnote (n. 156) that 'although [boxed mattress] producers Comfort and Elite completed separate domestic producers' questionnaire responses, Tempur Sealy acquired Comfort in

2018 and Leggett & Platt acquired Elite in 2019.'"  Def.'s Supp. Br. at 3–4, ECF No.
79; *see also id.* at 38 n.156, J.A. at 124,080.  The Commission explained that it
included this footnote "specifically to inform how it had tabulated the data and to
provide its reasoning" and that "it was a factually accurate finding, which
reasonably accounted for company acquisitions[.]"  Def.'s Supp. Br. at 4, ECF No.
79.

      The ITC next addressed the standard for harmless error.  It cited case law in
support of its argument that errors are harmless where, even including the error,
substantial evidence supports the Commission's determination.  *Id.* at 4–5 (citing
*U.S. Steel Grp. v. United States*, 96 F.3d 1352, 1363–65 (Fed. Cir. 1996) for the
proposition that errors are harmless where other evidence, taken as a whole, was
sufficient to support the conclusion).  The Commission argued that substantial
evidence still supports its material injury finding because it defined a single
domestic like product that encompassed all mattresses within the scope of its
investigation, which CVB did not challenge.  *Id.* at 5–6.  Because the Commission
analyzed the domestic industry as a whole, it was not legally required to analyze
different segments of the domestic industry and assess the impact to each
independently.  *Id.*  In a footnote, the Commission also asserted that, even if it
treated Elite and Comfort — the two boxed mattress producers that merged with
flat-packed mattress producers — separately, "there would still be the same 12
domestic producers that produced both [flat-packed] and [boxed mattresses] in

2019, accounting for a smaller but not insignificant portion of U.S. [boxed mattress]

production . . . that year." *Id.* at 4–5, n.6. The Commission concluded by once again

noting that it

> addressed [CVB's] arguments with respect to the performance of
> [boxed mattress] producers and found that subject imports had an
> impact on this subset of the domestic industry, negatively affecting
> their capacity utilization rates, sales revenues and operating and net
> income, and returns on investments as subject imports surged into the
> U.S. market and displaced domestically produced [boxed mattresses]
> and significantly depressed prices for this product.

*Id.* at 9.

The Defendant-Intervenors' supplemental brief endorsed the Commission's

brief. *See* Def.-Ints.' Supp. Br. at 1–2, ECF No. 81. Defendant-Intervenors

similarly argued that the Commission's statistical summary "while inartful, is

accurate and does not constitute an error"; and even if the Court were to find that

the Commission was in error, such error was harmless. *Id.* The Intervenors

acknowledged that the Commission changed its "tabulation methodology" when

summarizing Table III-1 but claimed that "[i]n footnote 156 on page 38 of its Views,

the Commission attempted to alert the reader" of the change. *Id.* at 4. Although

"this footnote might have been phrased more artfully . . . it still shows that the

Commission did try to be transparent about this limited instance where it combined

U.S. producer data due to the Leggett & Platt/Elite and Tempur Sealy/Comfort

transactions." *Id.* at 4–5. Further, the table "only presented data for 2019 and

given that the transactions had occurred in mid-2018 and January 2019, it was not unreasonable to point to combined data in this instance." *Id.* at 5.

Invoking the harmless error standard, Defendant-Intervenors assert that "Courts have previously affirmed Commission determinations containing an error, where the outcome would have been the same because the error did not detract from the substantial evidence as a whole supporting the Commission's decision." *Id.* at 8–9. They claim that "the path of the Commission's decision here is discernible even without" the misleading statistical summary because the Commission's Views "set forth all issues material to its conclusion[.]" *Id.* at 9. Defendant-Intervenors contend that, even if the Commission's creative statistics detract from its conclusion, the Commission's decision was "otherwise reasonable and supported by the record as a whole." *Id.* at 10.

CVB had the last word. Its brief argued that (1) the Commission was in error; (2) the error was not harmless because it prejudiced CVB and because, after correcting the error, the Commission's material injury determination is not supported by substantial evidence; and (3) the final pages of the Final Determination were not supported by substantial evidence and therefore do not function as an alternative holding. Pl.'s Supp. Br. at 1–2, ECF No. 84. CVB first offered its standard of harm, writing without citation to authority that "[e]rror is not harmless if the Commission cannot say for certain that its ultimate injury finding would not have changed in light of the error." *Id.* at 4. CVB then explained

how it believed it had been harmed by the Commission's misleading statistical summary, as "the error contributed to the Commission's refusal to meaningfully engage with CVB's market polarization argument and to evaluate properly the conditions of competition in the mattress industry." *Id.* at 3.

CVB rejected the Commission's and Defendant-Intervenors' assertion that the Commission did not need to address CVB's attenuated competition argument, claiming that the law requires the Commission to evaluate "all relevant economic factors within the context of the business cycle and conditions of competition that are distinctive to the affected industry." *Id.* at 3 (citing 19 U.S.C. § 1677(7)(C)(iii)). CVB wrote that "the Commission must comply with the statute no matter how a respondent allegedly structures its arguments." *Id.* Plaintiff acknowledged that there may be situations where the Commission is not required to engage in a market segmentation analysis but argued that § 1677(7)(C)(iii) made it necessary here. *Id.* at 5. It also criticized the Commission's and Defendant-Intervenors' attempts to "justify the Commission's mathematical legerdemain" and argued that "the record clearly supports a finding of market polarization when the error is removed." *Id.* at 6. CVB invoked the Commission's purchaser data summary for support. *Id.*

CVB closed by arguing that the Views' final pages could not function as an "alternative holding" because they were not supported by substantial evidence. *See id.* at 7. Plaintiff asserted that the domestic boxed mattress industry suffered no

injury, noting that the domestic industry gained market share during the period of investigation. *See id.* It quoted the Commission's admission that "'domestic producers of [boxed mattresses] improved their performance by most measures during the period of investigation.'" *Id.* at 8 (quoting Def.'s Resp. at 45, ECF No. 51). CVB cited cases where this Court sustained the Commission's finding of no material injury when the domestic industry's performance improved during the period of investigation. *Id.* at 8–9. It faulted the Commission for "merely assum[ing] that the cause of the unused capacity was subject imports, and not some other cause such as raw material shortages . . . or an inability to produce [boxed mattresses] to the same standard as importing producers." *Id.* at 9 (citing to record evidence that seven importers indicated that subject imports were superior in quality).

With briefing and argument concluded, the Court considers the claims of the parties.

## JURISDICTION AND STANDARD OF REVIEW

This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1581(c). The Court must assess the factual and legal findings underpinning the Commission's determinations and "hold unlawful any determination, finding or conclusion . . . unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 USC § 1516a(b)(1)(B)(i). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion." *Consol. Edison Co. of New York v. NLRB*, 305 U.S. 197, 229 (1938). It must be "more than a scintilla, and must do more than create a suspicion of the existence of the fact to be established." *NLRB v. Columbian Enameling & Stamping Co.*, 306 U.S. 292, 300 (1939). However, "the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984).

This Court's review of the Commission's determination is limited to the administrative record that was before the agency. 19 U.S.C. § 1516a(b)(2)(A). To determine if substantial evidence exists, the Court considers "the record as a whole, including evidence that supports as well as evidence that 'fairly detracts from the substantiality of the evidence.'" *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1379 (Fed. Cir. 2003) (quoting *Atlantic Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984)). The Court assesses whether the Commission succeeded in putting forward a reasoned explanation by "mak[ing] the necessary findings and hav[ing] an adequate evidentiary basis for its findings." *In re NuVasive, Inc.*, 842 F.3d 1376, 1382 (Fed. Cir. 2016) (internal citations omitted). To meet this threshold, the Commission must not only "examine the relevant data and articulate a satisfactory explanation for its action," it must also provide "a rational connection between the facts found and the choice made." *Id.*

## DISCUSSION

At the heart of CVB's argument lies the claim that the Commission unreasonably determined that boxed mattresses and flat-packed mattresses are not a segmented market.  *See* Pl.'s Br. at 2–4, ECF No. 48 (summarizing argument as containing four distinct claims, but with the first, second, and fourth claims being dependent on distinguishing data about boxed and flat-packed mattresses).  CVB argues that boxed mattresses experienced most of the competition from subject imports, but the domestic boxed mattress industry thrived during the period of investigation.  *Id.* at 9.  In contrast, the domestic flat-packed mattress industry contracted; but there were relatively few imports of flat-packed mattresses.  *Id.* CVB therefore argues the downturn cannot be attributed to subject imports but instead to a marketplace shift characterized by increased boxed mattress demand and declining flat-packed mattress demand.  *Id.*  CVB believes that the Commission unreasonably found that there was not a segmented market between boxed and flat-packed mattresses.  *Id.* at 8–17.  The Commission responds that it fully considered and analyzed the data, and CVB's primary objection is simply that the Commission came to conclusions opposite CVB's preference.  *See generally* Def.'s Resp. at 17–26, ECF No. 51.

The Court first analyzes three sections of the Commission's Views that were not supported by substantial evidence:  (1) the discussion of specialization in the industry, (2) the characterization of mattress purchasers' specialization, and (3) the

analysis of purchaser questionnaires. Final Determination at 38, 43–44, J.A. at

124,080, 124,085–86, ECF No. 66.  The Court then turns to the question of harmless

error.  The Court finds that the Commission's misleading statistical summaries are

harmless error.  Because the Court holds that there remains sufficient reasoning in

the Commission's Views to uphold its injury determination as supported by

substantial evidence, the determination is **SUSTAINED**.[2]

## I. The Commission's Errors

The Commission's Views contain errors that center around a common theme.

For much of its Views, the Commission employed mathematical obfuscation and

statistical chicanery to make the mattress industry appear less segmented than it

is.  When it addressed producer specialization, the Commission tried to make

producers appear less specialized.  To do this, it treated two pairs of companies that

merged during the period of investigation as two single companies that produced

both boxed and flat-packed mattresses, rather than as four companies that each

---

[2] The determination is sustained except with respect to Malaysia.  Plaintiff CVB does not possess standing to challenge the Commission's determination with respect to Malaysia. Def.'s Resp. at 1, ECF No. 51.  *But see* Oral Arg. Tr. at 55:5–16, ECF No. 75 (preserving standing argument for appeal).  It is well-established that each subject country is its own, unique determination, even when the Commission cumulates imports from multiple countries for its injury determination.  *See, e.g.*, *Shandong TTCA Biochemistry Co. v. United States*, 34 CIT 582, 589–90 (2010) (collecting cases).  A party requires standing to challenge the determination for each country.  Because CVB conceded there is no evidence it imports mattresses from Malaysia, it cannot show any injury from the Malaysia determination and therefore lacks standing to challenge the Commission's determination with respect to Malaysia.  Oral Arg. Tr. at 55:5–16, ECF No. 75; *see also TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2200 (2021) ("To have Article III standing to sue in federal court, plaintiffs must demonstrate, among other things, that they suffered a concrete harm. No concrete harm, no standing.").

specialized in one or the other. To make purchasers seem less specialized, the Commission reported that eleven of nineteen purchasers bought both boxed and flat-packed mattresses but conveniently omitted that almost all of those eleven purchased far more of one packaging type than the other. Finally, the Commission omitted important context from its description of purchaser surveys, giving the impression that wholesale purchasers did not care about packaging type. Each error demonstrates the Commission's unfortunate attempt to paint a perfect picture of an unsegmented market.

### A. Producer Specialization

The Commission's first error is its analysis of producer specialization. During the period of investigation, two pairs of domestic producers merged. Final Determination at III-9–10, J.A. at 124,201–02, ECF No. 66. Throughout the Views, the Commission treated those domestic producers as four separate companies. However, in its analysis of producer specialization, it treated the producers that merged as two companies instead of four; and it gave no explanation for making the change. The reason is self-evident. It was more convenient to treat them as two companies because doing so gave the impression that more domestic producers manufacture both boxed and flat-packed mattresses.

The Commission summarized its findings regarding producer specialization:

> Although two of the three largest domestic producers of [boxed mattresses] produced no [flat-packed mattresses], the three largest producers of [flat-packed mattresses] also produced [boxed mattresses]. Nearly a quarter (12)

*BUSINESS PROPRIETARY INFORMATION SUBJECT*
*TO PROTECTIVE ORDER REDACTED*

> of responding domestic producers produced both [flat-packed mattresses] and [boxed mattresses] in 2019, with these producers accounting for [a majority] of [boxed mattress] production that year, and nearly half (21) of all responding producers reported production of [boxed mattresses].

*Id.* at 38, J.A. at 124,080, (internal citations omitted).  To support its claims, the Commission relies primarily on Table III-1.  *Id.*  Table III-1 is a chart that lists for each U.S. producer in 2019 its share of total mattress production, boxed mattress production, and flat-packed mattress production.  *Id.* at III–3–6, J.A. at 124,195–98.

First, the Commission states that two of the three largest domestic producers of boxed mattresses produced no flat-packed mattresses.  *Id.* at 38, J.A. at 124,080.  According to the table, the three largest domestic producers of boxed mattresses are █████████████████, none of which produce flat-packed mattresses.  *Id.* at III-3–4, J.A. at 124,195–96.  Looking at the Commission's chart, it therefore appears that *all three* of the largest domestic boxed mattress producers manufactured no flat-packed mattresses in 2019.  However, Leggett & Platt — a flat-packed mattress producer — acquired Elite in a deal completed in January 2019.  *Id.* at 38 n.156, J.A. at 124,080.  The Commission apparently chose to treat them as one entity in 2019, allowing the Commission to say that one — rather than zero — of the three largest domestic producers of boxed mattresses also produced flat-packed mattresses.  The Commission did not explain its decision to treat the two companies as one entity, even though Elite's data was reported separately in the Commission's

own charts and Elite continued to operate separately.[3]  *See id.* at III–3–4, III–9–10,

J.A. at 124,195–96, 124,201–02.  It also does not explain why it treated Elite as a

separate entity everywhere else in the Views.

The Commission next states that the twelve producers that produced both

kinds of mattresses represented a majority of domestic boxed mattress production

in 2019.  *Id.* at 38, J.A. at 124,080.  But when the Court manually summed the

data, it sums to less than a quarter, as presented by the Commission in the chart.

*Id.* at III–3–6, J.A. at 124,195–98.  The only way to reach a majority of production is

to include Comfort and Elite with their respective acquirers, Tempur Sealy and

Leggett & Platt.  Once again, the Commission elsewhere treats these entities as

separate.   It repeatedly references fifty-three companies, not fifty-one; the

acquisitions were not coextensive with the period of investigation; and the

Commission treats Comfort and Elite as separate entities from Tempur Sealy and

Leggett & Platt at almost every other point in its determination.  *See, e.g.*, *id.* at 37–

39, J.A. at 124,079–81.  *Compare id.* at 36, n.156, J.A. at 124,080 (treating Comfort

and Elite as "domestic producers [that] produced both [flat-packed] and [boxed]

mattresses in 2019" to create a useful statistic), *with id.* at 69, n.305, J.A. at

124,111 (listing "domestic producers that produced [boxed mattresses] but no [flat-

packed mattresses] in 2019" and including both Comfort and Elite).  No explanation

for the statistical gimmick appears.

---

[3] The same is true of the Comfort/Tempur Sealy acquisition.  *See* Final Determination at
III–3–6, III–9–10, J.A. at 124,195–98, 124,201–02, ECF No. 66.

*BUSINESS PROPRIETARY INFORMATION SUBJECT
TO PROTECTIVE ORDER REDACTED*

Second, the Commission found that the three largest domestic producers of flat-packed mattresses also produced boxed mattresses.  *Id.* at 38, J.A. at 124,080.  The Commission is correct; it is strictly true that the three largest domestic producers of flat-packed mattresses also produced boxed mattresses.  However, this fails to tell the whole story.  Although the three companies produced both boxed and flat-packed mattresses, each produced multiples more flat-packed mattresses.  The three largest domestic flat-packed mattress producers are ██████████████████ ████████████████] Each company's market share in flat-packed mattresses is at least ██████ times greater than its share of the domestic boxed mattress market.  *Id.* at III-3–6, J.A. at 124,195–98.

The relative shares of boxed and flat-packed mattresses in domestic production are also important.  The Commission reported that in 2019 flat-packed mattresses were the substantial majority of domestic production, and boxed mattresses were less than a quarter of domestic production.  *Id.* at III-19, J.A. at 124,211.  Correcting for this domestic production ratio, ████████████████ ██████████████████████████████████████ ██████████████████████████████████████ ██████████████████████████████████████ ██████████████████████████████████████] The Commission's statement that the three largest domestic producers of flat-packed mattresses also produced boxed mattresses obscured the fact that their boxed

BUSINESS PROPRIETARY INFORMATION SUBJECT
TO PROTECTIVE ORDER REDACTED

mattress production was ████████   The Commission is obligated to draw from the evidence all inferences the evidence reasonably demands, not just those that are convenient.  *See Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 378 (1998) (The Commission must draw "all those inferences that the evidence fairly demands.").  The Commission failed to do so here.

Third, the Commission stated, "Nearly a quarter (12) of responding domestic producers produced both [flat-packed mattresses] and [boxed mattresses] in 2019, with these producers accounting for [a majority] of [boxed mattress] production that year[.]"  Final Determination at 38, J.A. at 124,080, ECF No. 66.  Of the twelve companies that produced both mattress types in 2019, five produced virtually none of one kind.  *Id.* at III-3–6 124,195–98 (providing data that ████████████ ████████████ each produced far less than one percent of U.S. production of one kind of mattress).  Of the remaining seven domestic manufacturers, four have stark production differences: ████████ produced more of one type of mattress than the other by a ratio of 63-to-1; ████████ had a ratio of 74-to-1; ████████████ had a ratio of 83-to-1; and ████████████ had a ratio of 60-to-1.  *Id.*  Of the remaining three companies, ██████ had a ratio of nearly 11-to-1; ████████████ of nearly 5-to-1; and the lone balanced producer, ████████ had a nearly 1-to-1 ratio.[4]  *Id.*

---

[4] Some producers manufactured more flat-packed mattresses, and others produced more boxed mattresses.  These ratios represent either flat-packed-to-boxed or boxed-to-flat-packed, depending on what packaging type the producer predominantly made.

Again, the Commission failed to provide necessary context by drawing all those inferences fairly demanded by the evidence.

The Commission must fairly analyze the data.  *See Allentown Mack Sales & Serv.,* 522 U.S. at 378.  Here, the evidence demanded acknowledgement that nearly every producer is highly specialized.  The Commission's failure to do so was not merely "inartful."  It misread the data in question.  *See* Def.-Ints.' Supp. Br. at 1, ECF No. 81.  The law charges the Commission with explaining how it views the evidence before it.  When it changes methodologies in analyzing the data, the Commission must acknowledge and justify any inconsistent treatment.  *See Wheatland Tube Co. v. United States,* 161 F.3d 1365, 1369–70 (Fed. Cir. 1998) (reviewing courts look for "a reasoned analysis or explanation" and can only affirm when the agency's path is "reasonably discernible").  Because the Commission opportunistically combined production figures only when it found it useful to avoid CVB's market segmentation objections, the Commission has failed to support its findings on producer specialization with substantial evidence.

### B. Mattress Purchasers' Specialization

The Commission's second error is its analysis of purchaser specialization.  As with producer specialization, the Commission ignored or failed to provide important context in its analysis of purchaser specialization.  This gave the false impression that purchasers are indifferent about mattress packaging.  Not so.  Out of nineteen purchasers, only three purchased flat-packed and boxed mattresses in numbers

BUSINESS PROPRIETARY INFORMATION SUBJECT
TO PROTECTIVE ORDER REDACTED

approaching parity.  The other sixteen purchased far more of one packaging type

than the other, and eight of the nineteen (42%) exclusively purchased one packaging

type.  The Commission papered over these statistics to make purchasers appear less

specialized and therefore make the market appear less segmented.

    The Commission reported that "[c]onsumer indifference towards mattress

packaging is reflected in purchasing behavior at the wholesale level" in part

because "[e]leven of [nineteen] responding purchasers reported purchasing and/or

importing both [boxed and flat-packed mattresses]."  Final Determination at 43,

J.A. at 124,085, ECF No. 66.  The Commission cites its purchaser questionnaires

but does not provide a detailed analysis of their responses.  The data demonstrate

significant bifurcation in wholesale purchasing decisions.  Eight of the nineteen

purchasers buy only one kind of mattress packaging; and eight of the remaining

eleven wholesale mattress purchasers are highly specialized.  ▮▮▮▮ purchases

one type of mattress more than another at nearly a 10-to-1 ratio; ▮▮▮▮ at a 15-to-

1 ratio; ▮▮▮▮▮▮ at a 5-to-1 ratio; ▮▮▮▮▮▮▮▮ at a 12-to-1 ratio;

▮▮▮▮▮▮ at a 50-to-1 ratio; ▮▮▮ at a 13-to-1 ratio; ▮▮▮▮ at a 62-to-1

ratio; and ▮▮▮▮ at a 6.5-to1 ratio.  J.A. at  102,831, ECF No. 66 ▮▮▮▮; *id.*

at 103,156 ▮▮▮; *id.* at 103,086 ▮▮▮▮▮ *id.* at 103,051 ▮▮▮▮▮ *id.*

at  102,935 ▮▮▮; *id.* at 102,865 ▮▮▮▮; J.A. at 108,419, ECF No. 65

BUSINESS PROPRIETARY INFORMATION SUBJECT
TO PROTECTIVE ORDER REDACTED



██████████████ ; J.A. at 102,977, ECF No. 73 ███████ .[5]  Only ████

and ████████████ had a roughly 1-to-1 ratio with ████ at about 2-to-1.

J.A. at 103,268, ECF No. 73 ██████ ; *id.* at 103,122 ██████ ; *id.* at 111,476 ████

██████ ]

The Commission must fairly analyze the data and draw all inferences the

data reasonably demands.  *See Allentown Mack Sales & Serv.,* 522 U.S. at 378.  It is

true that eleven of nineteen purchasers buy both boxed and flat-packed mattresses,

but the data once again show this statistic is misleading.  Only three of nineteen

wholesale purchasers buy boxed and flat-packed mattresses in similar quantities.

Sixteen of nineteen wholesale purchasers either purchase only one kind of mattress

packaging or purchase overwhelmingly one kind of packaging.  No reasonable

person could review this data and determine that it shows wholesale purchasers are

"indifferent" to packaging.  *See Goss Graphics Sys., Inc. v. United States*, 22 CIT

983, 1004 (1998), *aff'd*, 216 F.3d 1357 (Fed. Cir. 2000) (The Commission has

"discretion to make *reasonable* interpretations of the evidence.") (emphasis added).

Most purchasers strongly favor one packaging type over the other.  The Commission

should have acknowledged this data and provided its views.  Its failure to do so is

error.  *See Allentown Mack Sales & Serv., Inc.*, 522 U.S. at 378.

---

[5] These ratios represent either flat-packed-to-boxed or boxed-to-flat-packed, depending on
what packaging type the purchaser predominantly bought.

## C. Purchaser Survey Rankings

The Commission's third error is found in its analysis of purchaser surveys. Again, the Commission ignored or failed to provide important context that undermined the Commission's conclusion that packaging type is irrelevant to purchasers. The Commission wrote that "[a]lthough 11 purchasers reported that packaging was very important to their purchasing decisions, only two purchasers ranked packaging among the top three factors driving their purchasing decisions, consistent with the large number of purchasers reporting purchases of both [boxed and flat-packed mattresses]." Final Determination at 44, J.A. at 124,086, ECF No. 66. In a footnote, the Commission added that "[a]lthough responding purchasers were free to rank 'Packaging (i.e., [boxed] or flat packed mattresses)' among their top three purchasing factors, as among the purchasing factors enumerated in the purchasers' questionnaire, only two did so." *Id.* at 44, n.185, J.A. at 124,086.

The Commission's statements imply that the question involved ranking from a pre-selected list. It did not. The question merely provided a blank space and some examples: "Major purchasing factors. Please list, in order of their importance, the main factors your firm considers in deciding from whom to purchase mattresses (examples include availability, extension of credit, contracts, price, quality, range of supplier's product line, traditional supplier, etc.)." Despite packaging not being listed as a factor for this question, many wholesale purchasers' questionnaire responses told a more nuanced story about what drove their decisions. *See, e.g.*,

BUSINESS PROPRIETARY INFORMATION SUBJECT
TO PROTECTIVE ORDER REDACTED

U.S. Purchasers' Questionnaire of ██████████████ J.A. at 111,481, 111,490, ECF No. 66 (listing three factors other than packaging but earlier stating that "[w]e expect the industry to continue towards [boxed mattresses] due to customer preference and convenience/portability of the product"); U.S. Purchasers' Questionnaire of ██████ J.A. at 102,902, 102,915, ECF No. 65 (listing three non-packaging factors as most important but purchasing zero boxed mattresses); U.S. Purchasers' Questionnaire of ████████████ J.A. at 103,013, 103,028, ECF No. 66 (listing three non-packaging factors as most important but purchasing zero flat-packed mattresses); U.S. Purchasers' Questionnaire of ████████ J.A. at 103,051, 103,065 (listing "[p]roduct features and specifications" as third most important and purchasing a 50-to-1 ratio of flat-packed-to-boxed mattresses).

Although it is not the Court's domain to reweigh the evidence, it is the Court's domain to require that the Commission weigh *all* the evidence in the record — not just the evidence that supports its decision. *See Nippon Steel Corp.*, 337 F.3d at 1379 (requiring examination of "the record as a whole, including evidence that supports as well as evidence that fairly detracts from the substantiality of the evidence") (internal quotation omitted). The manufacturers' data combined with the wholesale purchasers' data tell a much more complicated story than the Commission's initial line that packaging is irrelevant. It was error to not examine this data on the record and explain what it meant for the Commission's ultimate decision. *See In re NuVasive, Inc.*, 842 F.3d at 1382 (requiring the ITC to "examine

the relevant data and articulate a satisfactory explanation for its action[,]" so that it provides "a rational connection between the facts found and the choice made").  The only thing the Commission has proven is the truth of the adage that "There are three kinds of lies:  Lies, Damned Lies, and Statistics."  Mark Twain, *Chapters from My Autobiography – XX*, NORTH AMERICAN REVIEW 465, 471 (July 5, 1907).[6]

## II.  Harmless Error

The Commission need not have gone to such lengths to avoid addressing the segmentation in the U.S. mattress market.  When the Commission finally engaged with CVB's arguments and addressed the domestic boxed mattress industry as a distinct segment, the Commission found injury to that segment.  These findings are supported by substantial evidence.  Contrary to CVB's assertions, the Commission did not need to go further and conduct a formal market segmentation analysis.  Because, even with the Commission's errors, there is still substantial evidence to support the Commission's ultimate injury finding, the Commission's errors were harmless.  It is on this basis that the Court will sustain the Commission's Final Determination.

### A.  Legal Standard

The principle of harmless error applies to judicial review of agency action.  *See Vermont Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 558 (1978) ("Administrative decisions should be set aside . . . only for

---

[6] Twain attributes this adage to British Prime Minister Benjamin Disraeli.

substantial procedural or substantive reasons[.]"); *Intercargo Ins. Co. v. United States*, 83 F.3d 391, 394 (Fed. Cir. 1996) ("It is well settled that principles of harmless error apply to the review of agency proceedings.").  Injury determinations by the Commission are no different.  *See, e.g.*, *CP Kelco US, Inc. v. United States*, 38 CIT 1511, 1529–31 (2014) (applying the principle of harmless error to an injury determination by the Commission), *aff'd*, 623 F. App'x 1012 (Fed. Cir. 2015).

The touchstone of the harmless error inquiry is prejudice.  If the errors did not change the ultimate result of the agency action, they are harmless.  Put another way, if the Commission's injury determination is still supported by substantial evidence — even with the errors — the errors are harmless; and the Commission's determination may be sustained.  *See Belton Indus., Inc. v. United States*, 6 F.3d 756, 761 (Fed. Cir. 1993) ("Commerce's violation did not prejudice appellees.  Accordingly, Commerce's violation was harmless error."); *CP Kelco US*, 38 CIT at 1529 (finding any potential error harmless because "[the Commission's] ultimate injury finding would not have changed").  The Court thus looks past the Commission's clumsy efforts to dodge CVB's arguments and now examines where the Commission squarely addressed CVB's objections regarding harm to domestic boxed mattress manufacturers.

## B. The Commission's Errors Were Harmless

In the final pages of its Views, the Commission found that — even when examining only domestic producers who exclusively manufactured boxed mattresses

— subject imports injured the domestic industry. The Commission forthrightly acknowledged that domestic boxed mattress manufacturers "improved their performance" during the period of investigation, but it found that these manufacturers could have performed even better if not for the subject imports. Final Determination at 69–73, J.A. at 124,111–114, ECF No. 66. In support, the Commission pointed to the low capacity utilization of domestic boxed mattress factories, which it attributed to the subject imports. *Id.* Substantial evidence supports this portion of the Commission's Views, and it is enough to sustain the Commission's ultimate injury finding. *See* 19 U.S.C. § 1677(7)(B) (requiring findings as to volume, price effects, and impact to sustain a material injury determination). Accordingly, the final section of the Commission's analysis renders its earlier errors harmless.

When the Commission finally turned to addressing CVB's arguments and examined domestic producers of boxed mattresses, it found subject imports injured those producers. Final Determination at 69–70, J.A. at 124,111–112, ECF No. 66. The Commission observed that these producers improved their performance during the period of investigation. *Id.* This improvement was expected because boxed mattress imports from China decreased dramatically in the wake of an antidumping order, and the domestic industry invested in increasing boxed mattress production capacity. *Id.* at 69–72, J.A. at 124,111–14. However, the Commission found that, but for the subject imports "displac[ing] domestic industry shipments . . . and

depress[ing] domestic like product prices to a significant degree," domestic boxed mattress producers would have improved their performance even more. *Id.* at 70, J.A. at 124,112.

In particular, the Commission pointed to domestic manufacturers' excess production capacity at a time when the market for boxed mattresses grew. *Id.* at 70–71, J.A. at 124,112–113. Capacity utilization "remained low over the [period of investigation]" and decreased from 2019 to 2020. *Id.* at 70, J.A. at 124,112. Although domestic producers of boxed mattresses grew their share of U.S. mattress consumption, importers saw their share of the market grow more — even as domestic producers had unused capacity. *Id.* at 71, J.A. at 124,113.

The Commission concluded that low-priced imports caused this excess domestic manufacturing capacity. *Id.* at 70–72, J.A. at 124,112–114. It also rejected arguments that factors other than price explained the low utilization of domestic manufacturing plants. *Id.* at 70, n.308, J.A. at 124,112. The Commission found a "moderately high degree of substitutability" between domestically produced mattresses and imports based on reports from domestic producers, importers, and purchasers. *Id.* at 28–29, J.A. at 124,070–71. The majority of responding purchasers said domestic boxed mattresses and imports were similar "in terms of product range, quality, and reliability of supply," undercutting any argument that a deficiency in one of those factors explained imports' advantage. *Id.* at 70, n.308, J.A. at 124,112. The Commission also noted domestic producers' low rate of

warranty claims, indicating the quality of their products. *Id.* These findings undermine the argument that low quality, and not subject imports, led to low capacity utilization. *Compare* Pl.'s Supp. Br. at 9, ECF No. 84 ("[T]he Commission merely assumes that the cause of the unused capacity was subject imports, and not some other cause such as . . . an inability to produce [boxed mattresses] to the same standard as importing producers."), *with* Final Determination at 70, n.308, J.A. at 124,112, ECF No. 66 (finding that "[n]on-price differences cannot explain the . . . low rates of capacity utilization because a majority of responding purchasers reported that domestically produced mattresses were comparable to subject imports in . . . quality" and "domestic producers of [boxed mattresses] experienced low warranty return rates").

When comparing the use of available manufacturing capacity between flat-packed mattress manufacturers and boxed mattress manufacturers, the Commission determined that boxed mattress manufacturers had more unused manufacturing capacity. Final Determination at 70, n.308, J.A. at 124,112, ECF No. 66. This discredits raw material shortages as a cause of the low utilization because flat-packed and boxed mattresses use similar inputs so that any raw material shortage should have affected both similarly. *Compare* Pl.'s Supp. Br. at 9, ECF No. 84 ("[T]he Commission merely assumes that the cause of the unused capacity was subject imports, and not some other cause such as raw material shortages[.]"), *with* Final Determination at 70, n.308, J.A. at 124,112, ECF No. 66

("While we recognize that the domestic [boxed mattress] producers' reduced rate of capacity utilization in interim 2020 partly reflects raw material shortages, their capacity utilization rates remained low . . . relative to domestic [flat-packed mattress] producers . . . and there is no evidence that [boxed mattress] producers were incapable of utilizing more of their reported capacity[.]").  It also undercuts CVB's argument that examining domestic boxed mattress manufacturers separately would lead to a determination of no injury.  *See* Pl.'s Supp. Br. at 1–2, ECF No. 84. At least for capacity utilization, treating domestic boxed mattress producers separately hurts rather than helps CVB.

Plaintiff points to prior decisions of this Court affirming Commission determinations of no injury where the domestic industry grew during the period of investigation and suggests the same result should apply here.  *See* Pl.'s Supp. Br. at 7–8, ECF No. 84.  Not so.  That the Commission could have come to a different conclusion does not mean its conclusion here was unsupported by substantial evidence.  *See Vermont Yankee*, 435 U.S. at 558 (administrative review is supposed to "insure a fully informed and well-considered decision, not necessarily a decision the judge[] . . . would have reached").  The standard of review the Court must apply is determinative.  As the Supreme Court has explained, "[T]he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence." *Consolo v. Fed. Maritime Comm'n*, 383 U.S. 607, 620 (1966).  Further, the law

prohibits the Commission from finding that there is no material injury to an industry "merely because . . . the performance of that industry has recently improved." 19 U.S.C. § 1677(7)(J). The Commission can find injury to the domestic industry even when the domestic industry's performance improved by some metrics over the course of the period of investigation. *See, e.g., OCTAL Inc. v. United States*, 539 F. Supp. 3d 1291, 1311–13 (CIT 2021) (affirming the Commission's finding of injury despite an increase in profit for the domestic industry during the period of investigation when other factors, including capacity utilization, suggest injury). Indeed, § 1677(7)(C)(iii) directs the Commission to evaluate "all relevant economic factors" when conducting its impact analysis, including "actual and potential negative effects on. . . growth[.]" The statute allows the Commission to consider whether the domestic industry grew less than it otherwise would have. *Cf.* 19 U.S.C. § 1677(7)(J) ("The Commission may not determine that there is no material injury or threat of material injury to an industry in the United States merely because that industry is profitable or because the performance of that industry has recently improved.").

For sixty-nine pages, the Commission dodges and ducks to avoid separately addressing domestic boxed mattress producers as CVB argued it should. The Commission buried important information and engaged in statistical chicanery. *See* Oral Arg. Tr. at 29:7–14, ECF No. 75 (describing the Commission's actions as "mathematical legerdemain"). The Commission persisted with its strategy even

after oral argument. *See* Def.'s Supp. Br. at 4–5, n.6, ECF No. 79 (only acknowledging in a footnote that the Commission's disparate treatment of companies that merged during the period of investigation resulted in a threefold increase in the percentage of domestic mattresses produced by companies making both flat-packed and boxed mattresses); *see also* Pl.'s Supp. Br. at 3–4, ECF No. 84. None of this was necessary. In the final section of its Views, the Commission addressed CVB's argument and reached the same ultimate finding of injury in a manner that satisfies the substantial evidence standard. Rather than attempting to paint a perfect picture, the Commission could have addressed CVB's arguments directly from the beginning. Instead, the Commission prevails only because of the final section of its Views and the harmless error principle. Candor should be option one, not the last resort.

### C. The Commission Was Not Required to Conduct a Formal Market Segmentation Analysis

In a final argument, CVB says that the Commission needed to conduct a "proper market segmentation analysis" to satisfy its statutory obligation to "evaluate all relevant economic factors described in this clause within the context of the business cycle and conditions of competition that are distinctive to the affected industry." Pl.'s Supp. Br. at 5, ECF No. 84 (quoting 19 U.S.C. § 1677(7)(C)(iii)). CVB acknowledges the many cases holding the Commission need not conduct a formal market segmentation analysis but nonetheless argues that such an analysis was necessary here. *See id.*; Def.'s Supp. Br. at 6–7, ECF No. 79 (listing cases).

Courts will defer to the Commission's methodology when it is reasonable, even if a plaintiff presents a reasonable alternative. *JMC Steel Grp. v. United States*, 39 CIT 649, 657 (2015) ("It is not enough for Plaintiffs simply to proffer an alternate methodology to that relied upon by the agency, even if that alternate methodology is reasonable and not inconsistent with the statute."). Because the Commission reasonably found that subject imports injured the domestic industry, the Commission satisfied its statutory obligations. *See supra* Section II-B.

Absent a statutory command, this Court cannot force a specific methodology onto the Commission. *See Vermont Yankee*, 435 U.S. at 546–47 (instructing courts not to mandate procedures beyond those explicitly required by Congress); *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 100 (2015) (citing *Vermont Yankee* and abrogating a doctrine that "imposes on agencies an obligation beyond" the Administrative Procedure Act's requirements); *U.S. Steel Grp.*, 96 F.3d at 1362 ("This court has no independent authority to tell the Commission how to do its job. We can only direct the Commission to follow the dictates of its statutory mandate. So long as the Commission's analysis does not violate any statute and is not otherwise arbitrary and capricious, the Commission may perform its duties in the way it believes most suitable."). Instead, the Court asks whether the Commission's methodology complied with the relevant statutes and finds substantial evidentiary support. *See U.S. Steel Grp.*, 96 F.3d at 1362. Here, it did.

No statute requires the Commission to conduct a market segmentation analysis. The Commission cites many cases holding that it was not obligated to conduct a market segmentation analysis. *See* Def.'s Supp. Br. at 6–7 (listing cases); *see also Full Member Subgroup of Am. Inst. of Steel Constr., LLC v. United States*, 547 F. Supp. 3d 1211, 1233 (CIT 2021) ("[T]he Commission was not required to analyze the impact of subject imports on different segments of the domestic industry."), *aff'd*, No. 2022-1176, 2023 WL 5761126 (Fed. Cir. Sept. 7, 2023); *ITG Voma Corp. v. United States Int'l Trade Comm'n*, 253 F. Supp. 3d 1339, 1354 (CIT 2017) (rejecting an argument that the Commission was required to engage in a market segmentation analysis because "the law imposes no such requirement"), *aff'd*, 753 F. App'x 913 (Fed. Cir. 2019). CVB meanwhile cites no caselaw to support its stance. The statute instructs the Commission to "evaluate all relevant economic factors described in this clause within the context of the business cycle and conditions of competition that are distinctive to the affected industry." 19 U.S.C. § 1677(7)(C)(iii). This general instruction does not obligate the Commission to use any specific methodology. *See United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union, AFL-CIO, CLC v. United States*, 348 F. Supp. 3d 1328, 1333 (CIT 2018) ("The statute does not provide further guidance, giving the Commission discretion to assess the conditions of competition in a particular industry."). Finding no support in caselaw or statutory text, the Court finds the Commission was not required to conduct a formal market segmentation

analysis.  The final section of its Views addressed imports' effects on the domestic boxed mattress market segment separately and that suffices.

## CONCLUSION

The Commission's determinations are reviewed under the substantial evidence standard.  19 U.S.C. § 1516a(b)(1)(B)(i).  Here, the Commission's errors were needless but ultimately harmless.  When the Commission stopped trying to dodge the issue and instead directly addressed harm to domestic boxed mattress manufacturers, it made the necessary findings to have its decision supported by substantial evidence.  It is on this basis that the Commission's final affirmative injury determination is **SUSTAINED**, and Plaintiff's Motion for Judgment on the Agency Record is respectfully **DENIED**.

                                        /s/      Stephen Alexander Vaden
                                                        Judge

Dated: December 19, 2023
            New York, New York